

FILED _____ _____ ENTERED
_____ LODGER _____ RECEIVED

C11-1245 MJP

27 2011

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON   DEPUTY

# Exhibit



FILED _____ _____ ENTERED
_____ LODGER _____ RECEIVED

27 2011

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON   DEPUTY



# A



**11-CV-01245-EXH**

3011430703



ORIGINAL DEED

Return To:

WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Assessor's Parcel or Account Number: 27042100408100
Abbreviated Legal Description: PORTION SOUTHEAST QUARTER 21-27-4

[Include lot, block and plat or section, township and range] Full legal description located on page 3
Trustee: CHICAGO TITLE INSURANCE CO

ZWA1
M28

[Space Above This Line For Recording Data]

CHICAGO
CTS425078

# DEED OF TRUST

3011430703-048

INSURED BY
CHICAGO TITLE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 05, 2007 together with all Riders to this document.

(B) "Borrower" is BRYAN D MIZE A SINGLE PERSON

Borrower is the trustor under this Security Instrument.

(C) "Lender" is WASHINGTON MUTUAL BANK, FA

WASHINGTON-Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3048 1/01

-6(WA) (0012)
Page 1 of 15          Initials:
VMP MORTGAGE FORMS - (800)521-7291

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA
Lender's address is 2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CHICAGO TITLE INSURANCE CO

(E) "Note" means the promissory note signed by Borrower and dated JANUARY 05, 2007
The Note states that Borrower owes Lender THREE HUNDRED TWENTY THOUSAND AND 00/100
Dollars
(U.S. $ 320,000.00 ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than FEBRUARY 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                          of   SNOHOMISH                          :

     [Type of Recording Jurisdiction]                          [Name of Recording Jurisdiction]

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
AND IS MADE A PART HEREOF.

Parcel ID Number: 27042100408100                          which currently has the address of
20908 48TH AVE W                          [Street]
LYNNWOOD                          [City], Washington  98036       [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. *Application of Payments or Proceeds.* Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. *Funds for Escrow Items.* Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

(Signature page)

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Signature page

Initials: BB

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was

*Signature page*

Initials: _BB_

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

*Signature page*

-6(WA) (0012)                 Page 7 of 15                 Initials: _____                 Form 3048 1/01

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Initials: _____

-6(WA) (0012)              Page 7 of 15              Form 3048 1/01

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and

*Signature page*

Initials *[signature]*

-6(WA) (0012)

Page 8 of 15

Form 3048 1/01

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and

Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

Signature page

-6(WA)  (0012)                          Page 9 of 15        Initials          Form 3048 1/01

Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

*Signature page*

-6(WA) (0012)        Page 10 of 15        Initials: _____        Form 3048 1/01

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

Initials: _____

-6(WA)  (0012)                    Page 10 of 15                    Form 3048 1/01

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*signature page*

Initials: _____

-6(WA) (0012)    Page 11 of 15    Form 3048 1/01

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.

*Signature page*          Initials: _____

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.

Initials: _____

-6(WA) (0012)          Page 12 of 15          Form 3048 1/01

Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

signature page

Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

Initials: _____

ZWA2

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. **Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                                                   -Borrower
                                      BRYAN D MIZE

_____     _____ (Seal)
                                                                   -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower

_____ (Seal)      _____ (Seal)
                        -Borrower                                  -Borrower

*Signature page*

ZWA2

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. **Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____       _____ (Seal)
                                                                    -Borrower
                                        BRYAN D MIZE

_____       _____ (Seal)
                                                                    -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                                     -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                                     -Borrower

_____ (Seal)   _____ (Seal)
                       -Borrower                                     -Borrower

STATE OF WASHINGTON
County of     SNOHOMISH                                      } ss:

On this day personally appeared before me   BRYAN D MIZE

to me known to be the individual(s) described in and who executed the within and foregoing instrument, and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned.

GIVEN under my hand and official seal this   8th   day of   January , 2007.

Notary Public in and for the State of Washington, residing at
Lake Stevens

My Appointment Expires on   07-09-08

-6(WA)  (0012)                        Page 15 of 15

Initials: _____

Form 3048 1/01

# Exhibit

# B

28US
M28





3011430703-048

# ADJUSTABLE RATE NOTE

(One-Year LIBOR Index (*As Published In The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JANUARY 05, 2007                     EVERETT,                              WASHINGTON
    [Date]                                      [City]                                      [State]

  20908 48TH AVE W, LYNNWOOD, WA 98036
                     [Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   320,000.00   (this amount is called "Principal"), plus interest, to the order of Lender. Lender is   WASHINGTON MUTUAL BANK, FA

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.000   %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**

(A) Time and Place of Payments

I will make a payment on the first day of every month, beginning on   MARCH 01, 2007   . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   FEBRUARY 01, 2037   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   P.O. BOX 78148 PHOENIX, AZ 85062-8148

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $   1,600.00   before the First Principal and Interest Payment Due Date. and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of FEBRUARY 01, 2012 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 50/100 percentage points ( 2.500 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.000 % or less than 2.500 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.000 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

W170NMU (0407)                                      Page 2 of 5                                      Initials:

6.   LOAN CHARGES
   If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

7.   BORROWER'S FAILURE TO PAY AS REQUIRED
   (A) Late Charges for Overdue Payments
   If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000      % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.
   (B) Default
   If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
   (C) Notice of Default
   If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.
   (D) No Waiver By Note Holder
   Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
   (E) Payment of Note Holder's Costs and Expenses
   If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

8.   GIVING OF NOTICES
   Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
   Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE
   If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

10.  WAIVERS
   I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
BRYAN D MIZE                     -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                                 -Borrower                                        -Borrower

Pay to the order of
Without Recourse
WASHINGTON MUTUAL BANK, FA (Sign Original Only)
By _____
CHI TRAN, ??EY
VICE PRESIDENT

W170NMU (0407)                    Page 5 of 5

# Exhibit C

Branch :FAH,User :KELL                    Comment:                                    Station Id :IGKZ

ELECTRONICALLY RECORDED                 201105040102.001
201105040102                 4
05/04/2011 09:14 AM          65.00
SNOHOMISH COUNTY, WASHINGTON

After Recording, Return to:
Vonnie McElligott
Northwest Trustee Services, INC.
P.O. Box 997
Bellevue, WA 98009-0997

201105040102

File No.:      7763.26470
Grantors:     Northwest Trustee Services, Inc.
              JPMorgan Chase Bank, N.A. successor in interest to Washington Mutual Bank
              fka Washington Mutual Bank, FA
Grantee:      Bryan D. Mize, as his separate estate
Ref to DOT Auditor File No.: 200701160657
Tax Parcel ID No.: 270421-004-081-00
Abbreviated Legal: Lot 1 S/P 200505065042

**Notice of Trustee's Sale**
Pursuant to the Revised Code of Washington 61.24, et seq.

I.

On **August 5, 2011**, at **10:00 a.m**. On the steps in front of the north entrance to the Snohomish County
Courthouse, 3000 Rockefeller Ave. in the City of Everett, State of Washington, the undersigned
Trustee (subject to any conditions imposed by the Trustee) will sell at public auction to the highest
and best bidder, payable at time of sale, the following described real property "Property", *situated in*
the County(ies) of Snohomish, State of Washington:

> Lot 1, City of Lynnwood Short Plat recorded under Auditor's File Number 200505065042,
> being a portion of the Southeast Quarter of Section 21, Township 27 North, Range 4 East,
> W.M. Situate in the County of Snohomish, State of Washington.

Commonly known as:   20908 48th Avenue West
                     Lynnwood, WA  98036

which is subject to that certain Deed of Trust dated 01/05/07, recorded on 01/16/07, under Auditor's
File No. 200701160657, records of Snohomish County, Washington, from Bryan D. Mize a single
person, as Grantor, to Chicago Title Insurance Co., as Trustee, to secure an obligation "Obligation" in
favor of Washington Mutual Bank, FA, as Beneficiary.

*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording statutes and
are not intended to supplement, amend or supersede the Property's full legal description provided herein.

II.

No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the Obligation in any Court by reason of the Grantor's or Borrower's default on the Obligation.

III.

The Beneficiary alleges default of the Deed of Trust for failure to pay the following amounts now in arrears and/or other defaults:

|  |  | Amount due to reinstate by 04/29/2011 |
|---|---|---|
| Monthly Payments |  | $42,890.32 |
| Late Charges |  | $1,758.02 |
| Lender's Fees & Costs |  | $3,400.53 |
| Total Arrearage | $48,048.87 |  |
| Trustee's Expenses (Itemization) |  |  |
| Trustee's Fee |  | $508.00 |
| Title Report |  | $0.00 |
| Statutory Mailings |  | $189.00 |
| Recording Costs |  | $129.00 |
| Postings |  | $75.00 |
| Sale Costs |  | $0.00 |
| Total Costs | $901.00 |  |
| Total Amount Due: |  | $48,949.87 |

Other known defaults as follows:

IV.

The sum owing on the Obligation is:  Principal Balance of $319,651.74, together with interest as provided in the note or other instrument evidencing the Obligation from 06/01/09, and such other costs and fees as are due under the Obligation, and as are provided by statute.

V.

The Property will be sold to satisfy the expense of sale and the Obligation as provided by statute.  The sale will be made without representation or warranty, express or implied regarding title, possession, encumbrances or condition of the Property on August 5, 2011.  The default(s) referred to in paragraph III, together with any subsequent payments, late charges, advances costs and fees thereafter due, must be cured by 07/25/11 (11 days before the sale date), to cause a discontinuance of the sale.  The sale will be discontinued and terminated if at any time before the close of the Trustee's business on 07/25/11 (11 days before the sale date), the default(s) as set forth in paragraph III, together with any subsequent payments, late charges, advances, costs and fees thereafter due, is/are cured and the Trustee's fees and costs are paid.  The sale may be terminated any time after 07/25/11 (11 days before the sale date), and before the sale by the Borrower, Grantor, any Guarantor or the holder of any recorded junior lien or encumbrance paying the entire balance of principal and interest secured by the Deed of Trust, plus costs, fees, and advances, if any made pursuant to the terms of the obligation and/or Deed of Trust.

owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW.  For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference.  You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com.**

EFFECTIVE: 04/29/2011                              **Northwest Trustee Services, Inc., Trustee**

                                                  **By** *[signature]*
                                                  **Authorized Signature**
                                                  **P.O. BOX 997**
                                                  **Bellevue, WA 98009-0997**
                                                  **Contact:  Vonnie McElligott**
                                                  **(425) 586-1900**

STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF KING               )

I certify that I know or have satisfactory evidence that _Vonnie McElligott_ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the *Assistant Vice President* of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _[handwritten]_

> HEATHER E. CASEY
> STATE OF WASHINGTON
> NOTARY PUBLIC
> MY COMMISSION EXPIRES
> 04-22-14

                              *[signature]*
                              NOTARY PUBLIC in and for the State of
                              Washington, residing at _____
                              My commission expires _____

**NORTHWEST TRUSTEE SERVICES, INC., SUCCESSOR BY MERGER TO NORTHWEST TRUSTEE SERVICES PLLC FKA NORTHWEST TRUSTEE SERVICES, LLC, P.O. BOX 997,         BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997**

**File No:** 7763.26470
**Client:** JPMorgan Chase Bank, National Association
**Borrower:** MIZE, BRYAN D.

**SERVING WA, OR, ID, CA, NV, AZ, MT HI**

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

# NORTHWEST TRUSTEE SERVICES, INC.

PO BOX 997
BELLEVUE, WA 98009
TELEPHONE (425) 586-1900 ◆ FACSIMILE (425) 586-1997

## April 29, 2011

Resident
**20908 48th Avenue West**
**Lynnwood, WA  98036**

Attention: Resident of property subject to foreclosure sale

## NOTICE TO TENANTS

The foreclosure process has begun on this property, which may affect your right to continue to live in this property.  Ninety days or more after the date of this notice, this property may be sold at foreclosure.  *If you are renting this property*, the new property owner may either give you a new rental agreement or provide you with a sixty-day (possibly longer if new federal laws apply) notice to vacate the property.  You may wish to contact a lawyer or your local legal aid or housing counseling agency to discuss any rights that you may have.

7763.26470
MIZE, BRYAN D.

# Exhibit

# D

# Notice of Default

**To:**

Bryan D. Mize
20908 48th Avenue West
Lynnwood, WA  98036

Bryan D. Mize
4619 136th Place Southwest
Edmonds, WA  98026

Bryan D. Mize
5622 202nd Street Southwest
Lynnwood, WA  98036

Bryan D. Mize
22518 95th Place West
Edmonds, WA  98020

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
20908 48th Avenue West
Lynnwood, WA  98036

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
4619 136th Place Southwest
Edmonds, WA  98026

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
5622 202nd Street Southwest
Lynnwood, WA  98036

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
22518 95th Place West
Edmonds, WA  98020

Regarding the real property ⬚Property⬚located at:

**Property Address:**
20908 48th Avenue West
Lynnwood, WA  98036

**If you are the owner of this property and you occupy it as your residence, you should take care to protect your interest in your home. This notice of default (your failure to pay or otherwise perform) is the first step in a process that could result in you losing your home. You should carefully review your options. For example:**

**Can you pay and stop the foreclosure process?**
**Do you dispute the failure to pay?**
**Can you sell your property to preserve your equity?**
**Are you able to refinance this loan or obligation with a new loan or obligation from another lender with payments, terms, and fees that are more affordable?**
**Do you qualify for any government or private homeowner assistance programs?**
**Do you know if filing for bankruptcy is an option? What are the pros and cons of doing so?**

**Do not ignore this notice; because if you do nothing, you could lose your home at a foreclosure sale. (No foreclosure sale can be held any sooner than ninety days after a notice of sale is issued and a notice of sale cannot be issued until thirty days after this notice.) Also, if you do nothing to pay what you owe, be careful of people who claim they can help you. There are many individuals and businesses that watch for the notices of sale in order to unfairly profit as a result of borrowers' distress.**

**You may feel you need help understanding what to do. There are a number of professional resources available, including home loan counselors and attorneys, who may assist you. Many legal services are lower-cost or even free, depending on your ability to pay. If you desire legal help in understanding your options or handling this default, you may obtain a referral (at no charge) by contacting the county bar association in the county where your home is located. These legal referral services also provide information about lower-cost or free legal services for those who qualify.  You may contact the**

Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals.

**A) Property description:**

      Lot 1, City of Lynnwood Short Plat recorded under Auditor's File Number 200505065042, being a portion of the Southeast Quarter of Section 21, Township 27 North, Range 4 East, W.M. Situate in the County of Snohomish, State of Washington.

**B) Deed of Trust information:** Snohomish County Auditor[s File No.: 200701160657;  Recording Date:  01/16/07

**C) Declaration of payment default:** The beneficiary declares you in default for failing to make payments as required by your note and deed of trust.

**D) Itemized account of the arrears:**

| | |
|---|---:|
| Delinquent monthly payments beginning with the 07/01/09 installment. | $17,546.04 |
| Late charges: | $719.19 |
| Lender[s Fees and Costs | $217.65 |
| Trustee[s fees | $435.00 |
| Costs | |
|     Title report (estimate) | $1,113.62 |
|     Recording | $0.00 |
|     Certified mail | $56.00 |
|     Posting | $70.00 |
|     Sale Costs | $0.00 |
| **Total arrears and costs due today** | **$20,157.50** |

**E) Itemized account of all other specific charges, costs or fees that grantor or borrower is or may be obliged to pay to reinstate the deed of trust before the recording of the notice of sale.**

| | |
|---|---:|
| Additional monthly payment | $1,949.56 |
| Additional late charge | $79.91 |

**F) <u>Amount required to cure payment defaults before notice of sale recorded:</u> $22,186.97**
In addition, grantor or borrower must timely cure all other defaults before the note and deed of trust are deemed reinstated.

*Payments and late charges continue to accrue and additional advances may be made. <u>The sums stated above are estimates only</u>. Before attempting to reinstate the loan, call us at 425-586-1900 to learn the exact amounts of monetary defaults and actions required to cure possible other defaults.*

**G) Effect of failure to cure:** Failure to cure all alleged defaults within 30 days of mailing/personal service of this notice may lead to recordation, transmittal and publication of a notice of sale and the Property may be sold at public auction no less than 120 days from the date of this notice.

**H) Effect of recording, transmitting and publication of the notice of sale:** The effect of the recordation, transmittal and publication of the notice of sale will be to (i) increase the costs and fees and (ii) publicize the default and advertise the Property for sale.

**I) Effect of sale of the Property:** The Trustee[s sale of the Property will deprive the borrower, grantor and any successor in interest of all their interest in the Property.

**J) Recourse to courts:** The borrower, grantor, any guarantor or any successor in interest has recourse to the courts pursuant to RCW 61.24.130 to contest the default(s) on any proper ground.

**𝔎) Contact Information for Beneficiary (Note Owner) and Loan Servicer.**

The beneficiary of the deed of trust is **JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (the "Savings Bank") successor to Washington Mutual Home Loans, Inc. fka PNC Mortgage Corporation of America from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d).,** whose address and telephone number are:

 7255 Baymeadows Way
Jacksonville, FL 32256
866-467-8538 #5

The loan servicer for this loan is JP Morgan Chase Bank, National Association, whose address and telephone number are:

7255 Baymeadows Way
Jacksonville, FL  32256
866-467-8538 #5

**L) Notice pursuant to the Federal Fair Debt Collection Practices Act:** If you are the consumer who originally contracted the debt or if you assumed the debt, then you are notified that:

1. As of the date of this notice you owe $336,809.25. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check. For further information, write to the address provided in Section 5 below or call us at 425-586-1900.
2. The creditor to whom the debt is owed JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (the "Savings Bank") successor to Washington Mutual Home Loans, Inc. fka PNC Mortgage Corporation of America from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d)./JP Morgan Chase Bank, National Association.
3. Unless within 30 days after receipt of this notice you dispute the debt or any portion of it, we will assume the debt to be valid.
4. If you notify us in writing within 30 days after receipt of this notice that you dispute the debt or any part of it, we will request that the creditor obtain verification of the debt and mail it to you.
5. If you request in writing within 30 days after receipt of this notice, we will request that the creditor provide you with the name and address of the original creditor, if different from the current creditor.
6. Written requests should be addressed to Northwest Trustee Services, Inc., Post Office Box 997, Bellevue, WA 98009-0997.

**Dated:  March 16, 2010**

JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of Washington Mutual Bank, formerly known as Washington Mutual Bank, FA (the "Savings Bank") successor to Washington Mutual Home Loans, Inc. fka PNC Mortgage Corporation of America from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d).
By Northwest Trustee Services, Inc., its duly authorized agent

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

NORTHWEST TRUSTEE SERVICES, INC.
P.O. BOX 997
BELLEVUE, WA 98009-0997

File No: 7763.26470
Borrower: Mize, Bryan D.
Client: JPMorgan Chase Bank, National Association

VONNIE MCELLIGOTT
425-586-1900
FAX 425-586-1997

**BENEFICIARY DECLARATION PURSUANT TO CHAPTER 61.24 RCW (SB 5810)**
**AND ▯FORECLOSURE▯LOSS MITIGATION FORM**

| Borrower(s): | **BRYAN D MIZE** |
| **Beneficiary:** | |
| **Loan Servicer:** | **JP Morgan Chase Bank NA** |
| **Property:** | **20908 48TH AVE. W., LYNNWOOD WA 98036** |
| **Loan No.:** | **3011430703** |

**The undersigned beneficiary or authorized agent for the beneficiary hereby represents and declares under the penalty of perjury that [check the applicable box and fill in any blanks so that the trustee can insert, on the beneficiary's behalf, the applicable declaration in the notice of default required under chapter 61.24 RCW as specified in SB 5810 (▯this act▯)]: Regarding the above-referenced loan (check applicable box ▯only ONE choice should apply):**

**[X]  (1)_The beneficiary or beneficiary's authorized agent has contacted the borrower under, and has complied with, section 2 of this act (contact provision to "assess the borrower's financial ability *to* pay the debt secured by *the* deed of trust and explore options for the borrower to avoid foreclosure").**

**[ ] (2) The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required in section 2(5) of this act and, after waiting fourteen days after the requirements in section 2 of this act were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required under section 2 of this act.**

**[ ] (3)_The borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee.**

**[ ] (4) Under section 2 of this act, the beneficiary or the beneficiary's authorized agent has verified information that, on or before the date of this declaration, the borrower(s) has filed for bankruptcy, and the bankruptcy stay remains in place, or the borrower has filed for bankruptcy and the bankruptcy court has granted relief from the bankruptcy stay allowing the enforcement of the deed of trust."**

**SB 5810 Does NOT apply because, regarding the above-referenced loan:**

[ ] The deed of trust was made before January 1, 2003 or after December 31, 2007, inclusive; or

[ ] The property is vacant, as evidenced by the return of the keys or communication in writing from the borrower(s); or

[ ] The deed of trust secures a commercial loan; or

[ ] The deed of trust secures obligations of a grantor who is not the borrower or a guarantor; or

[ ] The deed of trust secures a purchaser☐s obligations under a seller-financed sale.


Dated:   03/04/10

(Beneficiary☐s/Authorized Agent☐s signature)

Clement J. Durkin
**Print Name**

# Exhibit

# E

201004070247.001

**ELECTRONICALLY RECORDED**
201004070247                              1
04/07/2010 01:37 PM                   14.00
SNOHOMISH COUNTY, WASHINGTON

After Recording Return to:
Vonnie McElligott
Northwest Trustee Services, Inc.
P.O. Box 997
Bellevue, WA 98009-0997

201004070247

## Appointment of Successor Trustee

File No. 7763.26470

Bryan D. Mize a single person is/are the grantor(s), Chicago Title Insurance Co. is the trustee and Washington Mutual Bank, FA is the beneficiary under that certain deed of trust dated 01/05/07 and recorded on 01/16/07 under Snohomish County, Washington Auditor's File No. 200701160657.

The present beneficiary under said deed of trust appoints Northwest Trustee Services, Inc., a Washington corporation, whose address is P.O. Box 997, Bellevue, WA 98009-0997, as successor trustee under the deed of trust with all powers of the original trustee.

The undersigned present beneficiary warrants and represents that, as of the date this Appointment of Successor Trustee has been executed and acknowledged, it is the holder of the obligation secured by the subject deed of trust and is not holding the same as security for a different obligation.

**JPMorgan Chase Bank, National Association, as purchaser of the loans and other assets of Washington Mutual Bank fka Washington Mutual Bank, FA (the "Savings Bank") from the Federal Deposit Insurance Corporation, acting as receiver for the Savings Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d)**

By _____
      Margaret Dalton
      Vice President

STATE OF _____Florida_____ )
                                              )ss
COUNTY OF _____Duval_____ )

I certify that I know or have satisfactory evidence that _____Margaret Dalton_____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged it as the _____Vice President_____ of _____JPMorgan Chase Bank_____ to be the free and voluntary act of such party for the uses and purposes mentioned in _____National Association_____

Dated: _____APR 02 2010_____

_____
Notary Public in and for the State of _____Florida_____
Residing at _____Jacksonville   Florida_____ _____Duval_____
My appointment expires

[Notary Seal]
D. PEKUSIC
Notary Public - State of Florida
My Comm. Expires Jul 7, 2013
Commission # DD 905364

# Exhibit

# F



# ROUTH CRABTREE OLSEN, P.S.

*A Law Firm and Professional Services Corporation*
3535 Factoria Blvd. SE, Suite 200
Bellevue, WA 98006
Telephone (425) 458-2121 ◆ Facsimile (425) 283-0938
www.rcolegal.com

THIS OFFICE IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. THE FOLLOWING LETTER IS A DISCUSSION OF ALTERNATIVES TO FORECLOSURE. IT IS OUR UNDERSTANDING THAT YOU ARE NOT CURRENTLY IN BANKRUPTCY. IF YOU ARE IN BANKRUPTCY, THEN PLEASE DISREGARD THIS LETTER IN ITS ENTIRETY AND HAVE YOUR ATTORNEY CONTACT OUR OFFICE AS SOON AS POSSIBLE.

Mar 16, 2010

Re:  Property:  20908 48th Avenue West, Lynnwood, WA 98036
     Loan No.:  3011430703
     Our File No.: 7763.26470

Dear Homeowner:

Please be advised that **Routh Crabtree Olsen, P.S.** is working with JP Morgan Chase Bank, National Association to help you keep your home. We represent your mortgage company and have received notice to commence foreclosure proceedings against your property. It is JP Morgan Chase Bank, National Association's mission to attempt to work out a solution to your loan situation, and they have asked us to open a line of communication with you.

## WE WANT YOU TO BE ABLE TO KEEP YOUR HOME!

You may be eligible for certain opportunities that will help you stay in your home. You may have had an unexpected expense or a circumstance beyond your control that has forced you to miss some mortgage payments. JP Morgan Chase Bank, National Association would like to discuss your situation with you to determine what you can do to bring your loan current.

These alternatives are voluntary and could include:

- **Forbearance Plan:** An agreement to temporarily let you pay less than the full amount of your mortgage payment, or pay nothing at all, during the forbearance period. Your lender may consider a forbearance when you can show that funds from a bonus, tax refund, or other source of future income will let you bring the mortgage current or qualify you for a repayment plan or loan modification at the end of the forbearance period.
- **Reinstatement of Your Loan:** You would pay the total amount past due in one lump sum by a specified date.
- **Repayment Plan:** An agreement that gives you a fixed amount of time to repay the amount you are behind by combining a portion of what is past due with your regular mortgage payment. At the end of the repayment period you will have gradually paid back the amount of your mortgage that was delinquent.

- **Modification:** This is a written agreement between you and the lender that permanently changes the terms of the loan that in some instances may make your payments more affordable. Common loan modifications include:
  1. **Adding missed payments to your existing loan balance**
  2. **Making an adjustable-rate mortgage into a fixed-rate mortgage**
  3. **Extending the number of years you have to pay to a longer term**

## WHAT IF YOU CAN NO LONGER AFFORD TO KEEP YOUR HOME?

If you cannot or do not want to keep your home, your lender can work with you to avoid foreclosure. This can help reduce the negative effect on your credit reputation. There are several different ways this might occur depending on your financial circumstances:

- **Deed in Lieu of Foreclosure:** Under certain circumstances, you would voluntarily transfer ownership of your property to the lender in exchange for cancellation of your mortgage debt. In most cases, you must attempt to sell your home for its fair market value for at least 90 days. You would be given a specific period of time to relocate. This option may not be available to you if there are other liens or judgments on your home.
- **Short Payoff:** If you can sell your house but the sales proceeds are less than the total amount you owe on your mortgage, your lender may agree to a short payoff and write off the portion of your mortgage that exceeds the net proceeds from the sale.
- **Assumption of Your Loan:** This option permits a qualified buyer to take over your mortgage debt and pay the payments, even if the mortgage is non-assumable.

## <u>HOW DO YOU TAKE ADVANTAGE OF THESE ALTERNATIVES?</u>

Complete the enclosed two-page financial form and return it in the enclosed self-addressed envelope. Time is of the essence; this information will enable us to determine what option is best suited to keep your account from being foreclosed upon. Please return the requested information via fax at (425) 283-0938, or mail to:

Routh Crabtree Olsen, P.S.
Attention:  Antoinette Bartlein
P.O. Box 4143
Bellevue, WA 98009-4143

**<u>Please note that the foreclosure action will continue whether or not the form is completed and returned. The foreclosure action will continue unless your lender determines that you are eligible for one of these alternatives and an agreement is signed. You also have the right and should seek the advice of an attorney.</u>**

We hope that you will complete the enclosed forms so that we can work with you to consider alternatives to the pending foreclosure of your property.

Sincerely,
**ROUTH CRABTREE OLSEN, P.S.**

Form 1126

**Borrower Financial Information**

Freddie Mac Loan Number 417138164

| BORROWER | CO-BORROWER |
|---|---|
| BORROWER'S NAME | CO-BORROWER'S NAME |

| SOCIAL SECURITY NUMBER | DATE OF BIRTH | SOCIAL SECURITY NUMBER | DATE OF BIRTH |
|---|---|---|---|

| HOME PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) | HOME PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) |
|---|---|
| WORK PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) | WORK PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) |
| CELL PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) | CELL PHONE NUMBER WITH AREA CODE   (BEST TIME TO CALL) |

MAILING ADDRESS

PROPERTY ADDRESS (IF SAME AS MAILING ADDRESS, JUST WRITE SAME)          EMAIL ADDRESS

| Number of Dependants: | Do you occupy the property? Yes      No | Is it rental property? Yes      No     Is it leased?   Yes      No<br>If you have a lease agreement, please provide a copy. |
|---|---|---|

Is the property listed for sale?   Yes          No
If yes, please provide a copy of the listing agreement.
Agent's Name:
Agent's Phone Number:
Agent's Email:

Have you contacted a credit-counseling agency for help?   Yes          No
If yes, please complete counselor contact information below.
Counselor's Name:
Counselor's Phone Number:
Counselor's Email:

Do you receive, and pay, the Real Estate Tax bill on your home or does your lender pay it for you?   I do      Lender does
Are the taxes current?   Yes      No
If you pay it, please provide a copy of your tax statement.

Do you pay for a hazard insurance policy?   Yes      No
Is the policy current?   Yes      No
If you pay it, please provide a copy of the policy.

Have you filed for bankruptcy?   Yes      No      If yes: Chapter 7      Chapter 13      Filing Date:_____
Has your bankruptcy been discharged?   Yes      No      If yes, please provide a copy of the discharge order signed by the court.

### INVOLUNTARY INABILITY TO PAY

I (We), _____, am/are requesting that the Federal Home Loan Mortgage Corporation (Freddie Mac) review my/our financial situation to determine if I/we qualify for a workout option.

I am having difficulty making my monthly payment because of financial difficulties created by *(Please check all that apply)*:

| | | |
|---|---|---|
| Abandonment of Property | Excessive Obligations | Military Service          Other |
| Business Failure | Fraud | Payment Adjustment |
| Casualty Loss | Illness in Family | Payment Dispute |
| Curtailment of Income | Illness of Mortgagor | Property Problems |
| Death in Family | Inability to Rent Property | Title Problems |
| Death of Mortgagor | Incarceration | Transferring Property |
| Distant Employment Transfer | Marital Difficulties | Unemployment |

I believe that my situation is:          Short term (under 6 months)          Long term (over 6 months)          Permanent
I want to:          Keep the Property          Sell the Property

### *Please provide a detailed explanation of the hardship on a separate sheet of paper.*

If there are additional Liens/Mortgages or Judgments on this property, please name the person(s), company or firm and their respective telephone numbers.

| | $ | |
|---|---|---|
| Lien Holder's Name | Balance / Interest Rate | Phone Number (WITH AREA CODE) |
| | $ | |
| Lien Holder's Name | Balance / Interest Rate | Phone Number (WITH AREA CODE) |

*Before mailing, make sure you have signed and dated the form and attached appropriate documentation.*

## EMPLOYMENT

| BORROWER- EMPLOYER'S ADDRESS & PHONE # | HOW LONG? | CO-BORROWER- EMPLOYER'S ADDRESS & PHONE # | HOW LONG? |
|---|---|---|---|
| | | | |

| Monthly Income - Borrower | | Monthly Income - Co-Borrower | |
|---|---|---|---|
| Gross Wages / Frequency of Pay | $ | Gross Wages / Frequency of Pay | $ |
| Unemployment Income | $ | Unemployment Income | $ |
| Child Support / Alimony* | $ | Child Support / Alimony* | $ |
| Disability Income/ SSI | $ | Disability Income/ SSI | $ |
| Rents Received | $ | Rents Received | $ |
| Other | $ | Other | $ |
| Less: Federal and State Tax, FICA | $ | Less: Federal and State Tax, FICA | $ |
| Less: Other Deductions (401K, etc.) | $ | Less: Other Deductions (401K, etc.) | $ |
| Commissions, bonus and self-employed income | $ | Commissions, bonus and self-employed income | $ |

***** ALL INCOME NEEDS TO BE DOCUMENTED *****
**Pay stub must be most recent date with year to date information.**

| | | Total (Net income) | $ |
|---|---|---|---|

| Monthly Expenses | | Assets | | |
|---|---|---|---|---|
| Other Mortgages / Liens | $ | **Type** | | **Estimated Value** |
| Auto Loan(s) | $ | Checking Account(s) | | $ |
| Auto Expenses / Insurance | $ | Saving / Money Market | | $ |
| Credit Cards / Installment Loan(s) (total minimum payment for both per month) | $ | Stocks / Bonds / CDs | | $ |
| Health Insurance (not withheld from pay) | $ | IRA / Keogh Accounts | | $ |
| Medical (Co-pays and Rx) | $ | 401k / ESPO Accounts | | $ |
| Child Care / Support / Alimony | $ | Home | | $ |
| Food / Spending Money | $ | Other Real Estate | # | $ |
| Water / Sewer / Utilities / Phone | $ | Cars | # | $ |
| HOA/Condo Fees/Property Maintenance | $ | Life Insurance (Whole Life not Term) | | $ |
| Life Insurance Payments (not withheld from pay) | $ | Other | | $ |
| **Total** | $ | **Total** | | $ |

\* Alimony, child support or separate maintenance income need not be revealed if the Borrower or Co-borrower does not choose to have it considered for repaying this loan.

I agree as follows:  My lender may discuss, obtain and share information about my mortgage and personal financial situation with third parties such as purchasers, real estate brokers, insurers, financial institutions, creditors and credit bureaus.  Discussions and negotiations of a possible foreclosure alternative will not constitute a waiver of or defense to my lender's right to commence or continue any foreclosure or other collection action, and an alternative to foreclosure will be provided only if an agreement has been approved in writing by my lender.  The information herein is an accurate statement of my financial status. I consent to being contacted concerning my Mortgage at any cellular or mobile telephone number I may have.  This includes text messages and telephone calls to my cellular or mobile telephone.

Submitted this _____ day of _____, 20_____

By _____        By _____
    Signature of Borrower                              Signature of Co-Borrower

*Before mailing, make sure you have signed and dated the form and attached appropriate documentation.*

# Exhibit

# G

# FRAUD DIGEST

## False Credentials

### Margaret Dalton
### JPMorgan Chase Bank

**Action Date:** *September 19, 2010*
**Location:** *Jacksonville, FL*

Margaret Dalton has been employed for several years in the Jacksonville, FL (Duval County) offices of JPMorgan Chase Bank. She signs many different job titles on mortgage-related documents, often using different titles on the same day. She often signed as an officer of MERS ("Mortgage Electronic Registration Systems, Inc.") She often signs as a MERS officer on Mortgage Assignments to assign mortgages TO JPMorgan Chase Bank, without disclosing that she is actually employed BY JPMorgan Chase Bank. Titles attributed to Margaret Dalton include the following: Vice President, Bank of America, N.A. as successor-by-merger to LaSalle Bank, N.A. as trustee for WMALT 2006-AR03 Trust, by JP Morgan Chase Bank, N.A., as attorney-in-fact;

Vice President, Deutsche Bank National Trust Co., as Trustee for Long Beach Mortgage Trust 2006-1, by JP Morgan Chase Bank, N.A., under Limited Power of Attorney;

Vice President, Deutsche Bank National Trust Co., as Trustee for WAMU Mortgage Pass-Through Certificates, Series 2005-AR6 Trust, by JP Morgan Chase Bank, N.A., under Limited Power of Attorney;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Amstar Mortgage Corp.;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for CTX Mortgage Company, LLC;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Everbank;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for First Magnus Financial Corp.;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Homeside Lending, Inc.;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Irwin Mortgage Corporation;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Pinnacle Financial Corp.;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for Transland Financial Services, Inc.;

Vice President, Mortgage Electronic Registration Systems, Inc., acting solely as nominee for UBS AG, Tampa Branch; and

# Exhibit

# H

#2810041160373
4/16/2010

After Recording, Return to:
**Vonnie McElligott**
**Northwest Trustee Services, INC.**
**P.O. Box 997**
**Bellevue, WA 98009-0997**

**File No.:**      **7763.26470**
**Grantors:**     **Northwest Trustee Services, Inc.**
                **JPMorgan Chase Bank, National Association, as purchaser of the loans and**
                **other assets of Washington Mutual Bank fka Washington Mutual Bank, FA (the**
                **"Savings Bank") from the Federal Deposit Insurance Corporation, acting as**
                **receiver for the Savings Bank and pursuant to its authority under the Federal**
                **Deposit Insurance Act, 12 U.S.C. § 1821(d)**
**Grantee:**     **Bryan D. Mize, as his separate estate**
**Tax Parcel ID No.: 270421-004-081-00**
**Abbreviated Legal:  Lot 1 S/P 200505065042**

**Notice of Trustee's Sale**
Pursuant to the Revised Code of Washington 61.24, et seq.

I.

On **July 16, 2010**, at 10:00 a.m. On the steps in front of the north entrance to the Snohomish County
Courthouse, 3000 Rockefeller Ave. in the City of Everett, State of Washington, the undersigned
Trustee (subject to any conditions imposed by the Trustee) will sell at public auction to the highest
and best bidder, payable at time of sale, the following described real property "Property", situated in
the County(ies) of Snohomish, State of Washington:

> Lot 1, City of Lynnwood Short Plat recorded under Auditor's File Number 200505065042, being a portion of the
> Southeast Quarter of Section 21, Township 27 North, Range 4 East, W.M. Situate in the County of Snohomish,
> State of Washington.

>     Commonly known as:      20908 48th Avenue West
>                             Lynnwood, WA 98036

which is subject to that certain Deed of Trust dated 01/05/07, recorded on 01/16/07, under Auditor's
File No. 200701160657, records of Snohomish County, Washington, from Bryan D. Mize a single
person, as Grantor, to Chicago Title Insurance Co., as Trustee, to secure an obligation "Obligation" in
favor of Washington Mutual Bank, FA nka JPMorgan Chase Bank, National Association, as purchaser
of the loans and other assets of Washington Mutual Bank fka Washington Mutual Bank, FA (the
"Savings Bank") from the Federal Deposit Insurance Corporation, acting as receiver for the Savings
Bank and pursuant to its authority under the Federal Deposit Insurance Act, 12 U.S.C. § 1821(d), as
Beneficiary.

\*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording statutes and are not intended to supplement, amend or supersede the Property's full legal description provided herein.

## II.

No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the Obligation in any Court by reason of the Grantor's or Borrower's default on the Obligation.

## III.

The Beneficiary alleges default of the Deed of Trust for failure to pay the following amounts now in arrears and/or other defaults:

|  |  | Amount due to reinstate by 04/16/10 |
|---|---|---|
| Monthly Payments |  | $19,495.60 |
| Late Charges |  | $799.10 |
| Lender's Fees & Costs |  | $217.65 |
| Total Arrearage | $20,512.35 |  |
| Trustee's Expenses (Itemization) |  |  |
| Trustee's Fee |  | $725.00 |
| Title Report |  | $1,113.62 |
| Statutory Mailings |  | $39.12 |
| Recording Costs |  | $14.00 |
| Postings |  | $70.00 |
| Sale Costs |  | $0.00 |
| Total Costs | $1,961.74 |  |
| Total Amount Due: |  | $22,474.09 |

Other known defaults as follows:

## IV.

The sum owing on the Obligation is:  Principal Balance of $319,651.74, together with interest as provided in the note or other instrument evidencing the Obligation from 06/01/09, and such other costs and fees as are due under the Obligation, and as are provided by statute.

## V.

The Property will be sold to satisfy the expense of sale and the Obligation as provided by statute.  The sale will be made without representation or warranty, express or implied regarding title, possession, encumbrances or condition of the Property on July 16, 2010.  The default(s) referred to in paragraph III, together with any subsequent payments, late charges, advances costs and fees thereafter due, must be cured by 07/05/10 (11 days before the sale date), to cause a discontinuance of the sale.  The sale will be discontinued and terminated if at any time before the close of the Trustee's business on 07/05/10 (11 days before the sale date), the default(s) as set forth in paragraph III, together with any

subsequent payments, late charges, advances, costs and fees thereafter due, is/are cured and the Trustee's fees and costs are paid. The sale may be terminated any time after 07/05/10 (11 days before the sale date), and before the sale by the Borrower, Grantor, any Guarantor or the holder of any recorded junior lien or encumbrance paying the entire balance of principal and interest secured by the Deed of Trust, plus costs, fees, and advances, if any made pursuant to the terms of the obligation and/or Deed of Trust.

VI.

A written notice of default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

**NAME AND ADDRESS**

Bryan D. Mize
20908 48th Avenue West
Lynnwood, WA 98036

Bryan D. Mize
5622 202nd Street Southwest
Lynnwood, WA 98036

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
20908 48th Avenue West
Lynnwood, WA 98036

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
5622 202nd Street Southwest
Lynnwood, WA 98036

Bryan D. Mize
4619 136th Place Southwest
Edmonds, WA 98026

Bryan D. Mize
22518 95th Place West
Edmonds, WA 98020

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
4619 136th Place Southwest
Edmonds, WA 98026

Unknown Spouse and/or Domestic Partner
of Bryan D. Mize
22518 95th Place West
Edmonds, WA 98020

by both first class and either certified mail, return receipt requested on 03/16/10, proof of which is in the possession of the Trustee; and on 03/16/10 Grantor and Borrower were personally served with said written notice of default **or** the written notice of default was posted on a conspicuous place on the real property described in paragraph I above, and the Trustee has possession of proof of such service or posting.

VII.

The Trustee, whose name and address are set forth below, will provide in writing to anyone requesting it a statement of all foreclosure costs and trustee's fees due at any time prior to the sale.

VIII.

The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their right, title and interest in the Property.

IX.

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

X.

NOTICE TO OCCUPANTS OR TENANTS - The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the Deed of Trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference. You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com.**

EFFECTIVE: 04/16/10

Northwest Trustee Services, Inc., Trustee

By _____
**Authorized Signature**
**P.O. BOX 997**
**Bellevue, WA 98009-0997**
**Contact: Vonnie McElligott**
**(425) 586-1900**

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF KING )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _____

RHEA S. PRE
STATE OF WASHINGTON
NOTARY — • — PUBLIC
MY COMMISSION EXPIRES 04-22-10

NOTARY PUBLIC in and for the State of
Washington, residing at _____
My commission expires _____

NORTHWEST TRUSTEE SERVICES, INC., SUCCESSOR BY MERGER TO NORTHWEST TRUSTEE SERVICES PLLC FKA NORTHWEST TRUSTEE SERVICES, LLC, P.O. BOX 997,  BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997

File No: 7763.26470
Client: JPMorgan Chase Bank, National Association
Borrower: MIZE, BRYAN D.

SERVING WA, OR, ID, CA, NV, AZ, MT HI

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

# Exhibit

# I

*\# 3281 01 0280205*
*10/28/10*

**After Recording, Return to:**
**Vonnie McElligott**
**Northwest Trustee Services, Inc.**
**P.O. Box 997**
**Bellevue, WA 98009-0997**

**File No.:**      **7763.26470**
**Grantors:**    **Northwest Trustee Services, Inc.**
              **JPMorgan Chase Bank, N.A. successor in interest to Washington Mutual Bank**
              **fka Washington Mutual Bank, FA**
**Grantee:**     **Bryan D. Mize, as his separate estate**
**Ref to DOT Auditor File No.:** 200701160657
**Tax Parcel ID No.:** 270421-004-081-00
**Abbreviated Legal:** Lot 1 S/P 200505065042

**Amended Notice of Trustee's Sale**
Pursuant to the Revised Code of Washington 61.24, et seq.

I.

On **November 29, 2010**, at 10:00 a.m. On the steps in front of the north entrance to the Snohomish
County Courthouse, 3000 Rockefeller Ave. in the City of Everett, State of Washington, the Trustee
(subject to any conditions imposed by the Trustee) will sell at public auction to the highest and best
bidder, payable at time of sale, the following described real property "Property", situated in the
County(ies) of Snohomish, State of Washington:

>      Lot 1, City of Lynnwood Short Plat recorded under Auditor's File Number 200505065042,
>      being a portion of the Southeast Quarter of Section 21, Township 27 North, Range 4 East,
>      W.M. Situate in the County of Snohomish, State of Washington.

>      Commonly known as:   20908 48th Avenue West
>                           Lynnwood, WA  98036

which is subject to that certain Deed of Trust dated 01/05/07 and recorded on 01/16/07, under
Auditor's File No. 200701160657, records of Snohomish County, Washington, from Bryan D. Mize a
single person, as Grantor, to Chicago Title Insurance Co., as Trustee, to secure an obligation
"Obligation" in favor of Washington Mutual Bank, FA, as Beneficiary.

*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording statutes and
are not intended to supplement, amend or supersede the Property's full legal description provided herein.

## II.

No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the Obligation in any Court by reason of the Grantor's or Borrower's default on the Obligation.

## III.

The Beneficiary alleges default of the Deed of Trust for failure to pay the following amounts now in arrears and/or other defaults:

|  |  | Amount due to reinstate by 10/19/2010 |
|---|---|---|
| Monthly Payments |  | $31,192.96 |
| Late Charges |  | $1,278.56 |
| Lender's Fees & Costs |  | $2,697.49 |
| Total Arrearage | $35,169.01 |  |
| Trustee's Expenses (Itemization) |  |  |
| Trustee's Fee |  | $508.00 |
| Title Report |  | $0.00 |
| Statutory Mailings |  | $168.00 |
| Recording Costs |  | $129.00 |
| Postings |  | $70.00 |
| Sale Costs |  | $500.00 |
| Total Costs | $1,375.00 |  |
| **Total Amount Due:** |  | **$36,544.01** |

Other known defaults are as follows:

## IV.

The sum owing on the Obligation is:  Principal Balance of $319,651.74, together with interest as provided in the note or other instrument evidencing the Obligation from 06/01/09, and such other costs and fees as are due under the Obligation, and as are provided by statute.

## V.

The Property will be sold to satisfy the expense of sale and the Obligation as provided by statute.  The sale will be made without representation or warranty, express or implied regarding title, possession, encumbrances or condition of the Property on **November 29, 2010.**  The default(s) referred to in paragraph III, together with any subsequent payments, late charges, advances costs and fees thereafter due, must be cured by 11/18/10 (11 days before the sale date), to cause a discontinuance of the sale.  The sale will be discontinued and terminated if at any time before the close of the Trustee's business on 11/18/10 (11 days before the sale date), the default(s) as set forth in paragraph III, together with any subsequent payments, late charges, advances, costs and fees thereafter due, is/are cured and the Trustee's fees and costs are paid. The sale may be terminated any time after 11/18/10 (11 days before the sale date), and before the sale by the Borrower, Grantor, any Guarantor or the holder of any recorded junior lien or encumbrance paying the entire balance of principal and interest secured by the Deed of Trust, plus costs, fees, and advances, if any made pursuant to the terms of the obligation and/or Deed of Trust.

## VI.

A written notice of default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

#### NAME AND ADDRESS

Bryan David Mize
20908 48th Avenue West
Lynnwood, WA 98036

Bryan David Mize
5622 202nd Street Southwest
Lynnwood, WA 98036

Unknown Spouse and/or Domestic Partner
of Bryan David Mize
20908 48th Avenue West
Lynnwood, WA 98036

Unknown Spouse and/or Domestic Partner
of Bryan David Mize
5622 202nd Street Southwest
Lynnwood, WA 98036

Bryan David Mize
4619 136th Place Southwest
Edmonds, WA 98026

Bryan David Mize
22518 95th Place West
Edmonds, WA 98020

Unknown Spouse and/or Domestic Partner
of Bryan David Mize
4619 136th Place Southwest
Edmonds, WA 98026

Unknown Spouse and/or Domestic Partner
of Bryan David Mize
22518 95th Place West
Edmonds, WA 98020

by both first class and either certified mail, return receipt requested on 03/16/10, proof of which is in the possession of the Trustee; and on 03/16/10 Grantor and Borrower were personally served with said written notice of default **or** the written notice of default was posted on a conspicuous place on the real property described in paragraph I above, and the Trustee has possession of proof of such service or posting.

## VII.

The Trustee whose name and address are set forth below will provide in writing to anyone requesting it a statement of all foreclosure costs and trustee's fees due at any time prior to the sale.

## VIII.

The effect of the sale will be to deprive the Grantor, and all those who hold by, through or under the Grantor, of all their right, title and interest in the Property.

## IX.

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

## X.

NOTICE TO OCCUPANTS OR TENANTS - The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the Deed of Trust (the

owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference. You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com**

EFFECTIVE: 10/19/2010

Northwest Trustee Services, Inc., Trustee

By _____
**Authorized Signature**
**P.O. BOX 997**
**Bellevue, WA 98009-0997**
**Contact: Vonnie McElligott**
**(425) 586-1900**

STATE OF WASHINGTON    )
                        ) ss.
COUNTY OF KING          )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _____

HEATHER E. CASEY
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
04-22-14

NOTARY PUBLIC in and for the State of
Washington, residing at _____
My commission expires _____

**NORTHWEST TRUSTEE SERVICES, INC, P.O. BOX 997,      BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997**

**File No:** 7763.26470
**Client:** JPMorgan Chase Bank, National Association
**Borrower:** MIZE, BRYAN D.

**SERVING WA, OR, ID, AK, CA, NV, AZ, MT, HI**

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

# Exhibit

# J

1

**ROUTH CRABTREE OLSEN, P.S.**
3535 FACTORIA BLVD. SE, SUITE 200
2   BELLEVUE, WA 98006
TELEPHONE   (425) 458-2121
3   FACSIMILE   (425) 458-2131

Honorable Judge Karen A. Overstreet
Hearing Location: Marysville
Hearing Date: August 25, 2010
Hearing Time: 10:30 am
Response Date: August 18, 2010

4

5

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

6   IN RE:                                         **CHAPTER 7 BANKRUPTCY**

7   BRYAN DAVID MIZE AND                           **NO.: 10-16354-KAO**
REBECCA CORWIN MIZE
8                                                  **MOTION FOR RELIEF FROM STAY**
9                              DEBTORS.            **BY JPMORGAN CHASE BANK,**
                                                   **NATIONAL ASSOCIATION**

10

11                          **I.   Introduction**

12        COMES NOW, JPMorgan Chase Bank, National Association its successors in interest,

13   agents, assigns and assignors ("Creditor") and moves this court for an order terminating the

14   automatic stay, allowing Creditor to proceed with and complete any and all contractual and

15   statutory remedies incident to its security interests held in real property commonly described as

16   20908 48th Ave W., Lynnwood, Washington 98036 ("Property"), and legally described as set

17   forth in the Deed of Trust attached as an Exhibit to the affidavit on file with the court.  Creditor

18   further seeks relief in order to, at its option, offer, provide and enter into any potential

19   forbearance agreement, loan modification, refinance agreement or other loan workout/loss

20   mitigation agreement and to contact the Debtor via telephone or written correspondence to offer

21   such an agreement, which shall be non-recourse unless included in a reaffirmation agreement.

22   Creditor further moves that, absent objection, the provisions of F.R.B.P. 4001(a)(3) be waived to

23   avoid further deterioration of Creditor's secured position.

24

25

26

Motion For Relief From Stay
Page - 1

**ROUTH CRABTREE OLSEN, P.S.**
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ◆ FACSIMILE (425) 458-2131

Case 10-16354-KAO   Doc 22   Filed 07/16/10   Entered 07/16/10 16:25:04   Page 1 of 6

## II.   Jurisdiction

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(G).  This case relates to a case under Title 11 of the United States Code.  This proceeding is defined as a "core proceeding" as that is defined in the Code.

## III.   Standing

Under 11 U.S.C. § 362, a party seeking relief from stay must be a "party in interest."  To establish that Creditor is a "party in interest", a creditor must establish that it has at least a colorable claim to the property that is the subject of the motion.  In the case at bar, Creditor's claim is based on the Note and Deed attached to the Affidavit and on file with the court.  Creditor's interest in the Note and Deed is described below.

The Deed acts as the security for the Borrower's payment on the Note.  The Deed is recorded with the county in which the property is situated as evidence of the debt described in the Note for the benefit of any subsequent parties that may take an interest in the property described.

The Note is a negotiable instrument as that term is defined by RCW § 62A.3-104.  Under the terms of the Note, Borrower is obligated to pay the instrument according to its terms at the time it was issued.  Creditor is entitled to enforce the note under R.C.W. § 62A.3-301.

Under RCW § 62A.3-301(i), the holder of a negotiable instrument is entitled to enforce that instrument.  The term "holder" includes the person in possession of a negotiable instrument that is payable to a bearer that is in possession.  RCW § 62A.1-201.  A note not indorsed to a particular payee is a note "Indorsed in Blank."  A note Indorsed in Blank is payable to the bearer and may be transferred by possession alone.  RCW § 62A.3-205.  The transfer of a note secured by a deed of trust carries with it the security agreement as incident.  See *Spencer v. Alki Point Transportation Company*, 53 Wash. 77, 101 P. 509 (Wash. 1909).

Motion For Relief From Stay
Page - 2

ROUTH CRABTREE OLSEN, P.S.
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ◆ FACSIMILE (425) 458-2131

Case 10-16354-KAO   Doc 22   Filed 07/16/10   Entered 07/16/10 16:25:04   Page 2 of 6

In the case at bar, the Note, together with the Affidavit accompanying this motion, establish that Creditor is the holder of note indorsed in blank and is thus entitled to enforce the Note and foreclose on the deed of trust. Therefore, Creditor has standing to bring this motion.

### IV.      Parties in Interest

On or about January 5, 2007, Bryan D. Mize ('Borrower' herein), executed and delivered a note in favor of Washington Mutual Bank, FA with an original principal amount of $320,000.00.

The indebtedness under the note is secured by a deed of trust recorded against the Property.

Bryan David Mize and Rebecca Corwin Mize ('Debtor' collectively hereafter) filed for protection under Chapter 7 of Title 11 of the United States Code on June 2, 2010.

Prior to the filing, Creditor, through an appointed trustee, has set a trustee's sale to foreclose its interest in the Property for 7/16/2010. As a result of the filing, that sale will be postponed as dictated by the provisions of RCW 61.24 et.seq.

### V.      Default

Debtor is in default pursuant to the terms of the note for failure to make the required payments. Payments are credited as last received to first due. Creditor's loan status reflects payments now owing due after July 1, 2009. The following is a breakdown of the default:

| Date of Contractual Payments | Amount | Total |
|---|---|---|
| July 1, 2009 to July 1, 2009 | $1,949.56 | $1,949.56 |
| August 1, 2009 to July 1, 2010 | $1,843.53 | $22,122.36 |
| Accrued Late Charges | | $719.19 |
| Accrued Attorney Fees and Costs | | $2,017.29 |
| Property Inspection | | $86.80 |
| BPO | | $120.00 |
| Total Default | | $27,015.20 |

Motion For Relief From Stay
Page - 3

ROUTH CRABTREE OLSEN, P.S.
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ✦ FACSIMILE (425) 458-2131

Case 10-16354-KAO   Doc 22   Filed 07/16/10   Entered 07/16/10 16:25:04   Page 3 of 6

1   These figures are an estimate only and are subject to change as additional fees are

2   incurred and payments are made or become due, including but not limited to the attorney fees

3   and costs incurred as a result of the filing of this motion.   Please contact Creditor's counsel

4   directly for a reinstatement quote.

5

6                          **VI.      Estimate of Obligation**

7   The approximate amount owed under the terms of the note is $344,086.13.   The

8   following is an itemization of this approximate amount:

9

10          Principal Balance                        $319,651.74

11          Accrued Interest                          $21,491.11

12          Accrued Late Charges                        $719.19

13          Accrued Attorney Fees & Costs             $2,017.29

14          Property Inspection                          $86.80

15          BPO                                         $120.00

16          **Total Due**                          **$344,086.13**

17

18   This total is an approximation of the lien.   This estimate is provided only for the purposes

19   of this motion and cannot be relied upon for any other purpose, including tender of payoff.   An

20   exact, itemized payoff figure will be obtained from Creditor upon written request to counsel for

21   the Creditor.

22

23

24

25

26

Motion For Relief From Stay
Page - 4

**ROUTH CRABTREE OLSEN, P.S.**
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ◆ FACSIMILE (425) 458-2131

### VII.   Value of the Property

Debtor's sworn schedules value the Property at $145,000.00.

### VIII.   Authority

Under 11 U.S.C. § 362 (d)(1), on request of a party in interest, the Court shall terminate, annul, modify or condition the stay for cause, including the lack of adequate protection. Adequate protection is lacking in cases where there is an insufficient equity cushion in the subject property.  In re Mellor, 734 F.2d 1396, 1401 (9th Cir. 1984).  An equity cushion is the amount of value in property that exceeds the amount owed on the property such that a secured creditor will not be subject to a loss in the event of a decrease in value while the property is encumbered by the automatic stay.  Id. at 1400 n.2.  In determining the amount of value in property, the likely costs of sale or liquidation must be considered.  In re Faires, 34 Bankr. 549, 550 (Bankr. W.D. Wash. 1983).  In the case at bar, considering the value of the Property, Creditor's total lien, and the likely costs of liquidation, there is an insufficient equity cushion and thus Creditor lacks adequate protection.

Under 11 U.S.C § 362(d)(2), a Court shall terminate, annul, modify or condition the stay if the debtor has no equity in the Property and the Property is not necessary for an effective reorganization.  In the case at bar, the value of encumbrances, including all liens and costs of liquidation, together with available exemptions, exceed the value of the property such that there is no equity available for the estate.  Because the Debtor has chosen to liquidate under Chapter 7 of the Bankruptcy Code, the granting of an Order on Relief from Stay will not adversely affect the prospects of reorganization.

Under 11 U.S.C. § 362(d)(1), cause to terminate the automatic stay exists in Debtor's continued failure to make payments towards the obligation.  In this case Debtor has failed to

Motion For Relief From Stay
Page - 5

ROUTH CRABTREE OLSEN, P.S.
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ◆ FACSIMILE (425) 458-2131

Case 10-16354-KAO   Doc 22   Filed 07/16/10   Entered 07/16/10 16:25:04   Page 5 of 6

1   make the required payments as due under the terms of the note and thus there is cause to lift the

2   stay.

3   //

4

5   //

6

7   //

8                           **IV.    Conclusion**

9         THEREFORE, Creditor requests this Court enter an order terminating the automatic stay

10   pursuant to 11 U.S.C. § 362 and that Creditor be allowed to immediately proceed with and

11   complete any and all contractual and statutory remedies incident to the security interests held in

12   the Property.

13

14         DATED this 16th day of July, 2010.

15

16                  **ROUTH CRABTREE OLSEN, P.S.**

17                  By:    /s/ Mark Moburg WSBA#19463 for:

18                      James K. Miersma, WSBA# 22062

19                      Attorneys for Creditor

20

21

22

23

24

25

26

Motion For Relief From Stay
Page - 6

**ROUTH CRABTREE OLSEN, P.S.**
3535 FACTORIA BLVD. SE, SUITE 200
BELLEVUE, WA 98006
TELEPHONE (425) 458-2121 ✦ FACSIMILE (425) 458-2131

Case 10-16354-KAO    Doc 22    Filed 07/16/10    Entered 07/16/10 16:25:04    Page 6 of 6

# Exhibit

# K

After recording, return to:

BRYAN DAVID MIZE
4619 136th Place SW
Edmonds, WA, 98026
TEL: 206-349-0733

DATE: _March 5th_____, 2010

Loan #3011430703
APN #27042100408100
Legal Description: See Attached Exhibit A

## CONSTRUCTIVE LEGAL NOTICE OF LAWFUL DEBT VALIDATION DEMAND

**Real Estate Settlement Procedures Act** (RESPA) 12 U.S.C. § 2605(e);
Regulation X at 24 C.F.R. § 3500 et seq.
**Truth-In-Lending-Act (TILA)** § 1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq.
**Fair Debt Collection Practices Act** (FDCPA) 15 U.S.C. §1692c

**GRANTOR(S):  BRYAN DAVID MIZE**
4619 136th Place SW
Edmonds, WA, 98026

**GRANTEE(S):  WASHINGTON MUTUAL BANK FA**
2273 N. GREEN VALLEY PARKWAY, STE 14
HENDERSON, NV 89014
USPS Certified Mail # _7009 3410 0000 3895 1170_

You are now in receipt of this NOTICE under the authority of the Truth-In-Lending-Act (TILA) §
1604(e), 15 U.S.C. §§ 1601 et seq. (1968) and 1692 et seq., and the Fair Debt Collection Practices Act
(FDCPA) 15 U.S.C. §1692c, and the Real Estate Settlement Procedures Act (RESPA) 12 U.S.C. §
2605(e) and Regulation X at 24 C.F.R. § 3500 regarding loan number 3011430703 / NA. I dispute the
alleged mortgage debt in its entirety for being inaccurate and firmly believe that I have had fraud in the
factum committed against me for lack of full disclosure by the alleged Lender.

**NOTICE TO THE PRINCIPAL IS NOTICE TO THE AGENT,
NOTICE TO THE AGENT IS NOTICE TO THE PRINCIPAL.**

**THIS IS MY "QUALIFIED WRITTEN REQUEST": TILA REQUEST, RESPA REQUEST, COMPLAINT OF PROBABLE FRAUD IN THE FACTUM, DISPUTE OF DEBT & VALIDATION OF DEBT**

Reference:          Alleged Mortgage Loan # 3011430703
                    Private Land & Chattel Property located at
                    20908 48TH AVE W
                    LYNNWOOD, WASHINGTON

Attention Authorized Representative for the Above Referenced Companies / Corporations:

After several consultation meetings with Legal Counsel and knowledgeable accountants regarding this matter, I am writing to formally complain about intentional accounting omissions and probable fraud in the factum that took place at the closing in the purchase of my home. I need a clear understanding and clarification (**FULL DISCLOSURE**) of the transactions that occurred at my signing of the initial documents, the funding source, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date.

With our nation's mortgage default crisis and the mortgage scams that have occurred against millions of American families, I am most concerned that potential fraudulent and deceptive practices have been committed against me in the intentional omission of due consideration in the exchange of my promissory note, my signing of the mortgage note and security agreement; including deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive and fraudulent accounting tricks.

I hereby **DEMAND** absolute first-hand evidence from you and/or your legal department with regard to the original signed promissory note and an uncertificated or certificated security concerning account numbers 3011430703. In the event you refuse or fail to supply me with these documents it will be positive confirmation on your part that WASHINGTON MUTUAL BANK FA never really created and owned a security. I also hereby **DEMAND** that a chain of transfer from you to wherever the security is now be promptly sent to me as well. Absent the actual evidence of the security, I have no choice but to dispute the validity of your lawful ownership, funding, entitlement right, and the current debt you allege I owe. By debt, I am referring to the principal balance you claim I owe; the calculated monthly payment, calculated escrow payment and any fees claimed to be owed by you or any trust or entity you may service or subservice for.

**To independently validate this debt, I need to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this QUALIFIED WRITTEN REQUEST, please refrain from reporting any negative credit information [if any] to any credit reporting agency until you respond to each of the requests.**

I also request that you conduct your own investigation and audit of this account since its inception to validate the debt you currently claim I owe. Upon receipt of your answers and production of documents, I will contract with my CPA to do another audit for a secondary validation. I **DEMAND** that you validate this debt so that it is accurate to the penny!

I firmly request that you do not rely on previous servicers or originators records, assurances or indemnity agreements and refuse to conduct a full audit and investigation of this account. I understand that potential abuses by you or previous servicers could have deceptively, wrongfully, unlawfully, and/or illegally:

   ◊          Increased the amounts of monthly payments.
   ◊          Increased the principal balance I owe;
   ◊          Increased escrow payments;
   ◊          Increased the amounts applied and attributed toward interest on this account;

◊   <u>Decreased the proper amounts applied and attributed toward principal on this account;</u>
◊   <u>Assessed, charged and/or collected fees, expenses and misc. charges I am not legally obligated to pay under this mortgage, note and/or deed of trust.</u>

I **DEMAND** that you demonstrate that I have not been the victim of such predatory, fraudulent servicing or lending practices that have occurred throughout the nation.

To ensure this, I have authorized a thorough review, examination, accounting and audit of mortgage account # 3011430703 by mortgage auditing and predatory servicing or lending experts. These exam and audit experts will review this mortgage account file from the date of initial contact with the mortgage provider, WASHINGTON MUTUAL BANK FA, their applications and the origination of this account to the present date.

Again this is a **Qualified Written Request** under the Truth In Lending Act [TILA] 15 U.S.C. § 1601, et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code. TAKE NOTICE that RESPA provides substantial penalties and fines for non-compliance or failure to answer my questions & production of documents as requested in this letter within twenty [20] business days of its receipt.

In order to conduct the examination and audit of this loan, I need to have full and immediate disclosure including copies of all pertinent information regarding this loan. The documents requested and answers to my questions are needed for me and my audit experts to insure that this loan:

1.  Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to TILA, FDCPA, RESPA, HOEPA and other laws;

2.  That any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

3.  That the claimed holder in due course of the monetary instrument/deed of trust/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

4.  That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees etc., were and still are properly disclosed to me;

5.  That each servicer and/or sub-servicers of this mortgage have serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/deed of trust;

6.  That each servicer and sub-servicers of this mortgage have serviced this mortgage in compliance with local, state and federal statutes, laws and regulations;

7.  That this mortgage account has properly been credited, debited, adjusted, amortized and charged correctly;

8.  That interest and principal have been properly calculated and applied to this loan;

9.  That any principal balance has been properly calculated, amortized and accounted for; that no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account;

In order to validate this debt and audit this account, I need copies of pertinent documents to be provided to me. I also need answers, <u>certified</u>, in writing, to various servicing questions. For each record kept on computer or in any other electronic file or format, please provide a paper copy of all information in each field or record in each computer system, program or database used by you that contains any information on this account number or my name.

As such, please mail to me, at the address above, copies of the documents requested below as soon as possible. Please provide copies of:

10. Any certificated or uncertificated security, front and back, used for the funding of account # 3011430703.

11. Any and all "Pool Agreement(s)" including account # 3011430703 between WASHINGTON MUTUAL BANK FA and any government sponsored entity, hereinafter (GSE).

12. Any and all "Deposit Agreement(s)" regarding account # 3011430703 or the "Pool Agreement" including account # 3011430703 between WASHINGTON MUTUAL BANK FA and any GSE.

13. Any and all "Servicing Agreement(s)" between WASHINGTON MUTUAL BANK FA and any GSE.

14. Any and all "Custodial Agreement(s)" between WASHINGTON MUTUAL BANK FA and any GSE.

15. Any and all "Master Purchasing Agreement(s)" between WASHINGTON MUTUAL BANK FA and any GSE.

16. Any and all "Issuer Agreement(s)" between WASHINGTON MUTUAL BANK FA and any GSE.

17. Any and all "Commitment to Guarantee" agreement(s) between WASHINGTON MUTUAL BANK FA and any GSE.

18. Any and all "Release of Document agreements" between WASHINGTON MUTUAL BANK FA and any GSE.

19. Any and all "Master Agreement(s) for servicer's Principle and Interest Custodial Account(s)" between WASHINGTON MUTUAL BANK FA and any GSE.

20. Any and all "Servicers Escrow Custodial Account" between WASHINGTON MUTUAL BANK FA and any GSE.

21. Any and all "Release of Interest" agreements between WASHINGTON MUTUAL BANK FA and any GSE.

22. Any Trustee agreement(s) between WASHINGTON MUTUAL BANK FA trustee regarding account # 3011430703 or pool accounts with any GSE.

23. Please send to the requester a copy of any documentation evidencing any trust relationship regarding the Mortgage/Deed of Trust **and** any Note in this matter.

24. Please send to the requester a copy of any and all document(s) establishing any Trustee of record for the Mortgage/Deed of Trust **and** any Note.

25. Please send to the requester a copy of any and all document(s) establishing the date of any appointment of Trustee for this Mortgage/Deed of Trust **and** any Note. Please also include any and all assignments or transfers or nominees of any substitute trustee(s).

26. Please send to the requester a copy of any and all document(s) establishing any Grantor for this Mortgage/Deed of Trust **and** any Note.

27. Please send to the requester a copy of any and all document(s) establishing any Grantee for this Mortgage/Deed of Trust **and** any Note.

28. Please send to the requester a copy of any and all document(s) establishing any Beneficiary for this Mortgage/Deed of Trust **and** any Note.

29. Please send to the requester any documentation evidencing the Mortgage or Deed of trust is **not** a constructive trust or any other form of trust.

30. Please send to the requester a certified copy of the signed promissory note showing the front and back of the document.

31. All data, information, notations, text, figures and information contained in your mortgage servicing and accounting computer systems including, but not limited to Alltel or Fidelity CPI system, or any other similar mortgage servicing software used by you, any servicers, or sub-servicers of this mortgage account from the inception of this account to the date written above.

32. All descriptions and legends of all Codes used in your mortgage servicing and accounting system so that the examiners, auditors and experts retained to audit and review this mortgage account may properly conduct their work.

33. All assignments, transfers, allonges, or other document evidencing a transfer, sale or assignment of this mortgage, deed of trust, monetary instrument or other document that secures payment by me to this obligation in this account from the inception of this account to the present date including any such assignments on MERS.

34. All records, electronic or otherwise, of assignments of this mortgage, monetary instrument or servicing rights to this mortgage including any such assignments on MERS.

35. All deeds in lieu, modifications to this mortgage, monetary instrument or deed of trust from the inception of this account to the present date.

36. The front and back of each and every canceled check, money order, draft, debit or credit notice issued to any servicers of this account for payment of any monthly payment, other payment, escrow charge, fee or expense on this account.

37. All escrow analyses conducted on this account from the inception of this account until the date of this letter;

38. The front and back of each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on any and all disclosure statement(s) including, but not limited to, appraisal fees, inspection fees, title searches, title insurance fees, credit life insurance premiums, hazard insurance premiums, commissions, attorney fees, points, etc.

39. Front and back copies of all payment receipts, checks, money orders, drafts, automatic debits and written evidence of payments made by others or me on this account.

40. All letters, statements and documents sent to me by your company;

41. All letters, statements and documents sent to me by agents, attorneys or representatives of your company;

42. All letters, statements and documents sent to me by previous servicers, sub-servicers or others in your account file or in your control or possession or in the control or possession of any affiliate, parent company, agent, sub-servicers, servicers, attorney or other representative of your company.

43. All letters, statements and documents contained in this account file or imaged by you, any servicers or sub-servicers of this mortgage from the inception of this account to present date.

44. All electronic transfers, assignments, sales of the note/asset, mortgage, deed of trust or other security instrument.

45. All copies of my property inspection reports, appraisals, BPOs and reports done on the property.

46. All invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense, which has been charged to this mortgage account from the inception of this account to the present date.

47. All checks used to pay invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this mortgage account from the inception of this account to the present date.

48. All agreements, contracts and understandings with vendors that have been paid for any charge on this account from the inception of this account to the present date.

49. All account servicing records, payment payoffs, payoff calculations, ARM audits, interest rate adjustments, payment records, transaction histories, account histories, accounting records, ledgers, and documents that relate to the accounting of this account from the inception of this account until the date of this RESPA request.

50. All account servicing transaction records, ledgers, registers and similar items detailing how this account has been serviced from the from the inception of this account until the date of this RESPA request.

Further, in order to conduct the audit and review of this account, and to determine all proper amounts due, I need the following answers to questions concerning the servicing and accounting of this mortgage account from its inception to the present date. Accordingly, please provide me, in writing, the answers to the following questions listed below.

## ACCOUNT ACCOUNTING & SERVICING SYSTEMS

51. Please identify for me each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date so that the experts can decipher the data provided. I demand a certified Transaction Chart (T Chart) showing the GAAP journal entries made at the inception.

52. For each account accounting and servicing system identified by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the name and address of the company or party that designed and sold the system.

53. For each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the complete transaction code list for each system so that I, and others can adequately audit this account.

## DEBITS & CREDITS

54. Pursuant to banking law 12 USCA § 1813, please provide me the deposit slip for the alleged borrower's promissory note(s) that were issued to WASHINGTON MUTUAL BANK FA for processing through the Federal Reserve Bank in exchange for borrower's credit on January 16, 2007 and deposited on or around February 16, 2007.

55. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every credit on this account and the date such credit was posted to this account as well as the date any credit was received.

56. Please provide the order authorizing the withdrawal of funds from the borrower's promissory note deposit account.

57. In a spreadsheet form or in letter form in a columnar format, please detail for me each and every debit on this account and the date debit was posted to this account as well as the date any debit was received.

58. For each debit or credit listed, please provide me with the definition for each corresponding transaction code you utilize?

59. For each transaction code, please provide us with the master transaction code list used by you or previous servicers.

## MORTGAGE & ASSIGNMENTS

60. Has each sale, transfer or assignment of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in the parish/county property records in the parish/county and state in which my land and chattel property is located from the inception of this account to the present date? Yes or No?

61. If not, why?

62. Is your company the servicers of this mortgage account or the holder in due course and beneficial owner of this mortgage, monetary instrument and/or deed of trust?

63. Have any sales, transfers or assignments of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in any electronic fashion such as MERS or other internal or external recording system from the inception of this account to the present date? Yes or No?

64. If yes, please detail for me the names of each seller, purchaser, assignor, assignee or any holder in due course to any right or obligation of any note, mortgage, deed or security instrument I executed securing the obligation on this account that was not recorded in the county records where my property is located whether they be mortgage servicing rights or the beneficial interest in the principal and interest payments.

## ATTORNEY FEES

65. For purposes of my questions below dealing with attorney fees, please consider the terms attorney fees and legal fees to be one in the same.

66. Have attorney fees ever been assessed to this account from the inception of this account to the present date?

67. If yes, please detail each separate assessment, charge and collection of attorney fees to this account from the inception of this account to the present date and the date of such assessment to this account?

68. Have attorney fees ever been charged to this account from the inception of this account to the present date?

69. If yes, please detail each separate charge of attorney fees to this account from the inception of this account to the present date and the date of such charge to this account?

70. Have attorney fees ever been collected from this account from the inception of this account to the present date?

71. If yes, please detail each separate collection of attorney fees from this account from the inception of this account to the present date and the date of such collection from this account?

72. Please provide for me the name and address of each attorney or law firm that has been paid any fees or expenses related to this account from the inception of this account to the present date?

73. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed which authorized the assessment, charge or collection of attorney fees.

74. Please detail and list for me in writing each separate attorney fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

75. Please detail and list for me in writing each separate attorney fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

76. Please detail and list for me in writing any adjustments in attorney fees assessed and on what date such adjustment was made and the reasons for such adjustment.

77. Please detail and list for me in writing any adjustments in attorney fees collected and on what date such adjustment(s) were made and the reasons for such adjustment(s).

78. Has interest been charged on any attorney fee assessed or charged to this account? Yes or No?

79. Is interest allowed to be assessed or charged on attorney fees charged or assessed to this account? Yes or No?

80. How much in total attorney fees have been assessed to this account from the inception of this account until present date? $_____

81. How much in total attorney fees have been collected on this account from the inception of this account until present date? $_____

82. How much in total attorney fees have been charged to this account from the inception of this account until present date? $_____

83. Please send to me copies of all invoices and detailed billing statements from any law firm or attorney that has billed such fees that have been assessed or collected from this account.

## SUSPENSE/UNAPPLIED ACCOUNTS

For purposes of this section, please treat the term suspense account and unapplied account as one and the same.

84. Have there been any suspense or unapplied account transactions on this account from the inception of this account until present date?

85. If yes, please explain the reason for each and every suspense transaction that occurred on this account? If no, please skip the questions in this section dealing with suspense and unapplied accounts.

86. In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that have occurred on this account from the inception of this account until present date.

## LATE FEES

For purposes of my questions below dealing with late fees, please consider the terms late fees and late charges to be one in the same.

87. Have you reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

88. Has any previous servicers or sub-servicers of this mortgage reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

89. Do you consider the payment of late fees as liquidated damages to you for not receiving payment on time? Yes or No?

90. Are late fees considered interest? Yes or No?

91. Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

92. Were any of these expenses or damages charged or assessed to this account in any other way? Yes or No?

93. If yes, please describe what expenses or charges were charged or assessed to this account.

94. Please describe for me in writing what expenses you or others undertook due to any payment I made, which was late.

95. Please describe for me in writing what damages you or others undertook due to any payment I made which was late.

96. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed which authorized the assessment or collection of late fees.

97. Please detail and list for me in writing each separate late fee assessed to this account and for which corresponding payment period or month such late fee was assessed from the inception of this account to present date.

98. Please detail and list for me in writing each separate late fee collected from this account and for which corresponding payment period or month such late fee was collected from the inception of this account to present date.

99. Please detail and list for me in writing any adjustments in late fees assessed and on what date such adjustment was made and the reasons for such adjustment.

100. Has interest been charged on any late fee assessed or charged to this account? Yes or No?

101. Is interest allowed to be assessed or charged on late fees charged or assessed to this account? Yes or No?

102. Have any late charges been assessed to this account? Yes or No?

103. If yes, how much in total late charges have been assessed to this account from the inception of this account until present date? $_____

104. Please provide me with the exact months or payment dates you or other previous servicers of this account claim I have been late with a payment from the inception of this account to the present date.

105. Have late charges been collected on this account from the inception of this account until present date? Yes or No?

106. If yes, how much in total late charges have been collected on this account from the inception of this account until present date? $_____

## LAND & CHATTEL PROPERTY INSPECTIONS

107. For purposes of this section property inspection and inspection fee refer to any inspection of property by any source and any related fee or expense charged, assessed or collected for such inspection.

108. Have any property inspections been conducted on my land and chattel property from the inception of this account until the present date?

109. If your answer is no, you can skip the rest of these questions in this section concerning property inspections.

110. If yes, please tell me the date of each property inspection conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

111. Please tell me the price charged for each property inspection.

112. Please tell me the date of each property inspection.

113. Please tell me the name and address of each company and person who conducted each property inspection on my land & chattel property.

114. Please tell me why property inspections were conducted on my property.

115. Please tell me how property inspections are beneficial to me.

116. Please tell me how property inspections are protective of my land & chattel property.

117. Please explain to me your policy on property inspections.

118. Do you consider the payment of inspection fees as a cost of collection? Yes or No?

119. If yes, why?

120. Do you use property inspections to collect debts? Yes or No?

121. Have you used any portion of the property inspection process on my land & chattel property to collect a debt or inform me of a debt, payment or obligation I owe?

122. If yes, please answer when and why?

123. Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment or collection of property inspection fees?

124. Have you labeled in any record or document sent to me a property inspection as a miscellaneous advance? Yes or No?

125. If yes, why?

126. Have you labeled in any record or document sent to me a property inspection as a legal fee or attorney fee? Yes or No?

127. If yes, why?

128. Please detail and list for me in writing each separate inspection fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to present date.

129. Please detail and list for me in writing each separate inspection fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to present date.

130. Please detail and list for me in writing any adjustments in inspection fees assessed and on what date such adjustment was made and the reasons for such adjustment.

131. Please detail and list for me in writing any adjustments in inspection fees collected and on what date such adjustment was made and the reasons for such adjustment.

132. Has interest been charged on any inspection fees assessed or charged to this account? Yes or No?

133. If yes, when and how much was charged?

134. Is interest allowed to be assessed or charged on inspection fees or assessed to this account? Yes or No?

135. How much in total inspection fees have been assessed to this account from the inception of this account until present date? $_____

136. How much in total inspection fees have been collected on this account from the inception of this account until present date? $_____

137. Please forward to me copies of all property inspections made on my property in this mortgage account file.

138. Has any fee charged or assessed for property inspections been placed into escrow account? Yes or no?

## BPO FEES

139. Have any BPOs [Broker Price Opinions] been conducted on my land & chattel property?

140. If yes, please tell me the date of each BPO conducted on my land & chattel property that is the secured interest for this mortgage, deed or note?

141. Please tell me the price of each BPO.

142. Please tell me who conducted each BPO.

143. Please tell me why BPOs were conducted on my land & chattel property.

144. Please tell me how BPOs are beneficial to me.

145. Please tell me how BPOs are protective of my land & chattel property.

146. Please explain to me your policy on BPOs.

147. Have any BPO fees been assessed to this account? Yes or No?

148. If yes, how much in total BPO fees have been assessed to this account? $_____

149. Have any BPO fees been charged to this account? Yes or No?

150. If yes, how much in total BPO fees have been charged to this account? $_____

151. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or deed of trust or any agreement I have executed allows you to assess, charge or collect a BPO fee from me.

152. Please send to me copies of all BPO reports that have been done on my land & chattel property.

153. Has any fee charged or assessed for a BPO been placed into escrow? Yes or no?

## FORCED-PLACED INSURANCE

154. Have you placed or ordered any forced-placed insurance polices on my land & chattel property?

155. If yes, please tell me the date of each policy ordered or placed on my property that is the secured interest for this mortgage, deed or note.

156. Please tell me the price of each policy.

157. Please tell me the agent for each policy.

158. Please tell me why each policy was placed on my land & chattel property.

159. Please tell me how the policies are beneficial to me.

160. Please tell me how policies are protective of my land & chattel property.

161. Please explain to me your policy on forced-placed insurance.

162. Have any forced-placed insurance fees been assessed to this mortgage or escrow account? Yes or No?

163. If yes, how much in total forced-placed policy fees have been assessed to this account? $_____

164. Have any forced-placed insurance fees been charged to this mortgage or escrow account? Yes or No?

165. If yes, how much in total forced-placed insurance fees have been charged to this mortgage or escrow account? $_____

166. Please tell me specifically what clause, paragraph and sentence in the note, mortgage or deed of trust or any agreement I have executed allows you to assess, charge or collect forced-placed insurance fees from me.

167. Do you have any relationship with the agent or agency that placed any policies on my land and chattel property? If yes, please describe.

168. Do you have any relationship with the carrier that issued any policies on my land & chattel property? If yes, please describe.

169. Has the agency or carrier you used to place a forced-placed insurance policy on my land & chattel property provided you any service, computer system, discount on policies, commissions, rebates or any form of consideration? If yes, please describe.

170. Do you maintain a blanket insurance policy to protect your properties when customer policies have expired?  If yes, please send me a copy of each such policy.

171. Please send to me copies of all forced-placed insurance policies that have been ordered on my land & chattel property.

## SERVICING RELATED QUESTIONS

For each of the following questions listed below, please provide me with a detailed explanation in writing that answers each question. In addition, I need the following answers to questions concerning the servicing of this mortgage account from its inception to the present date. Accordingly, can you please provide me, in writing, the answers to the questions listed below:

172. Did the originator or previous servicers of this account have any financing agreements or contracts with your company or an affiliate of your company?

173. Did the originator of this account or previous servicers of this account have a warehouse account agreement or contract with your company?

174. Did the originator of this account or previous servicers of this account receive any compensation, fee, commission, payment, rebate or other financial consideration from your company or any affiliate of your company for handling, processing, originating or administering this loan? If yes, please describe and itemize each and every form of compensation, fee, commission, payment, rebate or other financial consideration paid to the originator of this account by your company or any affiliate.

175. Please identify for me where the originals of this entire account file are currently located and how they are being stored, kept and protected?

176. Where is the original monetary instrument (*promissory note*) or mortgage I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

177. Where is the original deed of trust or mortgage and note I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

178. Since the inception of this loan, has there been any assignment of my monetary instrument/asset to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

179. Since the inception of this loan, has there been any assignment of the deed of trust or mortgage and note to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment.

180. Since the inception of this loan, has there been any sale or assignment of servicing rights to this mortgage account to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignment or sale.

181. Since the inception of this loan, have any sub-servicers serviced any portion of this mortgage loan? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that have sub-serviced this mortgage loan.

182. Has this mortgage account been made a part of any mortgage pool since the inception of this loan? If yes, identify for me each and every account mortgage pool that this mortgage has been a part of from the inception of this account to the present date.

183. Has each and every assignment of my asset/monetary instrument been recorded in the parish/county land records where the property associated with this mortgage account is located?

184. Has there been any electronic assignment of this mortgage with MERS [Mortgage Electronic Registration System] or any other computer mortgage registry service or computer program? If yes, identify the name and address of each and every individual, entity, party, bank, trust or organization or servicers that have been assigned the mortgage servicing rights to this account as well as the beneficial interest to the payments of principal and interest on this loan.

185. Have there been any investors [as defined in your industry] who have participated in any mortgage-backed security, collateral mortgage obligation or other mortgage security instrument that this mortgage account has ever been a part of from the inception of this mortgage to the present date? If yes, identify the name and address of each and every individual, entity, organization and/or trust involved.

186. Please identify for me the parties and their addresses to all sales contracts, servicing agreements, assignments, allonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

187. Please provide me with copies of all sales contracts, servicing agreements, assignments, allonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from its inception to the current date written above.

188. How much was paid for this individual mortgage account by you?

189. If part of a mortgage pool, what was the principal balance used by you to determine payment for this individual mortgage loan.

190. If part of a mortgage pool, what was the percentage paid by you of the principal balance above used to determine purchase of this individual mortgage loan.

191. Who did you issue a check or payment to for this mortgage loan?

192. Please provide me copies with the front and back of canceled check.

Under the Truth In Lending Act [TILA] 15 U.S.C. § 1601, et seq., the Fair Debt Collection Practices Act (FDCPA) and the Real Estate Settlement Procedures Act ("RESPA"), codified as Title 12 § 2605 (e)(1)(B) (e) and Reg. X § 3500.21(f)2 of the United States Code it is mandatory that you provide me full disclosure of the alleged debt that is said to be owed before proceeding any further with your collection action from twenty (20)

days of receipt of this QUALIFIED WRITTEN REQUEST. If you do not provide all answers and production of documents requested in this Notice, you will be in fault, admitting no lawful claim and a default will be in order. Your admission of no lawful claim will be the basis for our Right to Cancel. A Notice of Right to Cancel will be issued twenty (20) days from the date of receipt of this CONSTRUCTIVE LEGAL NOTICE.

## AFFIDAVIT OF FACT

20908 48TH AVE W
LYNNWOOD, WASHINGTON

STATE OF WASHINGTON        )
COUNTY OF SNOHOMISH        ) ss.

I, Bryan David Mize, hereafter Affiant, being of sound mind, competent and able to testify to the accuracy of this Affidavit, hereby confirms that all the facts stated and affirmed herein are true, correct, complete, and not misleading, admissible as evidence, and if testifying shall so state under the penalty of perjury:

1. That, Affiant makes this Affidavit based on first hand knowledge of all the facts stated herein, including the research of federal and state laws and public policy documents that govern monetary instruments related to banking and financial institutions.

2. That, Affiant did sign alleged loan documents with WASHINGTON MUTUAL BANK FA at CHICAGO TITLE INSURANCE COMPANY office in LYNNWOOD, WA on January 16, 2007 concerning property located at 20908 48TH AVE W, LYNNWOOD, WASHINGTON.

3. That, Affiant, did sign a promissory note and issued to WASHINGTON MUTUAL BANK FA for processing on January 16, 2007; the promissory note was for the sum of $320,000.

4. That, Affiant was rushed by WASHINGTON MUTUAL BANK FA representatives to sign other alleged closing documents and was not provided time to review or provided a clear understanding of the terms and conditions of these documents that he was requested to sign.

5. That, since the above events and the exposure of this nation's mortgage default crisis, Affiant has recently learned that there has been possible fraud committed against him by WASHINGTON MUTUAL BANK FA representatives in withholding FULL DISCLOSURE at the signing of closing documents and that it appears fraud in the factum has been committed against him regarding his signing the mortgage note and Deed of Trust.

6. That, Affiant confirms and re-affirms his lawful and timely dispute and demands full compliance in providing FULL DISCLOSURE to all requested questions and provide all request for documentation per the LAWFUL DEBT VALIDATION DEMAND annexed hereto and made a part hereof.

7. That, WASHINGTON MUTUAL BANK FA registered agent acting as servicer are being served this Affidavit and LAWFUL DEBT VALIDATION DEMAND.

I hereby state that the above is true to the best of my knowledge and understanding.

Date: March 3rd, 2010

BY:
BRYAN DAVID MIZE
4619 136TH PLACE SW
EDMONDS, WA, 98026
TEL: 206-349-0733

# Jurat

State of WASHINGTON

County of *King*

Subscribed and sworn to (or affirmed) before me on this *3rd* day of *March*

2010 by *Bryan D. Mize*, proved to me on the basis of satisfactory

evidence to be the person(s) who appeared before me.

Signature of Notary Public

(Seal)

TAREN E R DAVIS
COMM. EXP.
NOTARY
PUBLIC
JULY 28, 2012
STATE OF WASHINGTON

*Carbon Copied:*

**FEDERAL TRADE COMMISSION**
**CONSUMER RESPONSE CENTER**
600 Pennsylvania Avenue NW,
Washington, DC. 20580
Certified Mail # 7009 3410 0000 3895 1187

**OFFICE OF RESPA AND**
**INTERSTATE LAND SALES**
Office of Housing, Room # 9146
Department of Housing and Urban Development
451 Seventh Street, SW,
Washington. D.C. 20410
Certified Mail # 7009 3410 0000 3895 1194

**US DEPARTMENT OF THE TREASURY**
**OFFICE OF COMPTROLLER OF THE**
**CURRENCY**
Customer Assistance Group,
1301 McKinney Street, Suite 3450
Houston, TX 77010
Certified Mail # 7009 3410 0000 3895 1200

**OFFICE OF HOUSING ENTERPRISE**
**OVERSIGHT (OFHEO)**
1700 G Street, NW, 4th Floor
Washington, DC 20552
Certified Mail # 7009 3410 0000 3895 1217

**WASHINGTON STATE ATTORNEY**
**GENERAL**
**ROB McKENNA**
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
Certified Mail # 7009 3410 0000 3895 1224

## CERTIFICATE OF MAILING

I, Bryan David Mize do hereby solemnly declare, that on _March 5ᵗʰ_, 2010, I did cause to be delivered by Federal Express private courier and/or first class Certified US Mail, a true and correct copy of the CONSTRUCTIVE LEGAL NOTICE OF LAWFUL DEBT VALIDATION DEMAND, including true and correct copies of all/any documents referenced therein as "attached hereto", to the parties and locations listed below:

Date: _March 5ᵗʰ_, 2010

Bryan David Mize

**WASHINGTON MUTUAL BANK FA
2273 N. GREEN VALLEY PARKWAY, STE 14
HENDERSON, NV 89014
US Certified Mail Tracking No.** ⸻ 7009 3410 0000 3895 1170 ⸻ 70



# CERTIFICATE OF MAILING

I, Bryan David Mize do hereby solemnly declare, that on _MARCH 5th_, 2010, I did cause to be delivered by Federal Express private courier and/or first class Certified US Mail, a true and correct copy of the CONSTRUCTIVE LEGAL NOTICE OF LAWFUL DEBT VALIDATION DEMAND, including true and correct copies of all/any documents referenced therein as "attached hereto", to the parties and locations listed below:

Date: _MARCH 5th_, 2010

_Bry D. M_
Bryan David Mize

**WASHINGTON MUTUAL BANK FA**
**2273 N. GREEN VALLEY PARKWAY, STE 14**
**HENDERSON, NV 89014**
**US Certified Mail Tracking No.**  7009 3410 0000 3895 1170    70

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Washington Mutual Bank FA
2273 N. Green Valley Pkwy
Ste. 14
Henderson, NV 89014

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _M Caller_   ☐ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

[postmark: HENDERSON 89012-9998 USPS-6 MAR 8 2010]

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)   7009 3410 0000 3895 1170

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

# Exhibit

# L

# CHASE ⬢

**Chase Home Finance LLC**
2210 Enterprise Drive
SC1-3050
Florence, SC  29501
(888) 310-7995 Home Lending Executive Office

June 2, 2010

Mr. Bryan D. Mize
4619 136th Place SW
Edmonds WA  98026-3430

Re:  Loan ******0703

Dear Mr. Mize:

I am writing in response to your correspondence dated March 5, 2010, addressed to the Office of
the Comptroller of the Currency, and your correspondence dated March 16, 2010, which was
addressed to the Attorney General of Washington, regarding your dispute of the validity of the
above-referenced mortgage account.  As you may know, JPMorgan Chase Bank, N.A. acquired
certain assets of Washington Mutual, including the servicing rights to your loan.  Therefore, your
letter was forwarded to Chase Home Finance (Chase), a subsidiary of JPMorgan Chase Bank,
N.A., and received by our office on March 15, 2010, for review.

As of April 8, 2010, our records reflect that the debt on the above-referenced account consisted
of the following:

- Unpaid Principal Balance $319,651.74
- Escrow Advances $1,800.71
- Other Fees & Advances $1,087.54
- Accrued Interest from June 1, 2009 to April 9, 2010 $16,402.97
- Subtotal $338,942.96
- Suspense Amounts $0.00
- Total $338,942.96

Enclosed is a copy of your Note and Mortgage Deed of Trust. It is our position that you have
undertaken a valid, binding and legally enforceable financial obligation. Chase does not agree to
any attempt by you, or anyone acting on your behalf, to unilaterally alter the terms of your
agreement with Chase, and objects to any attempts to interfere with any security interest held by
the company. Any attempts made by you and/or individuals on your behalf to void the obligation
or security interest through unauthorized means are fraudulent and unlawful. Given that your
questions relate not to the servicing of your loan, but to the terms and conditions of the loan

Bryan D. Mize
Page Two
June 2, 2010

documents for the loan that Chase is currently servicing, and your rights and obligations there under, we suggest that you consult with an attorney of your choice to clarify any questions you might have.

Following are our responses to your list of questions:

1. Questions 10 through 50

   - Questions 10 through 22: The information requested is proprietary and will not be provided.
   - Questions 23 through 29: Please refer to the enclosed copy of the Deed of Trust and Note.
   - Question 30: Please refer to the enclosed copy of the Note.
   - Questions 31 and 32: The information requested is proprietary and will not be provided.
   - Questions 33 and 34: Please review the Public Record for this information.
   - Question 35: Our records indicate that there has not been a Deed-in-Lieu or modification to this mortgage.
   - Question 36: The information requested is too broad. You would need to provide information about specific payments at issue.
   - Question 37: At this time, no copies of escrow analyses were found on file.
   - Question 38: You would need to contact the settlement agent for copies of any disbursement checks issued at settlement.
   - Question 39: The information requested is too broad. You would need to provide information about specific payments at issue.
   - Question 40 through 43: The information requested is too broad. You would need to be specific about the letters in question. Also, we do not have correspondences sent by prior servicers on file. You would need to contact the prior servicer for this information.
   - Question 44: Please review the Public Record for this information.
   - Question 45: Please refer to the enclosed copy of your Appraisal.
   - Question 46 and 47: The information requested is proprietary and will not be provided. Please refer to the Loan History Reconciliation for amounts paid.
   - Question 48: It is unclear what you are requesting in this question.
   - Question 49 and 50: Please refer to the Loan History Reconciliation. Account Accounting & Servicing Systems
   - Questions 51 through 53: The information requested is proprietary and will not be provided.

2. Debits & Credits
   - Questions 54, 56, 58 and 59: The information requested is proprietary and will not be provided.

Bryan D. Mize
Page Three
June 2, 2010

- Questions 55 and 57: Please refer to the enclosed copy of the Loan History Reconciliation.

3. Mortgage & Assignments
   - Questions 60 and 61: Please review public record for this information.
   - Question 62: Chase Home Finance is the servicer of the mortgage loan.
   - Questions 63 and 64: Please review the public record for this information. Attorney Fees
   - Questions 65 through 71, 74 through 77, and 80 through 82: Please review the enclosed Loan History Reconciliation for any question regarding the assessment to the loan of any attorney's fees.
   - Question 72: At this time, no attorney fees have been paid from this account.
   - Question 73: Please review the enclosed Deed of Trust for any question regarding our rights to assess attorney fees to the loan.
   - Questions 78 and 79: No interest has been charged on any attorney's fees assessed to your loan.
   - Question 83: The information requested is proprietary and will not be provided. Please refer to the Loan History Reconciliation for any amounts paid. Suspense/Unapplied Accounts
   - Questions 84 through 86: Please refer to the enclosed Loan History Reconciliation.

4. Late Fees
   - Please refer to the enclosed Loan History Reconciliation for any questions regarding late charges assessed or collected.
   - Please refer to the enclosed copy of your Deed of Trust for any questions regarding the applicability or nature of late charges, or of our ability to assess and collect late charges

5. Land and Chattel Property Inspections
   - For questions regarding inspection fees assessed or collected, please refer to the enclosed loan history reconciliation.
   - For any questions regarding the applicability or nature of property inspections fees, or our ability or requirement to conduct property inspections and assess and collect fees for the property inspections, please refer to the enclosed copy of the Deed of Trust.

5. Broker's Price Opinion (BPO) Fees
   - Please refer to the enclosed loan history for any questions regarding fees assessed or collected in connection with any BPO that may have been ordered by Chase.
   - Please refer to the enclosed copy of the Deed of Trust for any questions regarding the nature and applicability of BPO fees, and our ability to obtain a BPO on the property.

Bryan D. Mize
Page Four
June 2, 2010

6.   Forced-Placed Insurance
  • Questions 154 through 160, 162 through 165, and 171: No lender-placed insurance
    policies have been added to this loan.
  • Questions 161 and 166: Please refer to Uniform Covenant Five of the enclosed copy of
    the Deed of Trust for additional information regarding the servicer purchasing coverage
    on your behalf.
  • Questions 167 through 170: The information requested is proprietary and will not be
    provided.

7.   Servicing-Related Questions
  • Questions 172 through 192. The information requested is proprietary and will not be
    provided.

Mr. Mize, we apologize that the service you received did not meet your expectations.  Chase's
goal is to provide the highest level of quality service.  If you have any questions about this
matter, please contact Mr. Jeffrey Poston at (866) 605-9253, extension 4468.

We appreciate your business and value our relationship with you.

Sincerely,

Chase Home Lending Executive Office

Enclosures – Note, Payment History, Mortgage Deed of Trust, and Appraisal

cc:  Office of the Comptroller of the Currency, Case 1116364

     Attorney General of Washington
     800 Fifth Street, Suite 2000
     Seattle WA  98104-3188

CHASE HOME FINANCE LLC
Detailed Transaction History

Date: 4/8/2010
Pg. 1 of 10

Loan # 3011430703
BRYAN D MIZE

Interest Rate: 6.%
Payment Due Date: 7/1/2009
Monthly Payment Amt: $1,598.26
Current Escrow Balance: $-1,800.71
Current Principal Balance: $319,651.74

Property Address:
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

Mailing Address:
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period 1/16/2007 -- 4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 75 | 4/7/2010 | 4/7/2010 | 4/1/2010 | $-1,204.14 | COUNTY TAX | | |
| | $0.00 | $0.00 | $-1,204.14 | $0.00 | $0.00 | $319,651.74 | $-1,800.71 |
| 74 | 3/17/2010 | 3/17/2010 | | $0.00 | CORP ADV STATUTORY EXP DISB | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 73 | 3/12/2010 | 3/12/2010 | | $10.85 | PROPERTY INSPECTION ASSESSED | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 72 | 2/12/2010 | 2/12/2010 | | $10.85 | CORP ADV STATUTORY EXP DISB | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 71 | 2/9/2010 | 2/9/2010 | | $10.85 | PROPERTY INSPECTION ASSESSED | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 70 | 12/29/2009 | 12/29/2009 | | $10.85 | PROPERTY INSPECTION ASSESSED | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 69 | 11/24/2009 | 11/24/2009 | | $10.85 | PROPERTY INSPECTION ASSESSED | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |
| 68 | 10/14/2009 | 10/14/2009 | | $10.85 | PROPERTY INSPECTION ASSESSED | | |
| | $0.00 | $0.00 | $0.00 | $10.85 | $0.00 | $319,651.74 | $-596.57 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 2 of 10

**Loan # 3011430703**
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

Activity for Period  1/16/2007  –   4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 67 | 10/5/2009 $0.00 | 10/5/2009 $0.00 | $0.00 | $120.00 $120.00 | CORP ADV - MISC EXPENSE DISB $0.00 | $319,651.74 | $-596.57 |
| 66 | 10/1/2009 $0.00 | 10/1/2009 $0.00 | 10/1/2009 $-1,233.10 | $-1,233.10 | COUNTY TAX $0.00 | $319,651.74 | $-596.57 |
| 65 | 9/17/2009 $0.00 | 9/17/2009 $0.00 | $0.00 | $10.85 $10.85 | PROPERTY INSPECTION ASSESSED $0.00 | $319,651.74 | $636.53 |
| 64 | 9/4/2009 $0.00 | 9/4/2009 $1,598.26 | 6/1/2009 $351.30 | $1,949.56 | PAYMENT $0.00 | $319,651.74 | $636.53 |
| 63 | 8/20/2009 $0.00 | 8/20/2009 $0.00 | $0.00 | $10.85 $10.85 | CORP ADV - MISC EXPENSE DISB $0.00 | $319,651.74 | $285.23 |
| 62 | 8/11/2009 $0.00 | 8/11/2009 $0.00 | $0.00 | $10.85 $10.85 | PROPERTY INSPECTION ASSESSED $0.00 | $319,651.74 | $285.23 |
| 61 | 7/10/2009 $0.00 | 7/10/2009 $0.00 | $0.00 | $10.85 $10.85 | PROPERTY INSPECTION ASSESSED $0.00 | $319,651.74 | $285.23 |
| 60 | 6/13/2009 $0.00 | 6/13/2009 $0.00 | $-478.97 | $-478.97 | DISBURSEMENT TO MORTGAGOR $0.00 | $319,651.74 | $285.23 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 3 of 10

Loan # 3011430703
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

Property Address:
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

Mailing Address:
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  –  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 59 | 5/14/2009 | 5/14/2009 | 5/1/2009 | $-477.00 | FIRE/HOMEOWNER | | |
| | $0.00 | $0.00 | $-477.00 | $0.00 | $0.00 | $319,651.74 | $764.20 |
| 58 | 5/7/2009 | 5/7/2009 | 6/1/2009 | $0.00 | PRINCIPAL PAYMENT | | |
| | $22.33 | $0.00 | $0.00 | $22.33 | $0.00 | $319,651.74 | $1,241.20 |
| 57 | 5/7/2009 | 5/7/2009 | 5/1/2009 | $1,949.67 | PAYMENT | | |
| | $0.00 | $1,598.37 | $351.30 | $0.00 | $0.00 | $319,674.07 | $1,241.20 |
| 56 | 4/14/2009 | 4/14/2009 | 4/1/2009 | $-1,233.10 | COUNTY TAX | | |
| | $0.00 | $0.00 | $-1,233.10 | $0.00 | $0.00 | $319,674.07 | $889.90 |
| 55 | 4/7/2009 | 4/7/2009 | 5/1/2009 | $0.00 | PRINCIPAL PAYMENT | | |
| | $22.22 | $0.00 | $0.00 | $22.22 | $0.00 | $319,674.07 | $2,123.00 |
| 54 | 4/7/2009 | 4/7/2009 | 4/1/2009 | $1,949.78 | PAYMENT | | |
| | $0.00 | $1,598.48 | $351.30 | $0.00 | $0.00 | $319,696.29 | $2,123.00 |
| 53 | 3/6/2009 | 3/6/2009 | 4/1/2009 | $0.00 | PRINCIPAL PAYMENT | | |
| | $22.11 | $0.00 | $0.00 | $22.11 | $0.00 | $319,696.29 | $1,771.70 |
| 52 | 3/6/2009 | 3/6/2009 | 3/1/2009 | $1,949.89 | PAYMENT | | |
| | $0.00 | $1,598.59 | $351.30 | $0.00 | $0.00 | $319,718.40 | $1,771.70 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 4 of 10

Loan # 3011430703
BRYAN D MIZE

| | |
|---|---|
| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

Property Address:
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

Mailing Address:
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  --  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 51 | 2/6/2009 | 2/6/2009 | 3/1/2009 | $22.00 | PRINCIPAL PAYMENT | | |
| | $22.00 | $0.00 | $0.00 | $0.00 | $0.00 | $319,718.40 | $1,420.40 |
| 50 | 2/6/2009 | 2/6/2009 | 2/1/2009 | $1,950.00 | PAYMENT | | |
| | $0.00 | $1,598.70 | $351.30 | $0.00 | $0.00 | $319,740.40 | $1,420.40 |
| 49 | 1/7/2009 | 1/7/2009 | 2/1/2009 | $21.89 | PRINCIPAL PAYMENT | | |
| | $21.89 | $0.00 | $0.00 | $0.00 | $0.00 | $319,740.40 | $1,069.10 |
| 48 | 1/7/2009 | 1/7/2009 | 1/1/2009 | $1,950.11 | PAYMENT | | |
| | $0.00 | $1,598.81 | $351.30 | $0.00 | $0.00 | $319,762.29 | $1,069.10 |
| 47 | 12/5/2008 | 12/5/2008 | 1/1/2009 | $21.78 | PRINCIPAL PAYMENT | | |
| | $21.78 | $0.00 | $0.00 | $0.00 | $0.00 | $319,762.29 | $717.80 |
| 46 | 12/5/2008 | 12/5/2008 | 12/1/2008 | $1,950.22 | PAYMENT | | |
| | $0.00 | $1,598.92 | $351.30 | $0.00 | $0.00 | $319,784.07 | $717.80 |
| 45 | 11/7/2008 | 11/7/2008 | 12/1/2008 | $21.67 | PRINCIPAL PAYMENT | | |
| | $21.67 | $0.00 | $0.00 | $0.00 | $0.00 | $319,784.07 | $366.50 |
| 44 | 11/7/2008 | 11/7/2008 | 11/1/2008 | $1,950.33 | PAYMENT | | |
| | $0.00 | $1,599.03 | $351.30 | $0.00 | $0.00 | $319,805.74 | $366.50 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 5 of 10

**Loan # 3011430703**
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  —  4/8/2010

| Reference # | Tran Date / Principal Amt | Effective Date / Interest Amt | Due Date / Escrow Amt | Total Tran Amt / Fees/Other Amt | Transaction Description / Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 43 | 10/16/2008 | 10/16/2008 | 10/1/2008 | $-1,259.95 | COUNTY TAX | | |
|  | $0.00 | $0.00 | $-1,259.95 | $0.00 | $0.00 | $319,805.74 | $15.20 |
| 42 | 10/7/2008 | 10/7/2008 | 11/1/2008 | $21.56 | PRINCIPAL PAYMENT | | |
|  | $21.56 | $0.00 | $0.00 | $0.00 | $0.00 | $319,805.74 | $1,275.15 |
| 41 | 10/7/2008 | 10/7/2008 | 10/1/2008 | $1,950.44 | PAYMENT | | |
|  | $0.00 | $1,599.14 | $351.30 | $0.00 | $0.00 | $319,827.30 | $1,275.15 |
| 40 | 9/5/2008 | 9/5/2008 | 10/1/2008 | $21.46 | PRINCIPAL PAYMENT | | |
|  | $21.46 | $0.00 | $0.00 | $0.00 | $0.00 | $319,827.30 | $923.85 |
| 39 | 9/5/2008 | 9/5/2008 | 9/1/2008 | $1,950.54 | PAYMENT | | |
|  | $0.00 | $1,599.24 | $351.30 | $0.00 | $0.00 | $319,848.76 | $923.85 |
| 38 | 8/7/2008 | 8/7/2008 | 9/1/2008 | $21.35 | PRINCIPAL PAYMENT | | |
|  | $21.35 | $0.00 | $0.00 | $0.00 | $0.00 | $319,848.76 | $572.55 |
| 37 | 8/7/2008 | 8/7/2008 | 8/1/2008 | $1,950.65 | PAYMENT | | |
|  | $0.00 | $1,599.35 | $351.30 | $0.00 | $0.00 | $319,870.11 | $572.55 |
| 36 | 7/1/2008 | 7/1/2008 | 7/1/2008 | $1,972.00 | PAYMENT | | |
|  | $0.00 | $1,599.35 | $372.65 | $0.00 | $0.00 | $319,870.11 | $221.25 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 6 of 10

**Loan # 3014430703**
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  —  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 35 | 6/23/2008 | 6/23/2008 | 5/1/2008 | $-465.00 | FIRE/HOMEOWNER | | |
| | $0.00 | $0.00 | $-465.00 | $0.00 | $0.00 | $319,870.11 | $-151.40 |
| 34 | 6/6/2008 | 6/6/2008 | 6/1/2008 | $1,972.00 | PAYMENT | | |
| | $0.00 | $1,599.35 | $372.65 | $0.00 | $0.00 | $319,870.11 | $313.60 |
| 33 | 5/7/2008 | 5/7/2008 | 5/1/2008 | $1,972.00 | PAYMENT | | |
| | $0.00 | $1,599.35 | $372.65 | $0.00 | $0.00 | $319,870.11 | $-59.05 |
| 32 | 4/15/2008 | 4/15/2008 | 4/1/2008 | $-1,259.94 | COUNTY TAX | | |
| | $0.00 | $0.00 | $-1,259.94 | $0.00 | $0.00 | $319,870.11 | $-431.70 |
| 31 | 4/7/2008 | 4/7/2008 | 4/1/2008 | $-695.00 | FIRE/HOMEOWNER | | |
| | $0.00 | $0.00 | $-695.00 | $0.00 | $0.00 | $319,870.11 | $828.24 |
| 30 | 4/7/2008 | 4/7/2008 | 5/1/2008 | $27.78 | PRINCIPAL PAYMENT | | |
| | $27.78 | $0.00 | $0.00 | $0.00 | $0.00 | $319,870.11 | $1,523.24 |
| 29 | 4/7/2008 | 4/7/2008 | 4/1/2008 | $1,972.22 | PAYMENT | | |
| | $0.00 | $1,599.49 | $372.73 | $0.00 | $0.00 | $319,897.89 | $1,523.24 |
| 28 | 3/7/2008 | 3/7/2008 | 3/1/2008 | $1,972.00 | PAYMENT | | |
| | $0.00 | $1,599.49 | $372.51 | $0.00 | $0.00 | $319,897.89 | $1,150.51 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 7 of 10

**Loan # 3011430703**
BRYAN D MIZE

| | |
|---|---|
| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  —  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 27 | 2/8/2008 | 2/8/2008 | 3/1/2008 | $14.81 | PRINCIPAL PAYMENT | | |
| | $14.81 | $0.00 | $0.00 | $0.00 | $0.00 | $319,897.89 | $778.00 |
| 26 | 2/8/2008 | 2/8/2008 | 2/1/2008 | $1,869.66 | PAYMENT | | |
| | $0.00 | $1,599.56 | $270.10 | $0.00 | $0.00 | $319,912.70 | $778.00 |
| 25 | 1/23/2008 | 1/23/2008 | 4/1/2007 | $-2,463.22 | COUNTY TAX | | |
| | $0.00 | $0.00 | $-2,463.22 | $0.00 | $0.00 | $319,912.70 | $507.90 |
| 24 | 1/8/2008 | 1/8/2008 | 2/1/2008 | $14.73 | PRINCIPAL PAYMENT | | |
| | $14.73 | $0.00 | $0.00 | $0.00 | $0.00 | $319,912.70 | $2,971.12 |
| 23 | 1/8/2008 | 1/8/2008 | 1/1/2008 | $1,869.74 | PAYMENT | | |
| | $0.00 | $1,599.64 | $270.10 | $0.00 | $0.00 | $319,927.43 | $2,971.12 |
| 22 | 12/7/2007 | 12/7/2007 | 1/1/2008 | $14.66 | PRINCIPAL PAYMENT | | |
| | $14.66 | $0.00 | $0.00 | $0.00 | $0.00 | $319,927.43 | $2,701.02 |
| 21 | 12/7/2007 | 12/7/2007 | 12/1/2007 | $1,869.81 | PAYMENT | | |
| | $0.00 | $1,599.71 | $270.10 | $0.00 | $0.00 | $319,942.09 | $2,701.02 |
| 20 | 12/3/2007 | 12/3/2007 | 12/1/2007 | $1,231.61 | PROPERTY TAX REFUND | | |
| | $0.00 | $0.00 | $1,231.61 | $0.00 | $0.00 | $319,942.09 | $2,430.92 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date:   4/8/2010
Pg. 8 of 10

Loan # 3011430703
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

### Activity for Period  1/16/2007  --  4/8/2010

| Reference # | Tran Date / Principal Amt | Effective Date / Interest Amt | Due Date / Escrow Amt | Total Tran Amt / Fees/Other Amt | Transaction Description / Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 19 | 11/8/2007 / $14.59 | 11/8/2007 / $0.00 | 12/1/2007 / $0.00 | $14.59 / $0.00 | PRINCIPAL PAYMENT / $0.00 | $319,942.09 | $1,199.31 |
| 18 | 11/8/2007 / $0.00 | 11/8/2007 / $1,599.78 | 11/1/2007 / $270.10 | $1,869.88 / $0.00 | PAYMENT / $0.00 | $319,956.68 | $1,199.31 |
| 17 | 10/12/2007 / $0.00 | 10/12/2007 / $0.00 | 10/12/2007 / $-1,231.61 | $-1,231.61 / $0.00 | COUNTY TAX / $0.00 | $319,956.68 | $929.21 |
| 16 | 10/5/2007 / $14.51 | 10/5/2007 / $0.00 | 11/1/2007 / $0.00 | $14.51 / $0.00 | PRINCIPAL PAYMENT / $0.00 | $319,956.68 | $2,160.82 |
| 15 | 10/5/2007 / $0.00 | 10/5/2007 / $1,599.86 | 10/1/2007 / $270.10 | $1,869.96 / $0.00 | PAYMENT / $0.00 | $319,971.19 | $2,160.82 |
| 14 | 9/7/2007 / $14.44 | 9/7/2007 / $0.00 | 10/1/2007 / $0.00 | $14.44 / $0.00 | PRINCIPAL PAYMENT / $0.00 | $319,971.19 | $1,890.72 |
| 13 | 9/7/2007 / $0.00 | 9/7/2007 / $1,599.93 | 9/1/2007 / $270.10 | $1,870.03 / $0.00 | PAYMENT / $0.00 | $319,985.63 | $1,890.72 |
| 12 | 8/8/2007 / $14.37 | 8/8/2007 / $0.00 | 9/1/2007 / $0.00 | $14.37 / $0.00 | PRINCIPAL PAYMENT / $0.00 | $319,985.63 | $1,620.62 |

**CHASE HOME FINANCE LLC**
Detailed Transaction History

Date: 4/8/2010
Pg. 9 of 10

**Loan # 3011430703**
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

**Property Address:**
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

**Mailing Address:**
4619 136TH PL SW
EDMONDS,WA 980263430

Activity for Period  1/16/2007  --  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 11 | 8/8/2007 | 8/8/2007 | 8/1/2007 | $1,870.10 | PAYMENT | | |
| | $0.00 | $1,600.00 | $270.10 | $0.00 | $0.00 | $320,000.00 | $1,620.62 |
| 10 | 7/14/2007 | 7/14/2007 | 8/1/2007 | $172.44 | PAYMENT | | |
| | $0.00 | $0.00 | $172.44 | $0.00 | $0.00 | $320,000.00 | $1,350.52 |
| 9 | 7/6/2007 | 7/6/2007 | 7/1/2007 | $1,807.28 | PAYMENT | | |
| | $0.00 | $1,600.00 | $207.28 | $0.00 | $0.00 | $320,000.00 | $1,178.08 |
| 8 | 6/8/2007 | 6/8/2007 | 6/1/2007 | $1,807.28 | PAYMENT | | |
| | $0.00 | $1,600.00 | $207.28 | $0.00 | $0.00 | $320,000.00 | $970.80 |
| 7 | 6/7/2007 | 6/7/2007 | 6/1/2007 | $1,231.61 | PROPERTY TAX REFUND | | |
| | $0.00 | $0.00 | $1,231.61 | $0.00 | $0.00 | $320,000.00 | $763.52 |
| 6 | 5/8/2007 | 5/8/2007 | 5/1/2007 | $1,807.28 | PAYMENT | | |
| | $0.00 | $1,600.00 | $207.28 | $0.00 | $0.00 | $320,000.00 | $-468.09 |
| 5 | 4/27/2007 | 4/27/2007 | 4/1/2007 | $-1,231.61 | COUNTY TAX | | |
| | $0.00 | $0.00 | $-1,231.61 | $0.00 | $0.00 | $320,000.00 | $-675.37 |
| 4 | 4/10/2007 | 4/10/2007 | 4/1/2007 | $-778.00 | FIRE/HOMEOWNER | | |
| | $0.00 | $0.00 | $-778.00 | $0.00 | $0.00 | $320,000.00 | $556.24 |

CHASE HOME FINANCE LLC
Detailed Transaction History

Date: 4/8/2010
Pg.10 of 10

Loan # 3011430703
BRYAN D MIZE

| Interest Rate: | 6.% |
| Payment Due Date: | 7/1/2009 |
| Monthly Payment Amt: | $1,598.26 |
| Current Escrow Balance: | $-1,800.71 |
| Current Principal Balance: | $319,651.74 |

Property Address:
20908 48TH AVE W
LYNNWOOD,WA 98036-0000

Mailing Address:
4619 136TH PL SW
EDMONDS,WA 980263430

## Activity for Period  1/16/2007  —  4/8/2010

| Reference # | Tran Date Principal Amt | Effective Date Interest Amt | Due Date Escrow Amt | Total Tran Amt Fees/Other Amt | Transaction Description Suspense Amt | Principal Bal | Escrow Bal |
|---|---|---|---|---|---|---|---|
| 3 | 4/6/2007 | 4/6/2007 | 4/1/2007 | $1,807.28 | PAYMENT | | |
| | $0.00 | $1,600.00 | $207.28 | $0.00 | $0.00 | $320,000.00 | $1,334.24 |
| 2 | 3/8/2007 | 3/8/2007 | 3/1/2007 | $1,807.28 | PAYMENT | | |
| | $0.00 | $1,600.00 | $207.28 | $0.00 | $0.00 | $320,000.00 | $1,126.96 |
| 1 | 1/17/2007 | 1/17/2007 | 2/1/2007 | $1,761.28 | PAYMENT | | |
| | $0.00 | $841.60 | $919.68 | $0.00 | $0.00 | $320,000.00 | $919.68 |

3011430703

Return To:

WASHINGTON MUTUAL BANK   FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440

Assessor's Parcel or Account Number: 27042100408100
Abbreviated Legal Description: PORTION SOUTHEAST QUARTER 21-27-4

[Include lot, block and plat or section, township and range] Full legal description located on page 3
Trustee: CHICAGO TITLE INSURANCE CO

ZWA1
M28                      ————— [Space Above This Line For Recording Data] —————

CHICAGO          **DEED OF TRUST**                3011430703-048
CTS425078
                        INSURED BY
                        CHICAGO TITLE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 05, 2007 ,
together with all Riders to this document.

(B) "Borrower" is BRYAN D MIZE A SINGLE PERSON

Borrower is the trustor under this Security Instrument.

(C) "Lender" is WASHINGTON MUTUAL BANK, FA

WASHINGTON-Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3048 1/01

-6(WA) (0012)

Page 1 of 15            Initials: ___
VMP MORTGAGE FORMS - (800)521-7291

Lender is a  FEDERAL SAVINGS BANK
organized and existing under the laws of  THE UNITED STATES OF AMERICA
Lender's address is  2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV
89014
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is  CHICAGO TITLE INSURANCE CO

(E) "Note" means the promissory note signed by Borrower and dated   JANUARY 05, 2007
The Note states that Borrower owes Lender  THREE HUNDRED TWENTY THOUSAND AND 00/100
Dollars
(U.S. $   320,000.00   ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  FEBRUARY 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

Initials: _____

-6(WA) (0012)                        Page 2 of 15                        Form 3048 1/01

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY    of  SNOHOMISH                                                :

[Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

     THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
AND IS MADE A PART HEREOF.

Parcel ID Number: 27042100408100                    which currently has the address of
20908 48TH AVE W                                                        [Street]
LYNNWOOD                                      [City], Washington  98036      [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

-6(WA) (0012)                        Page 3 of 15         Initials:                Form 3048 1/01

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

(Signature page)

-6(WA) (0012)          Page 4 of 15          Initials:          Form 3048 1/01

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

*Signature page*

Initials: _____

-6(WA) (0012)                    Page 5 of 15                                      Form 3048 1/01

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

*Signature page*

Initials: _____

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

*Signature page*

Initials: _____

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and

*Signature page*

Initials: ____

-6(WA) (0012)                    Page 8 of 15                    Form 3048 1/01

required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

*Signature page*

Initials: ____

-6(WA) (0012)                     Page 9 of 15                      Form 3048 1/01

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

-6(WA) (0012)

*Signature page*

Page 10 of 15

Initials

Form 3048 1/01

Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

Initials: _____

-6(WA) (0012)                    Page 9 of 15                    Form 3048 1/01

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

-6(WA) (0012)                              Page 10 of 15               Initials: _____               Form 3048 1/01

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

*Signature page*

Initials: _____

-6(WA) (0012)

Page 11 of 15

Form 3048 1/01

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.

*Signature page*

Initials: _____

-6(WA) (0012)

Page 12 of 15

Form 3048 1/01

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property.

Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

*signature page*

Initials: ___

-6(WA) (0012)                         Page 13 of 15                         Form 3048 1/01

Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

ZWA2

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. **Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                                                    -Borrower
                                    BRYAN D MIZE

_____     _____ (Seal)
                                                                    -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                          -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                          -Borrower

_____ (Seal)     _____ (Seal)
                 -Borrower                                          -Borrower

Signature page

ZWA2

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. **Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Use of Property.** The Property is not used principally for agricultural purposes.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                                              -Borrower
                                     BRYAN D MIZE

_____     _____ (Seal)
                                                              -Borrower

_____ (Seal)     _____ (Seal)
              -Borrower                                        -Borrower

_____ (Seal)     _____ (Seal)
              -Borrower                                        -Borrower

_____ (Seal)     _____ (Seal)
              -Borrower                                        -Borrower

STATE OF WASHINGTON
County of    SNOHOMISH                                              } ss:
       On this day personally appeared before me   BRYAN D MIZE


to me known to be the individual(s) described in and who executed the within and foregoing
instrument, and acknowledged that he/she/they signed the same as his/her/their free and voluntary
act and deed, for the uses and purposes therein mentioned.
       GIVEN under my hand and official seal this   8 th   day of   January, 2007.

                                               _____
                                               Notary Public in and for the State of Washington, residing at
                                               Lake Stevens
                                               My Appointment Expires on
                                               07·09·08

Initials: _____

LGLD

LEGAL DESCRIPTION

3011430703-048

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE
EXHIBIT AND IS MADE A PART HEREOF.