**11-CV-01245-SUP**

FILED        ENTERED
LODGED       RECEIVED

AUG 2 7 2011   LK

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

R2US
M28

3011430703-048

# FIXED/ADJUSTABLE RATE RIDER

**(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this     5TH     day of
JANUARY, 2007     , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of
the same date given by the undersigned ("Borrower") to secure Borrower's
Fixed/Adjustable Rate Note (the "Note") to
WASHINGTON MUTUAL BANK, FA

("Lender") of the same date and covering the property described in the Security
Instrument and located at:

> 20908 48TH AVE W
> LYNNWOOD, WA 98036

                    (Property Address)

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE
AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of    6.000    %. The
Note also provides for a change in the initial fixed rate to an adjustable interest rate, as
follows:

**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   **(A) Change Dates**
   The initial fixed interest rate I will pay will change to an adjustable interest rate on
the first day of FEBRUARY 01, 2012     , and the adjustable interest rate I will
pay may change on that day every 12th month thereafter. The date on which my initial
fixed interest rate changes to an adjustable interest rate, and each date on which my
adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family -
Fannie Mae Uniform Instrument               **Form 3187 6/01**
&#9416;-168R (0401)
Page 1 of 4     Initials
VMP Mortgage Solutions
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding     TWO AND 50/100                     percentage points (      2.500      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.000                   % or less than     2.500                   %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than           11.000      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding     TWO AND 50/100                 percentage points (     2.500     %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.000             % or less than    2.500             %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than         11.000     %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

*Signature page*

Initials: *[signature]*

-168R (0401)                    Page 2 of 4                    Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Initials: _____

-168R (0401)                    Page 3 of 4                    Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

*Signature page*

Initials: _____

-168R (0401)                     Page 3 of 4                     Form 3187 6/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
            −Borrower                          −Borrower
                                    BRYAN D MIZE

_____ (Seal)    _____ (Seal)
            −Borrower                          −Borrower

_____ (Seal)    _____ (Seal)
            −Borrower                          −Borrower

_____ (Seal)    _____ (Seal)
            −Borrower                          −Borrower

*signature page*

Ⓜ️-168R (0401)            Page 4 of 4            Form 3187 6/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
                    −Borrower                              −Borrower
                                          BRYAN D MIZE

_____ (Seal)          _____ (Seal)
                    −Borrower                              −Borrower

_____ (Seal)          _____ (Seal)
                    −Borrower                              −Borrower

_____ (Seal)          _____ (Seal)
                    −Borrower                              −Borrower

 -168R (0401)                **Page 4 of 4**                **Form 3187 6/01**

## CHICAGO TITLE INSURANCE COMPANY

Order No.: 005425078

### LEGAL DESCRIPTION

LOT 1, CITY OF LYNNWOOD SHORT PLAT RECORDED UNDER AUDITOR'S FILE NUMBER 200505065042, BEING A PORTION OF THE SOUTHEAST QUARTER OF SECTION 21, TOWNSHIP 27 NORTH, RANGE 4 EAST, W.M.

SITUATE IN THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON.

LGLD

3011430703-048

LEGAL DESCRIPTION

THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE
EXHIBIT AND IS MADE A PART HEREOF.

R2US
M28

3011430703-048

# FIXED/ADJUSTABLE RATE RIDER

**(LIBOR One-Year Index (As Published In _The Wall Street Journal_) - Rate Caps)**

THIS FIXED/ADJUSTABLE RATE RIDER is made this      5TH      day of
JANUARY, 2007     , and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of
the same date given by the undersigned ("Borrower") to secure Borrower's
Fixed/Adjustable Rate Note (the "Note") to
WASHINGTON MUTUAL BANK, FA

("Lender") of the same date and covering the property described in the Security
Instrument and located at:

       20908 48TH AVE W
       LYNNWOOD, WA 98036

                (Property Address)

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE
AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in
the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of      6.000      %. The
Note also provides for a change in the initial fixed rate to an adjustable interest rate, as
follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
     (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on
the first day of   FEBRUARY 01, 2012     , and the adjustable interest rate I will
pay may change on that day every 12th month thereafter. The date on which my initial
fixed interest rate changes to an adjustable interest rate, and each date on which my
adjustable interest rate could change, is called a "Change Date."

MULTISTATE FIXED/ADJUSTABLE RATE RIDER – WSJ One-Year LIBOR – Single Family –
Fannie Mae Uniform Instrument                 **Form 3187 6/01**
&#9416;-168R (0401)
Page 1 of 4     Initials:
VMP Mortgage Solutions
(800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding     TWO AND 50/100                          percentage points (       2.500      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.000                            % or less than      2.500                 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than      11.000      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Signature page

@D-168R (0401)                          Page 2 of 4                          Form 3187 6/01

Initials:

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding    TWO AND 50/100                    percentage points (        2.500      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  11.000                % or less than     2.500             %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than       11.000      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials: _____

-168R (0401)                        Page 2 of 4                    Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

signature page

Initials:

-168R (0401)                    Page 3 of 4                    Form 3187 6/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Initials: _____

®-168R (0401)　　　　　Page 3 of 4　　　　　Form 3187 6/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

BRYAN D MIZE

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

_____ (Seal)
                        –Borrower

*Signature page*

-168R (0401)                    Page 4 of 4                    Form 3187 6/01

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
                     –Borrower                                  –Borrower
                                          BRYAN D MIZE

_____ (Seal)          _____ (Seal)
                     –Borrower                                  –Borrower

_____ (Seal)          _____ (Seal)
                     –Borrower                                  –Borrower

_____ (Seal)          _____ (Seal)
                     –Borrower                                  –Borrower

-168R (0401)              **Page 4 of 4**              Form 3187 6/01

## CHICAGO TITLE INSURANCE COMPANY

Order No.: 005425078

### LEGAL DESCRIPTION

LOT 1, CITY OF LYNNWOOD SHORT PLAT RECORDED UNDER AUDITOR'S FILE NUMBER 200505065042, BEING A PORTION OF THE SOUTHEAST QUARTER OF SECTION 21, TOWNSHIP 27 NORTH, RANGE 4 EAST, W.M.

SITUATE IN THE COUNTY OF SNOHOMISH, STATE OF WASHINGTON.

LEGAL1/RDA/0999

28US
M28





3011430703-048

# ADJUSTABLE RATE NOTE
**(One-Year LIBOR Index (*As Published In The Wall Street Journal*) - Rate Caps)**

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JANUARY 05, 2007                    EVERETT,                         WASHINGTON
[Date]                              [City]                           [State]

20908 48TH AVE W, LYNNWOOD, WA 98036
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $    320,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. Lender is    WASHINGTON MUTUAL BANK, FA

I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.000    %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
(A) Time and Place of Payments
I will make a payment on the first day of every month, beginning on    MARCH 01, 2007    . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on    FEBRUARY 01, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at    P.O. BOX 78148 PHOENIX, AZ  85062-8148

or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
My monthly payment will be in the amount of U.S. $    1,600.00    before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

MULTISTATE ADJUSTABLE RATE NOTE – ONE–YEAR LIBOR INDEX – Single Family

W170NMU (0407)                    VMP Mortgage Solutions, Inc. (800)521-7291                    Initials: _____

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of FEBRUARY 01, 2012     , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND 50/100 percentage points (     2.500     %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than     11.000     % or less than     2.500     %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than     11.000     %.

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Initials:

## 6.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.   BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000         % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.  UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
BRYAN D MIZE                     -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower


_____ (Seal)          _____ (Seal)
                                 -Borrower                                          -Borrower

Pay to the order of
Without Recourse
WASHINGTON MUTUAL BANK, FA (Sign Original Only)
By _____
CHRIS TINSLEY
VICE PRESIDENT

## (W) **Washington Mutual**    Collateral Valuation Report

| | | | |
|---|---|---|---|
| **Originating Office:** | BELLEVUE WLC | **Originating Phone:** | 425-748-5600 |
| **Consultant/Acct. Mgr.:** | JACKIE REED-COTTOM | **Consultant/Acct. Mgr. Phone:** | 425-748-5637 |
| **Coordinator/Team:** | BELLEVUE | **Coordinator/Team Phone:** | 425-748-5600 |
| **LFC Name:** | BELLEVUE WLC | **LFC Phone:** | 425-748-5600 |
| **Service Provider:** | TOM GARDNER | **Service Provider Phone:** | |

**\* Refer to Underwriter:**      Yes
**Loan Number:**      03-0836-301143070-3
**Job Number:**      NW-061211-0105-2
**Borrower:**      MIZE
**Property Address:**      20908 48TH AVE W, LYNNWOOD, SNOHOMISH
     County, WA 98036

**Property Type:**
**Service Type:**      COLLATERAL APPROVAL-WHOLESALE
**Date of Service:**      04-Dec-2006 00:00:00
**Valuation Report Date:**      11-Dec-2006 10:00:11
**Date of Signature and Report:**      05-Dec-2006 00:00:00
**Year Built:**      n/a
**Assessor's Parcel #:**      27 0421 004 022 00
**Foundation Walls:**      CONCRETE/AVG
**Exterior Walls:**      WSI/GOOD
**Non Owner Occupied:**      No
**Occupancy:**      n/a

APPRAISAL

*listing canceled over 2 mos ago*

| Unit | BR | Rent |
|---|---|---|
| | 3 | |

**This Appraisal is Made:**
AS-IS

The Subject Property is either: currently listed for sale, OR, has been listed in the 12 months prior to the effective date of the appraisal

**Required repairs, required inspections, or additional reviewer comments:**

*All required repairs/conditions/inspections must be completed in a workmanlike manner and in conformance with Bank policy.*

| **Appraised Value:** Appraiser Value $400,000.00 |
|---|

### Billing

| | | Fee | Cost Center |
|---|---|---|---|
| **Inspected By:** | TOM GARDNER | $0.00 | 0000836 |

We have charged the appropriate cost center for the above charges. Please reconcile the GL account at closing.

13-Dec-2006 09:37:54

https://appraisal.wamu.com/scripts/ViewTouchPtFour.asp?pgIntPage=1&pgQueue=folde...   12/13/2006

Mahon & Rutledge Appraisal Group

File No. 60871 Page #3

# Uniform Residential Appraisal Report
File # 60871

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| Property Address | 20908 48TH AV. W | City LYNNWOOD | State WA | Zip Code 98036-7708 |
|---|---|---|---|---|

Borrower MIZE · Owner of Public Record MIZE · County SNOHOMISH

Legal Description STR 21-27-04 SE 1/4 S. 90 FT OF E 1/3 N 3/4 NE1/4 SW1/4 SE1/4 ALSO E 25 FT OF S 160 FT....(SEE TITLE REPORT)

Assessor's Parcel # 27 0421 004 022 00 · Tax Year 2008 · R.E. Taxes $ 2,611.39

Neighborhood Name LYNNWOOD · Map Reference 455-E-6 TB · Census Tract 0514.00

Occupant ☒ Owner ☐ Tenant ☐ Vacant · Special Assessments $ 0 · ☐ PUD HOA $ ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☒ Refinance Transaction ☐ Other (describe)

Lender/Client ATLAS MORTGAGE · Address LYNNWOOD, WA

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s). MLS#26038115 LISTED 03/17/06 FOR $344,950 AND NOT PREVIOUSLY IN THE LAST 12 MONTHS, AND CANCELLED 03/22/05.

I ☐ did ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. N/A

Contract Price $ REFIN · Date of Contract N/A · Is the property seller the owner of public record? ☐ Yes ☐ No Data Source(s) N/A

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☒ No
If Yes, report the total dollar amount and describe the items to be paid. NONE KNOWN

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % |
|---|---|---|---|---|---|---|---|
| Location ☒ Urban ☐ Suburban ☐ Rural | | Property Values ☒ Increasing ☐ Stable ☐ Declining | | | PRICE $(000) | AGE (yrs) | One-Unit 92 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | Low 150 | 0 | 2-4 Unit 01 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | High 800 | 70 | Multi-Family 03 % |
| | | | | | Pred. 350 | 5-35 | Commercial 04 % |
| | | | | | | | Other Vct=sf % |

Neighborhood Boundaries See attached addenda.

Neighborhood Description See attached addenda.

Market Conditions (including support for the above conclusions) See attached addenda.

| Dimensions SEE TITLE REPORT | Area 0.22 +/- ACRES | Shape RECTANGULAR | View NONE |
|---|---|---|---|

Specific Zoning Classification RS 8400 · Zoning Description SINGLE FAMILY RESIDENTIAL

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements - Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street ASPHALT | ☒ | |
| Gas | | | Sanitary Sewer | ☒ | | Alley NONE | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No · FEMA Flood Zone X · FEMA Map # 53061C1320E · FEMA Map Date 11/8/1999

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No If Yes, describe
See attached addenda.

| General Description | | Foundation | | Exterior Description materials/condition | | Interior materials/condition | |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☒ Concrete Slab ☐ Crawl Space | | Foundation Walls CONCRETE/AVG | | Floors HW/CPT/GOOD | |
| # of Stories 1.5 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls WSI/GOOD | | Walls DRYWALL/GOOD | |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 960 sq.ft. | | Roof Surface COMP/AVG | | Trim/Finish WOOD/GOOD | |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish 50 % | | Gutters & Downspouts MTL-MTL/GOOD | | Bath Floor VINYL/GOOD | |
| Design (Style) 1.5 STY.BAS. | | ☒ Outside Entry/Exit ☐ Sump Pump | | Window Type VINYL INS/GOOD | | Bath Wainscot LAM/GOOD | |
| Year Built 1942 | | Evidence of ☐ Infestation NONE | | Storm Sash/Insulated INSULATED/GOOD | | Car Storage ☒ None | |
| Effective Age (Yrs) 10 | | ☐ Dampness ☐ Settlement | | Screens YES/GOOD | | ☒ Driveway # of Cars MULTI | |
| Attic ☐ None | | Heating ☐ FWA ☒ HWBB ☐ Radiant | | Amenities ☒ Woodstove(s) # 1 | | Driveway Surface GRAVEL | |
| ☐ Drop Stair ☐ Stairs | | ☒ Other WLL/BB Fuel ELEC | | ☒ Fireplace(s) # 1 ☐ Fence | | ☐ Garage # of Cars | |
| ☐ Floor ☒ Scuttle | | Cooling ☐ Central Air Conditioning | | ☒ Patio/Deck DECK ☐ Porch | | ☐ Carport # of Cars | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other | | ☐ Att. ☐ Det. ☐ Built-in | |

Appliances ☐ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains: 6 Rooms 3 Bedrooms 1.75 Bath(s) 1,344 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). See attached addenda.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe

Freddie Mac Form 70 March 2005 · Page 1 of 6 · Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871 | Page #4

## Uniform Residential Appraisal Report
File # 60871

| There are | 4 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 285,000 | | to $ 375,000 | . |
| There are | 5 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 285,000 | | to $ 375,000 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjustment | COMPARABLE SALE # 2 | +(-) $ Adjustment | COMPARABLE SALE # 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 20908 48TH AV. W LYNNWOOD, WA 98036-7708 | 23062 39TH AV. W BRIER, WA | | 19818 13TH PL.W LYNNWOOD, WA | | 23901 48TH AV. W MOUNTLAKE TERR, WA | |
| Proximity to Subject | | 1.24 MILES | | 1.69 MILES | | 2.0 MILES | |
| Sale Price | $ REFIN | $ 395,000 | | $ 380,000 | | $ 422,000 | |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 319.58 sq.ft. | | $ 244.85 sq.ft. | | $ 225.67 sq.ft. | |
| Data Source(s) | | METROSCAN/MLS/EXT.INSP. | | METROSCAN/MLS/EXT.INSP. | | METROSCAN/EXT.INSP. | |
| Verification Source(s) | | AFN#20060728-0157 | | AFN#20061117-0885 | | AFN#20060905-0232 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | CONVENT. NONE NOTED | | CONVENT. NONE NOTED | | CONVENT. NONE NOTED | |
| Date of Sale/Time | | 07/28/2006 | | 11/17/2006 | | 09/05/2006 | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Leasehold/Fee Simple | Fee Simple | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 0.22 +/- ACRES | 0.35 +/- ACRES | -7,500 | 0.14 +/- ACRES | +5,000 | 0.34+/- ACRES | -7,500 |
| View | NONE | NONE | | NONE | | NONE | |
| Design (Style) | 1.5 STY.BAS. | 1.5 STORY | | 1.5 STY.BAS. | | 2 STY.BAS. | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Actual Age | A64/E10 | A23/E10 | | A4/E3 | -7,000 | A23/E10 | |
| Condition | GOOD | GOOD | | GOOD | | GOOD | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 6  3  1.75 | 6  3  2.5 | -1,500 | 6  3  2.50 | -1,500 | 7  4  2.5 | -1,500 |
| Gross Living Area | 1,344 sq.ft. | 1,236 sq.ft. | +3,240 | 1,552 sq.ft. | -6,240 | 1,870 sq.ft. | -15,780 |
| Basement & Finished | 960 Sq.Ft. | 0 SF | +14,400 | 485 SF | +7,125 | 450 SF | +7,650 |
| Rooms Below Grade | 2-1-0 | 0-0-0 | | 2-1-1 | -3,000 | 1-0-.50 | -1,500 |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | BBWLL/EL/NO | FA GAS/NO | | FA GAS/NONE | | WLL EL/NO | |
| Energy Efficient Items | INS.WINDOWS | INS.WINDOWS | | INS.WINDOWS | | INS.WINDOWS | |
| Garage/Carport | NONE | 2-CAR GAR. | -4,000 | 2-CAR GAR. | -4,000 | 1-CAR GAR. | -2,000 |
| Porch/Patio/Deck | PORCH,DECK | SIMILAR | | SIMILAR | | SIMILAR | |
|  | 1 FPL | 1 FPL | | 1 FPL | | 1 FPL | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 4,640 | ☐ + ☒ - | $ -9,615 | ☐ + ☒ - | $ -20,630 |
| Adjusted Sale Price of Comparables | | Net Adj. 1.2 % Gross Adj. 7.8 % | $ 399,640 | Net Adj. 2.5 % Gross Adj. 8.9 % | $ 370,385 | Net Adj. 4.9 % Gross Adj. 8.5 % | $ 401,370 |

☒ I did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)    METROSCAN
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)    METROSCAN
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NO SALES IN LAST 3 YEARS | NO SALES IN LAST YEAR | NO SALES IN LAST YEAR | NO SALES IN LAST YEAR |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | METROSCAN/MLS | METROSCAN/MLS | METROSCAN/MLS | METROSCAN/MLS |
| Effective Date of Data Source(s) | | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales     THE SUBJECT HAS NOT SOLD OR TRANSFERRED IN THE LAST 3 YEARS, OR LISTED FOR SALE IN THE LAST 12 MONTHS. THE COMPARABLE SALES HAVE NOT SOLD PREVIOUSLY IN THE LAST 12 MONTHS.

Summary of Sales Comparison Approach    AFN#=AUDITOR'S FILE NUMBER AT CLOSING. THE EXHIBITED COMPARABLE SALES ARE RECENT CLOSED SALES OF SIMILAR STYLE AND/OR SIMILAR EFFECTIVE AGE AND UPDATING IN THE SUBJECTS MARKET AREA. DUE TO A LACK OF RECENT SALES OF SIMILAR STYLE, AGE AND UPDATING IT WAS NECESSARY TO RESEARCH ADJOINING NEIGHBORHOODS TO A 2 MILE DISTANCE FROM THE SUBJECT, ALL WITHIN THE SAME GENERAL MARKET AREA. SITE ADJUSTMENTS WERE BASED ON RELATIVE LAND VALUE DIFFERENCES. CS #1 WAS PROVIDED AS A RECENT SALE WHICH IS SMALLER ABOVE GRADE, ALTHOUGH A SLIGHTLY DIFFERENT STYLE. ALL WERE ADJUSTED FOR SUPERIOR CAR STORAGE.  ADJUSTMENTS MADE IN THE MARKET ANALYSIS GRID ARE BASED ON MARKET REACTION AND NOT COST.

Indicated Value by Sales Comparison Approach $  400,000

Indicated Value by: Sales Comparison Approach $  400,000     Cost Approach (if developed) $  401,972     Income Approach (if developed) $
THE SALES COMPARISON APPROACH TO VALUE IS GIVEN MOST WEIGHT IN DETERMINING THE SUBJECTS FINAL ESTIMATE OF VALUE, AS IT BEST REFLECTS THE MOTIVATIONS OF BUYERS AND SELLERS IN THE MARKETPLACE. THE COST APPROACH IS USED AS A GUIDE, AND SHOWS SUPPORT. INCOME APPROACH NOT MEANINGFUL FOR OWNER OCC. PROPERTIES.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  PERSONAL PROPERTY WAS NOT INCLUDED IN THIS VALUATION. THIS PROPERTY APPRAISED IN "AS IS" CONDITION.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  400,000 , as of  December 4, 2006 , which is the date of inspection and the effective date of this appraisal.

Freddie Mac Form 70 March 2005              Page 2 of 6              Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871 Page #5

# Uniform Residential Appraisal Report    File # 60871

ADDITIONAL COMMENTS

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)    (1) 18705 LARCH WAY, LYNNWOOD SOLD 03/07/06 FOR $165,000 AND IS 0.29 AC. (2) 3728 SERENE WAY, LYNNWOOD SOLD 06/16/05 FOR $159,950 AND IS 0.17 AC, (3) 5500 166TH PL SW, LYNNWOOD SOLD 09/06/05 FOR $155,000 AND IS 0.18 AC, (4) 23620 20TH AV.W, BOTHELL SOLD 03/14/06 FOR $170,000 AND IS 0.29 AC. SUBJECT LOT VALUE ESTIMATED AT $160,000.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 160,000 |
|---|---|---|---|
| Source of cost data  MARSHALL-SWIFT/BUILDERS/SUPPLIERS | DWELLING     1,344  Sq.Ft. @ $     120.00   =$ | | 161,280 |
| Quality rating from cost service  AVG    Effective date of cost data  2006 | 960  Sq.Ft. @ $     75.00   =$ | | 72,000 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | FPL/B-IN S/PORCH/DECK   =$ | | 7,800 |
| See attached addenda. | Garage/Carport     Sq.Ft. @ $   =$ | | |
| | Total Estimate of Cost-New   =$ | | 241,080 |
| | Less   Physical   Functional   External | | |
| | Depreciation   24,108   =$( | 24,108) | |
| | Depreciated Cost of Improvements   =$ | | 216,972 |
| | "As-is" Value of Site Improvements   =$ | | 25,000 |
| Estimated Remaining Economic Life (HUD and VA only)   40 Years | INDICATED VALUE BY COST APPROACH   =$ | | 401,972 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $    N/A    X Gross Rent Multiplier    N/A    = $ | Indicated Value by Income Approach |
|---|---|
| Summary of Income Approach (including support for market rent and GRM)    N/A | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No    Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold | |
|---|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) | |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Freddie Mac Form 70 March 2005                Page 3 of 6                Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report
File # 60871

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

## Uniform Residential Appraisal Report   File # 60871

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report

File # 60871

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature _____ |
| Name  Tom Gardner | Name _____ |
| Company Name   MAHON & RUTLEDGE APPRAISAL | Company Name _____ |
| Company Address | Company Address _____ |
| 14030 NE 24TH ST., #102 BELLEVUE, WA 98007 | |
| Telephone Number   425 454 4100 | Telephone Number _____ |
| Email Address   tgardner@mahonandrutledge.com | Email Address _____ |
| Date of Signature and Report   December 05, 2006 | Date of Signature _____ |
| Effective Date of Appraisal   December 4, 2006 | State Certification # _____ |
| State Certification # _____ | or State License # _____ |
| or State License #   27016-1600489 | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  WA | |
| Expiration Date of Certification or License   5/31/2007 | **SUBJECT PROPERTY** |

ADDRESS OF PROPERTY APPRAISED
20908 48TH AV. W
LYNNWOOD, WA 98036-7708
APPRAISED VALUE OF SUBJECT PROPERTY $   400,000
LENDER/CLIENT
Name _____
Company Name   ATLAS MORTGAGE
Company Address   LYNNWOOD, WA

Email Address _____

**SUBJECT PROPERTY**
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection _____
☐ Did inspect interior and exterior of subject property
   Date of Inspection _____

**COMPARABLE SALES**
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
   Date of Inspection _____

Freddie Mac Form 70 March 2005        Page 6 of 6        Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE



File No. 60871| Page #9

## Supplemental Addendum

File No. 60871

| Borrower/Client | MIZE | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20908 46TH AV. W | | | | | | |
| City | LYNNWOOD | | County | SNOHOMISH | State | WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | | |

**• URAR: Neighborhood Boundaries and Characteristics**
NORTH TO 168TH ST. SW, WEST TO 76TH AV. SW, SOUTH TO SW 212TH ST., AND EAST TO LOCUST WAY. THE NEIGHBORHOOD IS RESIDENTIAL IN CHARACTER, WITH OLDER AND NEWER RESIDENTIAL PLATS INTERSPERSED WITH SMALL ACREAGE PROPERTIES, AND MULTI-FAMILY, CONDOMINIUMS AND RETAIL USES TYPICALLY LOCATED ALONG THE MAIN ARTERIALS NEAR CENTRAL AREAS. UNFAVORABLE CONDITIONS AFFECTING MARKETABILITY OR VALUE WERE NOT OBSERVED.

**• URAR: Neighborhood Market Conditions**
THE REAL ESTATE MARKET IN THE GREATER PUGET SOUND MARKET HAS SHOWN PRICE INCREASES OVER THE PAST YEAR, WITH JOB INCREASES AT THE BOEING COMPANY, THE REGIONS LARGEST EMPLOYER, AS WELL AS MICROSOFT INCREASING DEMAND, AND A LIMITED AMOUNT OF LISTINGS INCREASING PRICES.
THE AREA IS A MAJOR TRADING PARTNER WITH THE ASIAN RIM AND ITS ECONOMY IS WIDELY DIVERSIFIED. THE AREA IS HOME TO SOME OF THE STATES LARGEST EMPLOYERS SUCH AS BOEING AIRCRAFT, PAC CAR, MICROSOFT AND A PROLIFERATION OF HIGH TEC COMPANIES. MOST HOUSING SECTORS ARE CONTINUING TO SEE PRICE APPRECIATION. MUCH OF THE HOUSING STRENGTH IS DUE TO INTEREST RATES, DESPITE RISING SEVERAL TIMES OVER THE LAST YEAR. HOMES THAT ARE PROPERLY PRICED AND PROFESSIONALLY MARKETED ARE TYPICALLY SELLING WITHIN 1-3 MONTHS AND WITHIN 97-100% OF ASKING PRICE. SELLING CONCESSIONS USUALLY CONSIST OF SELLER PAID CLOSING COSTS WHICH IS TYPICAL IN THE MARKET AND HAVE NO EFFECT ON MARKETABILITY OR VALUE.

**• URAR: Neighborhood Market Factors**
THE SUBJECT PROPERTY IS CONVENIENTLY LOCATED APPROXIMATELY 1.5 MILES SW OF THE CENTRAL BUSINESS AND COMMERCIAL AREA OF LYNNWOOD, IN WASHINGTON STATE, USA. MAJOR EMPLOYMENT CENTERS ARE WITHIN 5-30 MINUTES, AND SHOPPING, SCHOOLS AND PARKS, AS WELL AS MOST COMMUNITY SERVICES ARE ALL CONVENIENTLY LOCATED NEARBY. THE NEIGHBORHOOD IS COMPRISED OF MOSTLY AVERAGE TO GOOD QUALITY SFR DETACHED HOMES OF VARIED AND COMPATIBLE DESIGNS THAT SHOW ADEQUATE MAINTENANCE LEVELS AND MARKET APPEAL.

**• URAR: Site Comments**
THE SUBJECT SITE IS SERVED BY MOST ALL DESIRED UTILITIES. THE ATTACHED PLAT MAP SHOWS THE SITE BEFORE A RECENT SUBDIVIDING, WHICH HAS NOT YET BEEN UPDATED ON COUNTY RECORDS. THE CURRENT SUBJECT SITE IS APPROXIMATELY 9,400 SF +/-.

**• URAR: Condition of Improvements**
THE SUBJECTS FLOOR PLAN IS FELT TO BE TYPICAL OF ITS AGE/DESIGN, AND SHOULD MEET WITH AVERAGE MARKET ACCEPTANCE AND APPEAL. THE SUBJECT PROPERTY APPEARS TO BE IN ADEQUATE CONDITION, WITH NO FUNCTIONAL OR PHYSICAL INADEQUACIES OBSERVED DURING THE INSPECTION.

**• URAR: Additional Features**
HARDWOOD FLOORS ON THE MAIN LEVEL. THE SUBJECT HAS BEEN REMODELED AND UPDATED. UPDATED WITH UPDATED ELECTRICAL AND PLUMBING SYSTEMS, VINYL DOUBLE PANE INSULATED WINDOWS THROUGHOUT. OAK CABINETRY AND NEWER APPLIANCES IN THE UPDATED KITCHEN AND BATHS. NEW CARPETS AND NEWLY FINISHED LOWER FAMILY ROOM. WOODSTOVE INSERT IN THE LIVING ROOM FIREPLACE.

**• URAR: Cost Approach Comments**
THE COST APPROACH IS NOT REQUIRED FOR FNMA APPRAISALS, BUT IS USED AS A GUIDE AND SHOWS SUPPORT. LAND VALUE DETERMINED BY VACANT LAND SALES IN THE SUBJECT'S MARKET AREA.

**Environmental Disclaimer:**
THE APPRAISER ASSUMES THERE ARE NO HIDDEN OR UNAPPARENT CONDITIONS OF THE PROPERTY, SUBSOIL, OR STRUCTURE WHICH WOULD RENDER THE REAL ESTATE APPRAISED MORE OR LESS VALUABLE. THE APPRAISER ASSUMES NO RESPONSIBILITY FOR SUCH CONDITIONS, OR FOR THE ENGINEERING WHICH MIGHT BE REQUIRED TO DISCOVER SUCH FACTORS. UNLESS OTHERWISE STATED IN THIS REPORT, THE EXISTENCE OF HAZARDOUS MATERIALS, WHICH MAY OR MAY NOT BE PRESENT ON THE PROPERTY, WERE NOT OBSERVED BY THE APPRAISER. THE APPRAISER HAS NO KNOWLEDGE OF THE EXISTENCE OF SUCH MATERIALS, ON OR IN THE PROPERTY APPRAISED, NOR IS THE APPRAISER QUALIFIED TO DETECT SUCH SUBSTANCES. THE PRESENCE OF SUBSTANCES SUCH AS ASBESTOS, UREA-FORMALDEHYDE FOAM INSULATION, RADON GAS, OR ANY OTHER POTENTIALLY HAZARDOUS MATERIAL MAY AFFECT THE VALUE OF THE PROPERTY APPRAISED. THE VALUE ESTIMATE IS PREDICATED ON THE ASSUMPTION THAT THERE ARE NO SUCH MATERIALS ON OR IN THE SUBJECT PROPERTY THAT WOULD CAUSE A LOSS OF VALUE. NO RESPONSIBILITY IS ASSUMED BY THE APPRAISER FOR ANY SUCH CONDITIONS, OR FOR ANY EXPERTISE OR ENGINEERING KNOWLEDGE REQUIRED TO DISCOVER THEM. THE CLIENT IS ADVISED TO RETAIN AN EXPERT IN THE FIELD, IF DESIRED.

File No. 60871 Page #10

## Supplemental Addendum

File No. 60871

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | | State WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | |

**Digital Signature Acknowledgement:**

APPRAISER ACKNOWLEDGES AND AGREES, IN CONNECTION WITH ELECTRONIC SUBMISSION OF APPRAISALS TO OUR CLIENTS AND/OR ANY OF THEIR AFFILIATES AS FOLLOWS:

THIS APPRAISAL COMPLIES WITH USPAP SMT-8, AND WHEN APPLICABLE TO FEDERAL HOUSING ADMINISTRATION OR DEPARTMENT OF VETERAN AFFAIRS STANDARDS AND REQUIREMENTS.

THIS SOFTWARE UTILIZED BY THE APPRAISER TO GENERATE THE APPRAISAL PROTECTS SIGNATURE SECURITY BY MEANS OF A DIGITAL SIGNATURE SECURITY FEATURE FOR EACH APPRAISER SIGNING THE REPORT, AND EACH APPRAISER MAINTAINS SOLE CONTROL OF THEIR RELATED SIGNATURE THROUGH A PASSWORD, HARDWARE DEVICE OR OTHER MEANS.

THE APPRAISER IS FULLY RESPONSIBLE FOR THE INTEGRITY AND AUTHENTICITY OF THE DATA AND SIGNATURES TRANSMITTED ELECTRONICALLY AND WILL HOLD OUR CLIENT HARMLESS FROM AND AGAINST ANY BREACH OR FAILURE OF DATA INTEGRITY, SIGNATURE AUTHENTICITY, OR BREACH OF DATA SECURITY.

ADOBE'S DISTILLER SOFTWARE OR EQUIVALENT IS UTILIZED BY THE APPRAISER TO TRANSMIT THIS PDF FORMATTED APPRAISAL. AT A MINIMUM, THE SOFTWARE CONTAINS THE FOLLOWING SECURITY MEASURES:

1. IDENTIFIES TRANSMISSION ERRORS DURING THE TRANSMISSION PROCESS, AND:

2. CONFIRMS THE DATE, TIME AND QUANTITY OF THE DATA SUBMITTED BY THE APPRAISER AND THE DATE, TIME AND QUANTITY OF THE DATA RECEIVED BY THE CLIENT, AND:

3. SECURES DATA FROM EDITING BY MEANS OF A PASSWORD, HARDWARE DEVICE, OR OTHER MEANS THAT REMAIN IN THE SOLE CONTROL OF THE TRANSMITTING APPRAISER.

ALL SUCH TRANSMISSIONS SHALL BE ROUTED ONLY TO THE CLIENT AT THE EMAIL ADDRESS PROVIDED IN THE ASSIGNMENT REQUEST AT THE TIME THE ORDER WAS PLACED, UNLESS SUBSEQUENTLY DIRECTED OTHERWISE BY THE CLIENT. THE APPRAISER AGREES THAT NO SUCH SUBSEQUENT TRANSMISSION WILL RESULT IN ADDITIONAL FEES BILLED TO THE CLIENT, UNLESS AGREED TO BY THE CLIENT BEFORE SAID SUBSEQUENT TRANSMISSION.

NO DUPLICATE TRANSMISSION OF THIS REPORT WILL BE MADE AND NO DELIVERY OF A HARD COPY OF THIS REPORT WILL BE MADE UNTILL THE APPRAISER HAS RECEIVED THE CLIENTS PERMISSION.

File No. 60671 Page #11

## Plat Map

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | | State WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | |



File No. 608711 Page #12

## Building Sketch

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | State WA | Zip Code 98036-7708 | |
| Lender | ATLAS MORTGAGE | | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 960.00 | 960.00 |
| GLA2 | Second Floor | 384.00 | 384.00 |
| BSMT | Basement | 960.00 | 960.00 |
| P/P | Deck | 80.00 | 80.00 |
| | | | |
| | TOTAL LIVABLE   (rounded) | | 1344 |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 30.0  x  32.0 | 960.00 |
| Second Floor | |
| 12.0  x  32.0 | 384.00 |
| | |
| 2 Calculations Total (rounded) | 1344 |

Form SKT.BldSkl — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871| Page #13

## Subject Photo Page

| Borrower/Client | MIZE | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | |
| City | LYNNWOOD | County | SNOHOMISH | State | WA | Zip Code  98038-7708 |
| Lender | ATLAS MORTGAGE | | | | | |



### Subject Front

| 1214 183RD ST. SE | |
|---|---|
| Sales Price | REFIN |
| Gross Living Area | 1,969 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.68 +/- ACRES |
| Quality | AVERAGE |
| Age | A27/E15 |



### Subject Rear



### Subject Street

## Comparable Photo Page

File No. 60871 | Page #14

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | State WA | Zip Code 98036-7708 | |
| Lender | ATLAS MORTGAGE | | | | |



**Comparable 1**
23062 39TH AV. W
| | |
|---|---|
| Prox. to Subject | 1.24 MILES |
| Sale Price | 395,000 |
| Gross Living Area | 1,236 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.35 +/- ACRES |
| Quality | AVERAGE |
| Age | A23/E10 |



**Comparable 2**
19818 13TH PL W
| | |
|---|---|
| Prox. to Subject | 1.69 MILES |
| Sale Price | 380,000 |
| Gross Living Area | 1,552 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.50 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.14 +/- ACRES |
| Quality | AVERAGE |
| Age | A4/E3 |



**Comparable 3**
23901 48TH AV. W
| | |
|---|---|
| Prox. to Subject | 2.0 MILES |
| Sale Price | 422,000 |
| Gross Living Area | 1,870 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.5 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.34+/- ACRES |
| Quality | AVERAGE |
| Age | A23/E10 |

**Location Map**

File No. 60871 | Page #15

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | | State WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | |



File No. 60871 Page #2



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
20908 48TH AV. W
3. 90 FT OF E 1/3 N 3/4 NE1/4 SW1/4 SE1/4 ALSO E 25 FT OF S 160 FT....(
LYNNWOOD, WA 98036-7708

### FOR:
ATLAS MORTGAGE

### AS OF:
December 4, 2006

### BY:
Tom Gardner

File No. 60871 | Page #18

# STATE OF WASHINGTON

DEPARTMENT OF LICENSING - BUSINESS AND PROFESSIONS DIVISION

THIS CERTIFIES THAT THE PERSON NAMED HEREON IS AUTHORIZED, AS PROVIDED BY LAW, AS A

STATE LICENSED REAL ESTATE APPRAISER

THOMAS EUGENE GARDNER
14020 NE 94TH ST  #101
BELLEVUE  WA  98007

| Certific No. | Issued Date | Expiration Date | |
|---|---|---|---|
| 1600489 | 07/25/1991 | 05/31/2007 | Director. |

| | | | | |
|---|---|---|---|---|
| SIZE | Contract Price $ REFIN | Date of Sale N/A | | Effective Date of Original Appraisal 12/04/2006 |

| ...y Rights Appraised ⊠ Fee Simple ☐ Leasehold ☐ Other (describe) | Original Appraised Value $ 400,000 |

Original Appraiser Tom Gardner | Company Name MAHON & RUTLEDGE APPRAISAL
Original Lender/Client ATLAS MORTGAGE | Address LYNNWOOD, WA

## ⊠ SUMMARY APPRAISAL UPDATE REPORT

**INTENDED USE:** The Intended use of this appraisal update is for the lender/client to evaluate the property that is the subject of this report to determine if the property has declined in value since the date of the original appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal update is the lender/client.

**SCOPE OF WORK:** The appraiser must, at a minimum: (1) concur with the original appraisal, (2) perform an exterior inspection of the subject property from at least the street, and (3) research, verify, and analyze current market data in order to determine if the property has declined in value since the effective date of the original appraisal.

**HAS THE MARKET VALUE OF THE SUBJECT PROPERTY DECLINED SINCE THE EFFECTIVE DATE OF THE PRIOR APPRAISAL?**    ☐ Yes ⊠ No

THERE HAS BEEN NO DAMAGE TO THE SUBJECT IMPROVEMENTS SINCE THE EFFECTIVE DATE OF THE ORIGINAL INSPECTION,

CAUSED BY WIND OR SNOW STORMS OR ANY OTHER INFLUENCE. THE SUBJECT VALUE HAS NOT DECLINED SINCE THEN.

**APPRAISER'S CERTIFICATION:** The appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal update in accordance with the scope of work requirements stated in this appraisal update report and concur with the analysis and conclusions in the original appraisal.
2. I performed this appraisal update in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal update was prepared.
3. I have updated the appraisal by incorporating the original appraisal report.
4. I have summarized my analysis and conclusions in this appraisal update and retained all supporting data in my work file.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal update assignment, have read the appraisal update report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.
2. I accept full responsibility for the contents of this appraisal update report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

## ■ CERTIFICATION OF COMPLETION

**INTENDED USE:** The intended use of this certification of completion is for the lender/client to confirm that the requirements or conditions stated in the appraisal report referenced above have been met.

**INTENDED USER:** The intended user of this certification of completion is the lender/client.

**HAVE THE IMPROVEMENTS BEEN COMPLETED IN ACCORDANCE WITH THE REQUIREMENTS AND CONDITIONS STATED IN THE ORIGINAL APPRAISAL REPORT?**    ☐ Yes ☐ No   If No, describe any impact on the opinion of market value.

**APPRAISER'S CERTIFICATION:** I certify that I have performed a visual inspection of the subject property to determine if the conditions or requirements stated in the original appraisal have been satisfied.

**SUPERVISORY APPRAISER'S CERTIFICATION:** I accept full responsibility for this certification of completion.

## SIGNATURES

**ADDITIONAL CERTIFICATION:** I/we certify that if this report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this report containing a copy or representation of my signature, the report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Thomas E Garden_ | Signature _____ |
| Name  Tom Gardner | Name _____ |
| Company Name  MAHON & RUTLEDGE APPRAISAL | Company Name _____ |
| Company Address  □□14030 NE 24TH ST., #102 BELLEVUE, WA 980 | Company Address  □□ |
| Telephone Number  425 454 4100 | Telephone Number _____ |
| Date of Signature and Report  January 12, 2007 | Date of Signature _____ |
| Effective Date of Appraisal Update _____ | State Certification # _____ |
| Date of Inspection  January 12, 2007 | or State License # _____ |
| State Certification # _____ | or Other _____ |
| or State License #  27016-1600489 | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  WA | |
| Expiration Date of Certification or License  5/31/2007 | **SUPERVISORY APPRAISER** |
| CURRENT LENDER/CLIENT | ☐ Did not inspect subject property |
| Name | ☐ Did inspect exterior of subject property from street |



**Subject Front**

| | |
|---|---|
| 20908 48TH AV. W | |
| Sales Price | REFIN |
| Gross Living Area | 1,344 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 1.75 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.22 +/- ACRES |
| Quality | AVERAGE |
| Age | A64/E10 |

**Subject Rear**



**Subject Street**

Mahon & Rutledge Appraisal Group

File No. 60871 Page #3

# Uniform Residential Appraisal Report
File # 60871

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | |
|---|---|
| Property Address  20908 48TH AV. W | City  LYNNWOOD  State  WA  Zip Code  98036-7708 |
| Borrower  MIZE | Owner of Public Record  MIZE  County  SNOHOMISH |
| Legal Description  STR 21-27-04 SE 1/4 S. 90 FT OF E 1/3 N 3/4 NE1/4 SW1/4 SE1/4 ALSO E 25 FT OF S 160 FT.....(SEE THIS TITLE REPORT) | |
| Assessor's Parcel #  27 0421 004 022 00 | Tax Year  2006  R.E. Taxes $  2,611.39 |
| Neighborhood Name  LYNNWOOD | Map Reference  455-E-6 TB  Census Tract  0514.00 |
| Occupant  ☒ Owner  ☐ Tenant  ☐ Vacant | Special Assessments $  0  ☐ PUD  HOA $  ☐ per year  ☐ per month |
| Property Rights Appraised  ☒ Fee Simple  ☐ Leasehold  ☐ Other (describe) | |
| Assignment Type  ☐ Purchase Transaction  ☒ Refinance Transaction  ☐ Other (describe) | |
| Lender/Client  ATLAS MORTGAGE  Address  LYNNWOOD, WA | |

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☒ Yes  ☐ No
Report data source(s) used, offering price(s), and date(s).    MLS#26038115 LISTED 03/17/06 FOR #344,950 AND NOT PREVIOUSLY IN THE LAST 12 MONTHS, AND CANCELLED 03/22/05.

I ☐ did  ☒ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.  N/A

Contract Price $  REFIN  Date of Contract  N/A  Is the property seller the owner of public record?  ☐ Yes  ☐ No  Data Source(s)  N/A
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ Yes  ☒ No
If Yes, report the total dollar amount and describe the items to be paid.    NONE KNOWN

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|
| Location  ☒ Urban  ☐ Suburban  ☐ Rural | | Property Values  ☒ Increasing  ☐ Stable  ☐ Declining | | | PRICE | AGE | One-Unit | 92 % |
| Built-Up  ☒ Over 75%  ☐ 25-75%  ☐ Under 25% | | Demand/Supply  ☐ Shortage  ☒ In Balance  ☐ Over Supply | | | $ (000) | (yrs) | 2-4 Unit | 01 % |
| Growth  ☐ Rapid  ☒ Stable  ☐ Slow | | Marketing Time  ☒ Under 3 mths  ☐ 3-6 mths  ☐ Over 6 mths | | | 150  Low  0 | | Multi-Family | 03 % |
| Neighborhood Boundaries    See attached addenda. | | | | | 800  High  70 | | Commercial | 04 % |
| | | | | | 350  Pred.  5-35 | | Other  Vct=sf % |

Neighborhood Description    See attached addenda.

Market Conditions (including support for the above conclusions)    See attached addenda.

| | |
|---|---|
| Dimensions  SEE TITLE REPORT | Area  0.22 +/- ACRES  Shape  RECTANGULAR  View  NONE |
| Specific Zoning Classification  RS 8400 | Zoning Description  SINGLE FAMILY RESIDENTIAL |

Zoning Compliance  ☒ Legal  ☐ Legal Nonconforming (Grandfathered Use)  ☐ No Zoning  ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes  ☐ No  If No, describe

| Utilities  Public  Other (describe) | | | | Public  Other (describe) | | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity  ☒  ☐ | | | Water  ☒ | | | Street  ASPHALT | ☒ | ☐ |
| Gas  ☒  ☐ | | | Sanitary Sewer  ☒ | | | Alley  NONE | | |

FEMA Special Flood Hazard Area  ☐ Yes  ☒ No  FEMA Flood Zone  X  FEMA Map #  53061C1320E  FEMA Map Date  11/8/1999
Are the utilities and off-site improvements typical for the market area?  ☒ Yes  ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes  ☒ No  If Yes, describe
See attached addenda.

| General Description | | Foundation | | Exterior Description  materials/condition | Interior  materials/condition |
|---|---|---|---|---|---|
| Units  ☒ One  ☐ One with Accessory Unit | | ☒ Concrete Slab  ☐ Crawl Space | | Foundation Walls  CONCRETE/AVG | Floors  HW/CPT/GOOD |
| # of Stories  1.5 | | ☒ Full Basement  ☐ Partial Basement | | Exterior Walls  WSI/GOOD | Walls  DRYWALL/GOOD |
| Type  ☒ Det.  ☐ Att.  ☐ S-Det./End Unit | | Basement Area  960 sq.ft. | | Roof Surface  COMP/AVG | Trim/Finish  WOOD/GOOD |
| ☒ Existing  ☐ Proposed  ☐ Under Const. | | Basement Finish  50 % | | Gutters & Downspouts  MTL-MTL/GOOD | Bath Floor  VINYL/GOOD |
| Design (Style)  1.5 STY.BAS. | | ☒ Outside Entry/Exit  ☐ Sump Pump | | Window Type  VINYL INS/GOOD | Bath Wainscot  LAM/GOOD |
| Year Built  1942 | | Evidence of  ☐ Infestation  NONE | | Storm Sash/Insulated  INSULATED/GOOD | Car Storage  ☒ None |
| Effective Age (Yrs)  10 | | ☐ Dampness  ☐ Settlement | | Screens  YES/GOOD | ☒ Driveway  # of Cars  MULTI |
| Attic  ☐ None | | Heating  ☐ FWA  ☐ HWBB  ☐ Radiant | | Amenities  ☒ Woodstove(s) # 1 | Driveway Surface  GRAVEL |
| ☐ Drop Stair  ☐ Stairs | | ☒ Other  WLL/BB  Fuel  ELEC | | ☒ Fireplace(s) #  1  ☐ Fence | ☐ Garage  # of Cars |
| ☐ Floor  ☐ Scuttle | | Cooling  ☐ Central Air Conditioning | | ☒ Patio/Deck  DECK  ☒ Porch | ☐ Carport  # of Cars |
| ☐ Finished  ☐ Heated | | ☐ Individual  ☐ Other | | ☐ Pool  ☐ Other | ☐ Att.  ☐ Det.  ☐ Built-in |

Appliances  ☒ Refrigerator  ☒ Range/Oven  ☒ Dishwasher  ☐ Disposal  ☐ Microwave  ☒ Washer/Dryer  ☐ Other (describe)
Finished area above grade contains:    6 Rooms    3 Bedrooms    1.75 Bath(s)    1,344 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.).    See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    See attached addenda.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes  ☒ No  If Yes, describe

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes  ☐ No  If No, describe

| | | |
|---|---|---|
| Freddie Mac Form 70 March 2005 | Page 1 of 6 | Fannie Mae Form 1004 March 2005 |

File No. 60871| Page #4

## Uniform Residential Appraisal Report
File # 60871

| There are | 4 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 285,000 | to $ 375,000 |
| There are | 5 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 285,000 | to $ 375,000 |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 20908 48TH AV. W LYNNWOOD, WA 98036-7708 | 23062 39TH AV. W BRIER, WA | 19818 13TH PL.W LYNNWOOD, WA | 23901 48TH AV. W MOUNTLAKE TERR, WA |
| Proximity to Subject | | 1.24 MILES | 1.69 MILES | 2.0 MILES |
| Sale Price | $ REFIN | $ 395,000 | $ 380,000 | $ 422,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 319.58 sq.ft. | $ 244.85 sq.ft. | $ 225.67 sq.ft. |
| Data Source(s) | | METROSCAN/MLS/EXT.INSP. | METROSCAN/MLS/EXT.INSP. | METROSCAN/EXT.INSP. |
| Verification Source(s) | | AFN#/20060728-0157 | AFN#20061117-0885 | AFN#20060905-0232 |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment | DESCRIPTION +(-) $ Adjustment |
| Sales or Financing Concessions | | CONVENT. NONE NOTED | CONVENT. NONE NOTED | CONVENT. NONE NOTED |
| Date of Sale/Time | | 07/28/2006 | 11/17/2006 | 09/05/2006 |
| Location | AVERAGE | AVERAGE | AVERAGE | AVERAGE |
| Leasehold/Fee Simple | Fee Simple | FEE SIMPLE | FEE SIMPLE | FEE SIMPLE |
| Site | 0.22 +/- ACRES | 0.35 +/- ACRES  -7,500 | 0.14 +/- ACRES  +5,000 | 0.34+/- ACRES  -7,500 |
| View | NONE | NONE | NONE | NONE |
| Design (Style) | 1.5 STY.BAS. | 1.5 STORY | 1.5 STY.BAS. | 2 STY.BAS. |
| Quality of Construction | AVERAGE | AVERAGE | AVERAGE | AVERAGE |
| Actual Age | A64/E10 | A23/E10 | A4/E3  -7,000 | A23/E10 |
| Condition | GOOD | GOOD | GOOD | GOOD |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths | Total Bdrms. Baths |
| Room Count | 6  3  1.75 | 6  3  2.5  -1,500 | 6  3  2.50  -1,500 | 7  4  2.5  -1,500 |
| Gross Living Area | 1,344 sq.ft. | 1,236 sq.ft.  +3,240 | 1,552 sq.ft.  -6,240 | 1,870 sq.ft.  -15,780 |
| Basement & Finished | 960 Sq.Ft. | 0 SF  +14,400 | 485 SF  +7,125 | 450 SF  +7,650 |
| Rooms Below Grade | 2-1-0 | 0-0-0 | 2-1-1  -3,000 | 1-0-.50  -1,500 |
| Functional Utility | AVERAGE | AVERAGE | AVERAGE | AVERAGE |
| Heating/Cooling | BB/WLL/EL/NO | FA GAS/NO | FA GAS/NONE | WLL ELE/NO |
| Energy Efficient Items | INS.WINDOWS | INS.WINDOWS | INS.WINDOWS | INS.WINDOWS |
| Garage/Carport | NONE | 2-CAR GAR  -4,000 | 2-CAR GAR.  -4,000 | 1-CAR GAR.  -2,000 |
| Porch/Patio/Deck | PORCH,DECK | SIMILAR | SIMILAR | SIMILAR |
| | 1 FPL | 1 FPL | 1 FPL | 1 FPL |
| Net Adjustment (Total) | | ☒ + ☐ - $  4,640 | ☐ + ☒ - $  -9,615 | ☐ + ☒ - $  -20,630 |
| Adjusted Sale Price of Comparables | | Net Adj. 1.2 % Gross Adj. 7.8 % $ 399,640 | Net Adj. 2.5 % Gross Adj. 8.9 % $ 370,385 | Net Adj. 4.9 % Gross Adj. 8.5 % $ 401,370 |

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)  METROSCAN

My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)  METROSCAN

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | NO SALES IN LAST 3 | NO SALES IN LAST YEAR | NO SALES IN LAST YEAR | NO SALES IN LAST YEAR |
| Price of Prior Sale/Transfer | YEARS | METROSCAN/MLS | METROSCAN/MLS | METROSCAN/MLS |
| Data Source(s) | METROSCAN/MLS | | | |
| Effective Date of Data Source(s) | | | | |

Analysis of prior sale or transfer history of the subject property and comparable sales    THE SUBJECT HAS NOT SOLD OR TRANSFERRED IN THE LAST 3 YEARS, OR LISTED FOR SALE IN THE LAST 12 MONTHS. THE COMPARABLE SALES HAVE NOT SOLD PREVIOUSLY IN THE LAST 12 MONTHS.

Summary of Sales Comparison Approach    AFN#=AUDITOR'S FILE NUMBER AT CLOSING. THE EXHIBITED COMPARABLE SALES ARE RECENT CLOSED SALES OF SIMILAR STYLE AND/OR SIMILAR EFFECTIVE AGE AND UPDATING IN THE SUBJECT'S MARKET AREA. DUE TO A LACK OF RECENT SALES OF SIMILAR STYLE, AGE AND UPDATING IT WAS NECESSARY TO RESEARCH ADJOINING NEIGHBORHOODS TO A 2 MILE DISTANCE FROM THE SUBJECT, ALL WITHIN THE SAME GENERAL MARKET AREA. SITE ADJUSTMENTS WERE BASED ON RELATIVE LAND VALUE DIFFERENCES. CS #1 WAS PROVIDED AS A RECENT SALE WHICH IS SMALLER ABOVE GRADE, ALTHOUGH A SLIGHTLY DIFFERENT STYLE, ALL WERE ADJUSTED FOR SUPERIOR CAR STORAGE.  ADJUSTMENTS MADE IN THE MARKET ANALYSIS GRID ARE BASED ON MARKET REACTION AND NOT COST.

Indicated Value by Sales Comparison Approach $  400,000

Indicated Value by: Sales Comparison Approach $  400,000    Cost Approach (if developed) $  401,972    Income Approach (if developed) $

THE SALES COMPARISON APPROACH TO VALUE IS GIVEN MOST WEIGHT IN DETERMINING THE SUBJECTS FINAL ESTIMATE OF VALUE, AS IT BEST REFLECTS THE MOTIVATIONS OF BUYERS AND SELLERS IN THE MARKETPLACE. THE COST APPROACH IS USED AS A GUIDE, AND SHOWS SUPPORT.  INCOME APPROACH NOT MEANINGFUL FOR OWNER OCC. PROPERTIES.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  PERSONAL PROPERTY WAS NOT INCLUDED IN THIS VALUATION. THIS PROPERTY APPRAISED IN "AS IS" CONDITION.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  400,000 , as of   December 4, 2006 , which is the date of inspection and the effective date of this appraisal.

File No. 60871| Page #5

# Uniform Residential Appraisal Report    File # 60871

ADDITIONAL COMMENTS

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)     (1) 18705 LARCH WAY, LYNNWOOD SOLD 03/07/06 FOR $165,000 AND IS 0.29 AC. (2) 3728 SERENE WAY, LYNNWOOD SOLD 06/16/05 FOR $159,950 AND IS 0.17 AC. (3) 5500 166TH PL.SW, LYNNWOOD SOLD 09/06/05 FOR $155,000 AND IS 0.18 AC. (4) 23620 20TH AV.W, BOTHELL SOLD 03/14/06 FOR $170,000 AND IS 0.29 AC. SUBJECT LOT VALUE ESTIMATED AT $160,000.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ | 160,000 |
|---|---|---|---|---|
| Source of cost data  MARSHALL-SWIFT/BUILDERS/SUPPLIERS | DWELLING | 1,344 Sq.Ft. @ $ 120.00 | =$ | 161,280 |
| Quality rating from cost service  AVG      Effective date of cost data  2006 | | 960 Sq.Ft. @ $ 75.00 | =$ | 72,000 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | FPL/B-IN'S/PORCH/DECK | | =$ | 7,800 |
| See attached addenda. | Garage/Carport | Sq.Ft. @ $ | =$ | |
| | Total Estimate of Cost-New | | =$ | 241,080 |
| | Less   Physical | Functional | External | |
| | Depreciation   24,108 | | =$( | 24,108) |
| | Depreciated Cost of Improvements | | =$ | 216,972 |
| | "As-is" Value of Site Improvements | | =$ | 25,000 |
| Estimated Remaining Economic Life (HUD and VA only)     40 Years | INDICATED VALUE BY COST APPROACH | | =$ | 401,972 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $      N/A      X Gross Rent Multiplier     N/A    = $ | Indicated Value by Income Approach |
|---|---|
| Summary of Income Approach (including support for market rent and GRM)     N/A | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?   ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?   ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871 Page #6

## Uniform Residential Appraisal Report
File # 60871

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Uniform Residential Appraisal Report    File # 60871

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871| Page #8

## Uniform Residential Appraisal Report

File # 60871

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Tom Gardner | Name |
| Company Name  MAHON & RUTLEDGE APPRAISAL | Company Name |
| Company Address | Company Address |
| 14030 NE 24TH ST., #102 BELLEVUE, WA 98007 | |
| Telephone Number  425 454 4100 | Telephone Number |
| Email Address  tgardner@mahonandrutledge.com | Email Address |
| Date of Signature and Report  December 05, 2006 | Date of Signature |
| Effective Date of Appraisal  December 4, 2006 | State Certification # |
| State Certification # | or State License # |
| or State License #  27016-1600489 | State |
| or Other (describe) _____ State # ____ | Expiration Date of Certification or License |
| State  WA | |
| Expiration Date of Certification or License   5/31/2007 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 20908 48TH AV. W | Date of Inspection |
| LYNNWOOD, WA 98036-7708 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $   400,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name | COMPARABLE SALES |
| Company Name  ATLAS MORTGAGE | |
| Company Address   LYNNWOOD, WA | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Supplemental Addendum

File No. 60871

| Borrower/Client | MIZE | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | | |
| City | LYNNWOOD | | County | SNOHOMISH | | State WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | | |

• **URAR: Neighborhood Boundaries and Characteristics**
NORTH TO 168TH ST. SW, WEST TO 76TH AV. SW, SOUTH TO SW 212TH ST., AND EAST TO LOCUST WAY.
THE NEIGHBORHOOD IS RESIDENTIAL IN CHARACTER, WITH OLDER AND NEWER RESIDENTIAL PLATS
INTERSPERSED WITH SMALL ACREAGE PROPERTIES, AND MULTI-FAMILY, CONDOMINIUMS AND RETAIL USES
TYPICALLY LOCATED ALONG THE MAIN ARTERIALS NEAR CENTRAL AREAS. UNFAVORABLE CONDITIONS
AFFECTING MARKETABILITY OR VALUE WERE NOT OBSERVED.

**URAR: Neighborhood Market Conditions**
THE REAL ESTATE MARKET IN THE GREATER PUGET SOUND MARKET HAS SHOWN PRICE INCREASES OVER THE
PAST YEAR. WITH JOB INCREASES AT THE BOEING COMPANY, THE REGIONS LARGEST EMPLOYER, AS WELL AS
MICROSOFT INCREASING DEMAND, AND A LIMITED AMOUNT OF LISTINGS INCREASING PRICES.
THE AREA IS A MAJOR TRADING PARTNER WITH THE ASIAN RIM AND ITS ECONOMY IS WIDELY DIVERSIFIED. THE
AREA IS HOME TO SOME OF THE STATES LARGEST EMPLOYERS SUCH AS BOEING AIRCRAFT, PAC CAR,
MICROSOFT AND A PROLIFERATION OF HIGH TEC COMPANIES. MOST HOUSING SECTORS ARE CONTINUING TO
SEE PRICE APPRECIATION. MUCH OF THE HOUSING STRENGTH IS DUE TO INTEREST RATES, DESPITE RISING
SEVERAL TIMES OVER THE LAST YEAR.  HOMES THAT ARE PROPERLY PRICED AND PROFESSIONALLY MARKETED
ARE TYPICALLY SELLING WITHIN 1-3 MONTHS AND WITHIN 97-100% OF ASKING PRICE. SELLING CONCESSIONS
USUALLY CONSIST OF SELLER PAID CLOSING COSTS WHICH IS TYPICAL IN THE MARKET AND HAVE NO EFFECT
ON MARKETABILITY OR VALUE.

• **URAR: Neighborhood Market Factors**
THE SUBJECT PROPERTY IS CONVENIENTLY LOCATED APPROXIMATELY 1.5 MILES SW OF THE CENTRAL
BUSINESS AND COMMERCIAL AREA OF LYNNWOOD, IN WASHINGTON STATE, USA.  MAJOR EMPLOYMENT
CENTERS ARE WITHIN 5-30 MINUTES, AND SHOPPING, SCHOOLS AND PARKS, AS WELL AS MOST COMMUNITY
SERVICES ARE ALL CONVENIENTLY LOCATED NEARBY. THE NEIGHBORHOOD IS COMPRISED OF MOSTLY
AVERAGE TO GOOD QUALITY SFR DETACHED HOMES OF VARIED AND COMPATIBLE DESIGNS THAT SHOW
ADEQUATE MAINTENANCE LEVELS AND MARKET APPEAL.

• **URAR: Site Comments**
THE SUBJECT SITE IS SERVED BY MOST ALL DESIRED UTILITIES. THE ATTACHED PLAT MAP SHOWS THE SITE
BEFORE A RECENT SUBDIVIDING, WHICH HAS NOT YET BEEN UPDATED ON COUNTY RECORDS. THE CURRENT
SUBJECT SITE IS APPROXIMATELY 9,400 SF +/-.

• **URAR: Condition of Improvements**
THE SUBJECTS  FLOOR PLAN IS FELT TO BE TYPICAL OF ITS AGE/DESIGN, AND SHOULD MEET WITH AVERAGE
MARKET ACCEPTANCE AND APPEAL. THE SUBJECT PROPERTY APPEARS TO BE IN ADEQUATE CONDITION, WITH
NO FUNCTIONAL OR PHYSICAL INADEQUACIES OBSERVED DURING THE INSPECTION.

• **URAR: Additional Features**
HARDWOOD FLOORS ON THE MAIN LEVEL.  THE SUBJECT HAS BEEN REMODELED AND UPDATED. UPDATED
WITH UPDATED ELECTRICAL AND PLUMBING SYSTEMS, VINYL DOUBLE PANE INSULATED WINDOWS
THROUGHOUT.  OAK CABINETRY AND NEWER APPLIANCES IN THE UPDATED KITCHEN AND BATHS. NEW
CARPETS AND NEWLY FINISHED LOWER FAMILY ROOM. WOODSTOVE INSERT IN THE LIVING ROOM FIREPLACE.

• **URAR: Cost Approach Comments**
THE COST APPROACH IS NOT REQUIRED FOR FNMA APPRAISALS, BUT IS USED AS A GUIDE AND SHOWS
SUPPORT. LAND VALUE DETERMINED BY VACANT LAND SALES IN THE SUBJECT'S MARKET AREA.

**Environmental Disclaimer:**
THE APPRAISER ASSUMES THERE ARE NO HIDDEN OR UNAPPARENT CONDITIONS OF THE PROPERTY, SUBSOIL,
OR STRUCTURE WHICH WOULD RENDER THE REAL ESTATE APPRAISED MORE OR LESS VALUABLE.  THE
APPRAISER ASSUMES NO RESPONSIBILITY FOR SUCH CONDITIONS, OR FOR THE ENGINEERING WHICH MIGHT BE
REQUIRED TO DISCOVER SUCH FACTORS.  UNLESS OTHERWISE STATED IN THIS REPORT, THE EXISTENCE OF
HAZARDOUS MATERIALS, WHICH MAY OR MAY NOT BE PRESENT ON THE PROPERTY, WERE NOT OBSERVED BY
THE APPRAISER.  THE APPRAISER HAS NO KNOWLEDGE OF THE EXISTENCE OF SUCH MATERIALS, ON OR IN THE
PROPERTY APPRAISED, NOR IS THE APPRAISER QUALIFIED TO DETECT SUCH SUBSTANCES.  THE PRESENCE OF
SUBSTANCES SUCH AS ASBESTOS, UREA-FORMALDEHYDE FOAM INSULATION, RADON GAS, OR ANY OTHER
POTENTIALLY HAZARDOUS MATERIAL MAY AFFECT THE VALUE OF THE PROPERTY APPRAISED.  THE VALUE
ESTIMATE IS PREDICATED ON THE ASSUMPTION THAT THERE ARE NO SUCH MATERIALS ON OR IN THE SUBJECT
PROPERTY THAT WOULD CAUSE A LOSS OF VALUE.  NO RESPONSIBILITY IS ASSUMED BY THE APPRAISER FOR
ANY SUCH CONDITIONS, OR FOR ANY EXPERTISE OR ENGINEERING KNOWLEDGE REQUIRED TO DISCOVER
THEM.  THE CLIENT IS ADVISED TO RETAIN AN EXPERT IN THE FIELD, IF DESIRED.

File No. 60871 Page #10

## Supplemental Addendum

File No. 60871

| Borrower/Client | MIZE | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | | |
| City | LYNNWOOD | | County | SNOHOMISH | State | WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | | |

**Digital Signature Acknowledgement:**

APPRAISER ACKNOWLEDGES AND AGREES, IN CONNECTION WITH ELECTRONIC SUBMISSION OF APPRAISALS TO OUR CLIENTS AND/OR ANY OF THEIR AFFILIATES AS FOLLOWS:

THIS APPRAISAL COMPLIES WITH USPAP SMT-8, AND WHEN APPLICABLE TO FEDERAL HOUSING ADMINISTRATION OR DEPARTMENT OF VETERAN AFFAIRS STANDARDS AND REQUIREMENTS.

THIS SOFTWARE UTILIZED BY THE APPRAISER TO GENERATE THE APPRAISAL PROTECTS SIGNATURE SECURITY BY MEANS OF A DIGITAL SIGNATURE SECURITY FEATURE FOR EACH APPRAISER SIGNING THE REPORT, AND EACH APPRAISER MAINTAINS SOLE CONTROL OF THEIR RELATED SIGNATURE THROUGH A PASSWORD, HARDWARE DEVICE OR OTHER MEANS.

THE APPRAISER IS FULLY RESPONSIBLE FOR THE INTEGRITY AND AUTHENTICITY OF THE DATA AND SIGNATURES TRANSMITTED ELECTRONICALLY AND WILL HOLD OUR CLIENT HARMLESS FROM AND AGAINST ANY BREACH OR FAILURE OF DATA INTEGRITY, SIGNATURE AUTHENTICITY, OR BREACH OF DATA SECURITY.

ADOBE'S DISTILLER SOFTWARE OR EQUIVALENT IS UTILIZED BY THE APPRAISER TO TRANSMIT THIS PDF FORMATTED APPRAISAL. AT A MINIMUM, THE SOFTWARE CONTAINS THE FOLLOWING SECURITY MEASURES:

1. IDENTIFIES TRANSMISSION ERRORS DURING THE TRANSMISSION PROCESS, AND:

2. CONFIRMS THE DATE, TIME AND QUANTITY OF THE DATA SUBMITTED BY THE APPRAISER AND THE DATE, TIME AND QUANTITY OF THE DATA RECEIVED BY THE CLIENT, AND:

3. SECURES DATA FROM EDITING BY MEANS OF A PASSWORD, HARDWARE DEVICE, OR OTHER MEANS THAT REMAIN IN THE SOLE CONTROL OF THE TRANSMITTING APPRAISER.

ALL SUCH TRANSMISSIONS SHALL BE ROUTED ONLY TO THE CLIENT AT THE EMAIL ADDRESS PROVIDED IN THE ASSIGNMENT REQUEST AT THE TIME THE ORDER WAS PLACED, UNLESS SUBSEQUENTLY DIRECTED OTHERWISE BY THE CLIENT. THE APPRAISER AGREES THAT NO SUCH SUBSEQUENT TRANSMISSION WILL RESULT IN ADDITIONAL FEES BILLED TO THE CLIENT, UNLESS AGREED TO BY THE CLIENT BEFORE SAID SUBSEQUENT TRANSMISSION.

NO DUPLICATE TRANSMISSION OF THIS REPORT WILL BE MADE AND NO DELIVERY OF A HARD COPY OF THIS REPORT WILL BE MADE UNTILL THE APPRAISER HAS RECEIVED THE CLIENTS PERMISSION.

File No. 60871 Page #11

## Plat Map

| Borrower/Client | MIZE | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | | |
| City | LYNNWOOD | | County | SNOHOMISH | State | WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | | |



File No. 60871| Page #12

## Building Sketch

| | |
|---|---|
| Borrower/Client | MIZE |
| Property Address | 20908 48TH AV. W |
| City | LYNNWOOD |
| Lender | ATLAS MORTGAGE |

County SNOHOMISH   State WA   Zip Code 98036-7708



Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 960.00 | 960.00 |
| GLA2 | Second Floor | 384.00 | 384.00 |
| BSMT | Basement | 960.00 | 960.00 |
| P/P | Deck | 80.00 | 80.00 |
| | | | |
| **TOTAL LIVABLE** (rounded) | | | **1344** |

| LIVING AREA BREAKDOWN | |
|---|---|
| Breakdown | Subtotals |
| First Floor | |
| 30.0 x 32.0 | 960.00 |
| Second Floor | |
| 12.0 x 32.0 | 384.00 |
| | |
| **2 Calculations Total (rounded)** | **1344** |

Form SKT.BldSkd — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871| Page #13

## Subject Photo Page

| Borrower/Client | MIZE | | | | |
|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | |
| City | LYNNWOOD | County SNOHOMISH | | State WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | |



**Subject Front**

1214 183RD ST. SE

| Sales Price | REFIN |
|---|---|
| Gross Living Area | 1,969 |
| Total Rooms | 6 |
| Total Bedrooms | 2 |
| Total Bathrooms | 2.0 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.68 +/- ACRES |
| Quality | AVERAGE |
| Age | A27/E15 |



**Subject Rear**



**Subject Street**

Form PIC3x5.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

File No. 60871| Page #14

## Comparable Photo Page

| Borrower/Client | MIZE | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | | |
| City | LYNNWOOD | County | SNOHOMISH | | State | WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | | |



### Comparable 1
23062 39TH AV. W

| | |
|---|---|
| Prox. to Subject | 1.24 MILES |
| Sale Price | 395,000 |
| Gross Living Area | 1,236 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.35 +/- ACRES |
| Quality | AVERAGE |
| Age | A23/E10 |



### Comparable 2
19816 13TH PL. W

| | |
|---|---|
| Prox. to Subject | 1.69 MILES |
| Sale Price | 380,000 |
| Gross Living Area | 1,552 |
| Total Rooms | 6 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.50 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.14 +/- ACRES |
| Quality | AVERAGE |
| Age | A4/E3 |



### Comparable 3
23901 48TH AV. W

| | |
|---|---|
| Prox. to Subject | 2.0 MILES |
| Sale Price | 422,000 |
| Gross Living Area | 1,870 |
| Total Rooms | 7 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.5 |
| Location | AVERAGE |
| View | NONE |
| Site | 0.34+/- ACRES |
| Quality | AVERAGE |
| Age | A23/E10 |

File No. 60871 Page #15

## Location Map

| Borrower/Client | MIZE | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 20908 48TH AV. W | | | | | |
| City | LYNNWOOD | County | SNOHOMISH | State | WA | Zip Code 98036-7708 |
| Lender | ATLAS MORTGAGE | | | | | |



File No. 60871 | Page #16

# STATE OF WASHINGTON

DEPARTMENT OF LICENSING - BUSINESS AND PROFESSIONS DIVISION

THIS CERTIFIES THAT THE PERSON NAMED HEREON IS AUTHORIZED, AS PROVIDED BY LAW, AS A

STATE LICENSED REAL ESTATE APPRAISER

THOMAS EUGENE GARDNER
14030 NE 24TH ST #102
BELLEVUE WA  98007



| Cert/Lic No. | Issued Date | Expiration Date | |
|---|---|---|---|
| 1600489 | 07/25/1991 | 05/31/2007 | Director |

File No. 60871) Page #2



# APPRAISAL OF REAL PROPERTY

### LOCATED AT:
20908 48TH AV. W
3. 90 FT OF E 1/3 N 3/4 NE1/4 SW1/4 SE1/4 ALSO E 25 FT OF S 160 FT....(
LYNNWOOD, WA  98036-7708

### FOR:
ATLAS MORTGAGE

### AS OF:
December 4, 2006

### BY:
Tom Gardner

12-07-2006  P03:23

Form GA4 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Exhibit

# M

# Our Business

In 1970, Congress created Freddie Mac with a few important goals in mind:

- Make sure that financial institutions have mortgage money to lend
- Make it easier for consumers to afford a decent house or apartment
- Stabilize residential mortgage markets in times of financial crisis

To fulfill this mission, Freddie Mac conducts business in the U.S. secondary mortgage market – meaning we do not originate loans – and works with a national network of mortgage lending customers. We have three business lines: a Single Family Credit Guarantee business for home loans; a Multifamily business for apartment financing; and an investment portfolio.

- Single-Family Credit Guarantee Business
- Multifamily Business
- Investment Business

Learn more about the benefits of our mortgage funding.

## Single-Family Credit Guarantee Business

In our Single-Family business, we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are sold in global capital markets, and recycle the proceeds back to lenders. This recycling is designed to ensure that lenders have mortgage money to lend.

In the first nine months of 2010, Freddie Mac purchased or guaranteed $261 billion in single-family home loans – funding one out of every four mortgages originated in the market. At the end of the third quarter 2010, our total outstanding obligations of mortgage-backed securities stood at $1.8 trillion.

What makes the securitization process work? Families paying their mortgages every month. Because once a family moves into their home, their monthly payments of mortgage principal and interest are transferred ultimately to securities investors. When a family stops making payments – often due to loss of income – Freddie Mac steps in and makes those payments to securities investors. Managing this risk, known as credit risk, is how we generate revenue. Each time we fund a loan, we collect a credit guarantee fee from the lender selling us the loan. This fee is intended to protect us in case of loan default.

Other features of this business line:

- We guarantee mortgages exclusively in the conventional conforming market, where we purchase loans only up to a certain dollar amount (for 2011, $417,000 for most of the nation and $729,750 in certain high-cost areas)
- The vast majority of the loans we fund are long term, fixed rate mortgages
- We generally require third-party mortgage insurance on loans with low downpayments
- We have loan servicing operations that work with lenders to avoid foreclosure, where possible, for families in financial difficulty

## Multifamily Business

Since not everyone owns their own home, Freddie Mac supports renters, too. Through our Multifamily business, we work with a network of lenders to finance apartment buildings around the country. Like single-family loans, these lenders originate and close loans that Freddie Mac later purchases; lenders then use the proceeds to originate additional loans.

Unlike single-family loans, which are relatively small in dollar amount and standardized in their composition and underwriting, multifamily loans typically are several million dollars in size, have underwriting characteristics that vary from property to property, and require custom examination such

as on-site property inspections and verification of income cash flows (i.e., rents). One other difference: while single-family borrowers are individual consumers, multifamily borrowers are property developers and/or managers.

In this business line, Freddie Mac finances most of its loan acquisitions through mortgage securitization. We also finance a portion through our investment portfolio.

During 2010, Freddie Mac funded $15 billion in multifamily loans - financing more than 1,000 properties amounting to 241,000 apartment units.

## Investment Business

The investment portfolio invests in mortgage-related securities that are guaranteed by Freddie Mac and other financial institutions. The portfolio also invests in individual loans that are guaranteed by Freddie Mac but not immediately securitized. As a bidder in the market, the investment portfolio helps to make mortgage-related securities more liquid and mortgage funding more available.

We fund acquisition of mortgage securities by issuing corporate debt securities. From this activity, we produce net income; that is, the difference between the interest payments we collect on the securities we buy and the yields we pay investors for buying our debt. In the first quarter of 2011, the investment portfolio acquired a net of $1.8 billion in mortgage assets, and had an ending balance of $692 billion. Roughly one-third of this balance includes Freddie Mac mortgage-backed securities, known as Participation Certificates, guaranteed by the Single-Family and Multifamily businesses. During 2011, the investment portfolio can be no larger than $729 billion, per our regulator.

© 2011 Freddie Mac

# Our Business

In 1970, Congress created Freddie Mac with a few important goals in mind:

- Make sure that financial institutions have mortgage money to lend
- Make it easier for consumers to afford a decent house or apartment
- Stabilize residential mortgage markets in times of financial crisis

To fulfill this mission, Freddie Mac conducts business in the U.S. secondary mortgage market – meaning we do not originate loans – and works with a national network of mortgage lending customers. We have three business lines: a Single Family Credit Guarantee business for home loans; a Multifamily business for apartment financing; and an investment portfolio.

- Single-Family Credit Guarantee Business
- Multifamily Business
- Investment Business

Learn more about the benefits of our mortgage funding.

## Single-Family Credit Guarantee Business

In our Single-Family business, we use mortgage securitization to fund millions of home loans every year. Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are sold in global capital markets, and recycle the proceeds back to lenders. This recycling is designed to ensure that lenders have mortgage money to lend.

In the first nine months of 2010, Freddie Mac purchased or guaranteed $261 billion in single-family home loans – funding one out of every four mortgages originated in the market. At the end of the third quarter 2010, our total outstanding obligations of mortgage-backed securities stood at $1.8 trillion.

What makes the securitization process work? Families paying their mortgages every month. Because once a family moves into their home, their monthly payments of mortgage principal and interest are transferred ultimately to securities investors. When a family stops making payments – often due to loss of income – Freddie Mac steps in and makes those payments to securities investors. Managing this risk, known as credit risk, is how we generate revenue. Each time we fund a loan, we collect a credit guarantee fee from the lender selling us the loan. This fee is intended to protect us in case of loan default.

Other features of this business line:

- We guarantee mortgages exclusively in the conventional conforming market, where we purchase loans only up to a certain dollar amount (for 2011, $417,000 for most of the nation and $729,750 in certain high-cost areas)
- The vast majority of the loans we fund are long term, fixed rate mortgages
- We generally require third-party mortgage insurance on loans with low downpayments
- We have loan servicing operations that work with lenders to avoid foreclosure, where possible, for families in financial difficulty

## Multifamily Business

Since not everyone owns their own home, Freddie Mac supports renters, too. Through our Multifamily business, we work with a network of lenders to finance apartment buildings around the country. Like single-family loans, these lenders originate and close loans that Freddie Mac later purchases; lenders then use the proceeds to originate additional loans.

Unlike single-family loans, which are relatively small in dollar amount and standardized in their composition and underwriting, multifamily loans typically are several million dollars in size, have underwriting characteristics that vary from property to property, and require custom examination such

as on-site property inspections and verification of income cash flows (i.e., rents). One other difference: while single-family borrowers are individual consumers, multifamily borrowers are property developers and/or managers.

In this business line, Freddie Mac finances most of its loan acquisitions through mortgage securitization. We also finance a portion through our investment portfolio.

During 2010, Freddie Mac funded $15 billion in multifamily loans - financing more than 1,000 properties amounting to 241,000 apartment units.

## Investment Business

The investment portfolio invests in mortgage-related securities that are guaranteed by Freddie Mac and other financial institutions. The portfolio also invests in individual loans that are guaranteed by Freddie Mac but not immediately securitized. As a bidder in the market, the investment portfolio helps to make mortgage-related securities more liquid and mortgage funding more available.

We fund acquisition of mortgage securities by issuing corporate debt securities. From this activity, we produce net income; that is, the difference between the interest payments we collect on the securities we buy and the yields we pay investors for buying our debt. In the first quarter of 2011, the investment portfolio acquired a net of $1.8 billion in mortgage assets, and had an ending balance of $692 billion. Roughly one-third of this balance includes Freddie Mac mortgage-backed securities, known as Participation Certificates, guaranteed by the Single-Family and Multifamily businesses. During 2011, the investment portfolio can be no larger than $729 billion, per our regulator.

© 2011 Freddie Mac

Go straight to content.

- Home   |
- Terms and Conditions   |
- Privacy Policy



Freddie Mac
How to Get Help with Your Mortgage

# Yes. Our records show that Freddie Mac is the owner of your mortgage.

En Español

## What to Do Next

1. **For help with your mortgage, contact your lender and let them know you would like to pursue assistance through the federal Making Home Affordable program.**

   (Your lender is the company to which you make your mortgage payments, and may also be referred to as a mortgage servicer.)  Your lender can help you determine if you are eligible for the Making Home Affordable Program.

   a. **Through the Making Home Affordable program,** there are several options available to you:

      - A **Home Affordable Modification** to help you obtain more affordable mortgage payments if you're behind in making your mortgage payments or believe you may be soon.

      - A **Home Affordable Refinance** to better position you for long-term homeownership success if you have been making timely mortgage payments but have been unable to refinance due to declining property values.

      - A **short sale** or **"deed-in-lieu of foreclosure"** to transition to more affordable housing if it is not realistic for you to keep your home.

      Freddie Mac is working with our mortgage servicers (your lenders) to offer these solutions to eligible borrowers with Freddie Mac-owned mortgages.  *Because Freddie Mac does not work directly with consumers, you will need to work with your lender to determine your best foreclosure prevention option.*

   b. **If you are not eligible for the Making Home Affordable program,** don't give up!  Ask your lender about other options to make your payments more affordable

# Exhibit

# N



Rob McKenna

# ATTORNEY GENERAL OF WASHINGTON

1125 Washington Street SE • PO Box 40100 • Olympia WA 98504-0100

October 13, 2010

Trustee Name
Address
City, State  Zip Code

RE:   **Potential Unlawful Foreclosure Practices in Washington**

Dear Foreclosure Trustee:

I am writing to you regarding serious problems associated with foreclosures in the state of Washington that we have been observing. As a trustee responsible for conducting non-judicial foreclosures, you have a statutory duty to perform all foreclosures in good faith and you owe that duty to both the homeowner and the lender. Your duty includes assuring that every procedural step, every legal notice, and all mandated mediation opportunities are provided to homeowners facing foreclosure in fullest conformance with the law.

Our office has been investigating lenders, mortgage servicers and local trustees. We have discovered that problems related to foreclosure processing are not limited to the national banks and mortgage servicers. In Washington, we have found evidence that foreclosure trustees appear to be ignoring laws specific to our state and may be regularly using some of the same questionable practices used by national banks, such as:

- Employees of foreclosure trustees are signing documents posing as the corporate officer of multiple banks and mortgage servicers. This may misstate the signer's role in the process and be a conflict of interest contrary to the trustee's duties to the homeowner.

- The signatures of some trustees vary widely from document to document, which suggests that trustees are signing other person's signatures. This problem is compounded by the fact that the signatures are notarized with a statement that the signer is the actual person standing before the notary.

- Trustees may be foreclosing on homes when there is no clear chain of ownership for the loan or the security interest. Trustees must be sure that the lender has the authority to foreclose and that the documents which create the chain of ownership are accurate. One of the problems emerging nationally is that lenders are "reverse-

ATTORNEY GENERAL OF WASHINGTON

Trustee Name
October 13, 2010
Page 2

engineering" the chain of title, including back-dating documents to make it appear as though the loan was passed from company to company on certain dates when no such assignment actually occurred.

- Since July 26, 2009, Washington trustees have been required to identify the actual owner of the loan and the company that is acting as servicer, with their addresses and a phone number for the servicer. Many default notices have gone out without this required information, which can make it harder for homeowners to contact and deal with their mortgage owners.

- Lenders with mortgages made between 2003 and 2007 must advise the borrower that he or she has the right to request mediation and, if requested, the loan owner will schedule the meeting to occur within fourteen days of the request. It is our understanding that lenders are regularly not telling homeowners about this right, which exists to help homeowners explore alternatives to foreclosure.

Your role as foreclosure trustee is to ensure that each foreclosure you conduct is completed in good faith and in full compliance with the law. Because Washington State law allows foreclosure without court oversight, you are the party most responsible for ensuring that foreclosures are done properly. Consequently, I ask you to suspend all foreclosures in which you have not yet confirmed that all foreclosure-related documents were lawfully signed, that the chain of ownership is clear and has been revealed to you in full, and that state consumer protection requirements have been followed.

Our Consumer Protection Division has already begun investigations regarding several trustees and I would ask for your cooperation when you are contacted. I have also directed our legal team to survey the foreclosure trustees that are not under investigation to determine whether and how they are reforming their practices to comply with the law.

Sincerely,

*Rob McKenna*

ROB MCKENNA
Attorney General

RMM:lra

cc:    Mortgage servicers and sub-servicers

FOR IMMEDIATE RELEASE                                                    back
April 06, 2011

### Attorney General steps in to ensure homeowners can contact foreclosure trustees

SEATTLE – Six months into its investigation into unlawful business practices by foreclosure trustees, the Washington Attorney General's Office announced that it has uncovered an additional widespread problem that jeopardizes homeowners' chances of stopping a foreclosure.

"Foreclosures run on strict timelines and homeowners need a human who they can talk with face to face when there's a problem," Attorney General Rob McKenna said. "They need an office where they can make last-minute payments or show documents that may prove reasons for stopping forced sales."

 "Washington law requires that foreclosure trustees maintain actual offices in our state and  local phone numbers for this reason," he continued. "But our investigation shows that some of the largest trustees are not in compliance and borrowers who have a legitimate reason to stop a foreclosure are having trouble reaching trustees."

McKenna said his office's Consumer Protection Division is contacting a handful of trustees believed to be violating the law. The office isn't naming those trustees at this time, but said they are processing large volumes of foreclosures in Washington. In addition, the office sent a letter today to all trustees operating in the state that notifies them of their obligations.

The state's Deed of Trust statute was amended in 2008 to ensure that trustees are knowledgeable about Washington law and that they are available for last-minute payoffs when homeowners are trying to catch up on their mortgages or have a legitimate reason to stop a sale. Having an agent in Washington State isn't sufficient; the law also requires that the trustee itself maintain an office with a phone where homeowners can go to resolve their foreclosure issues.

The investigation is being conducted solely by the Washington Attorney General's Office, which is also a participant in the multistate investigation by attorneys general into abuses in the mortgage servicing industry.

McKenna sent a letter to 52 trustees in October 2010, announcing its concerns about inaccurate documents, conflicts-of-interest, faulty chains of title and failure to provide disclosures and conduct mediations. The letter called on trustees to suspend any questionable foreclosures.

Since then, the office has requested and received documents from several trustees. Attorneys are reviewing the information they have received so far and are waiting for documents from other companies.

McKenna said homeowners who believe they have a legitimate reason to stop a

foreclosure should contact their trustee immediately, preferably with the advice of a housing counselor or an attorney. Foreclosure trustees have the power to postpone a foreclosure sale whenever they think it is advantageous. Some possible reasons for stopping a foreclosure include: a mortgage servicer failed to credit payments, the homeowner never received notice of the foreclosure, one division of the mortgage servicer promised a loan modification while the other started the foreclosure process, the homeowner has a genuine contract to sell his home but the servicer will not respond to the sales offer.

A homeowner who is unable to find a local address or phone number for their trustee should file a complaint with the Attorney General's Office online at http://atg.wa.gov/FileAComplaint.aspx. However, this will not stop a foreclosure sale.  Homeowners should also contact a housing counselor or an attorney.

Washington is a "non-judicial foreclosure" state, which means that a lender can proceed directly to selling a home at public auction without first filing a lawsuit. This process was created by the state Legislature. Although lenders may foreclose in court in Washington, they almost always choose non-judicial foreclosures.

If a trustee is unwilling to stop a foreclosure, then the homeowner must file a lawsuit under the Deed of Trust Act and obtain a court order before the sale. Bankruptcy may stop or delay a foreclosure but it may also put the homeowner in a worse position. Legal representation is essential to a successful case, McKenna said.

BORROWER RESOURCES:

- If you believe unlawful activity has occurred in regard to your mortgage, you should speak with an attorney. A homeowner may file a suit to challenge a foreclosure, but they must do so prior to the foreclosure sale.
- If you are unable to afford a lawyer, you should contact the Washington State Homeownership Information Hotline at 1-877-894-4663 (HOME) for referral to the Home Foreclosure Legal Aid Project. The hotline can also refer to you a free, state-approved housing counselor.
- Te Attorney General's Office cannot stop a foreclosure or provide individuals with legal advice, as the office is barred by law from representing private citizens.
- Homeowners should read the Washington Foreclosure Prevention Resources Guide, provided by the Seattle-King County Asset Building Collaborative Foreclosure Prevention Team and recommended by the Attorney General's Office and the Washington State Department of Financial Institutions.
- Additional resources can be found at www.atg.wa.gov/foreclosure.aspx.

Media Contact: Kristin Alexander, Media Relations Manager, (206) 464-6432

# Exhibit

# O

**BENEFICIARY DECLARATION PURSUANT TO CHAPTER 61.24 RCW (SB 5810) AND ☐FORECLOSURE☐LOSS MITIGATION FORM**

Borrower(s):      **BRYAN D MIZE**
Beneficiary:
Loan Servicer:   **JP Morgan Chase Bank NA**
Property:          **20908 48TH AVE. W., LYNNWOOD WA 98036**
Loan No.:          **3011430703**

**The undersigned beneficiary or authorized agent for the beneficiary hereby represents and declares under the penalty of perjury that [check the applicable box and fill in any blanks so that the trustee can insert, on the beneficiary's behalf, the applicable declaration in the notice of default required under chapter 61.24 RCW as specified in SB 5810 (☐his act☐]: Regarding the above-referenced loan (check applicable box ☐only ONE choice should apply):**

> **[X] (1)_The beneficiary or beneficiary's authorized agent has contacted the borrower under, and has complied with, section 2 of this act (contact provision to "assess the borrower's financial ability to pay the debt secured by the deed of trust and explore options for the borrower to avoid foreclosure").**

> **[ ] (2) The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required in section 2(5) of this act and, after waiting fourteen days after the requirements in section 2 of this act were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required under section 2 of this act.**

> **[ ] (3)_The borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee.**

> **[ ] (4) Under section 2 of this act, the beneficiary or the beneficiary's authorized agent has verified information that, on or before the date of this declaration, the borrower(s) has filed for bankruptcy, and the bankruptcy stay remains in place, or the borrower has filed for bankruptcy and the bankruptcy court has granted relief from the bankruptcy stay allowing the enforcement of the deed of trust."**

**SB 5810 Does NOT apply because, regarding the above-referenced loan:**

[ ] The deed of trust was made before January 1, 2003 or after December 31, 2007, inclusive; or

[ ] The property is vacant, as evidenced by the return of the keys or communication in writing from the borrower(s); or

[ ] The deed of trust secures a commercial loan; or

[ ] The deed of trust secures obligations of a grantor who is not the borrower or a guarantor; or

[ ] The deed of trust secures a purchaser's obligations under a seller-financed sale.


Dated: ___03/04/10_____

_Clement J. Durkin_
_____
(Beneficiary's/Authorized Agent's signature)

___Clement J. Durkin_____
Print Name

# Exhibit

# P

66000

When Recorded Return to
Bryan D & Rebecca C M
20908 48th Avenue West
Lynnwood, WA 98036

200109110176
09/11/2001 11:50 AM Snohomish
P.0004 RECORDED        County

*CHICAGO* (079156-1)

## STATUTORY WARRANTY DEED

THE GRANTOR, JOHN W. WEBB and DEANNA L. WEBB, husband and wife, for and in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration in hand paid, conveys and warrants to BRYAN D. MIZE and REBECCA C. MIZE, husband and wife, the following described real estate situated in the County of Snohomish, State of Washington:

The south 90 feet of the east 1/3rd of the north 3/4ths of the northeast quarter of the southwest quarter of the southeast quarter of section 21, township 27 north, range 4 east, W.M.;
Also the east 25 feet of the south 150 feet of the east 1/3rd of the north 3/4ths of the northeast quarter of the southwest quarter of the southeast quarter of section 21, township 27 north, range 4 east W.M.;
EXCEPT from said east 25 feet the south 90 feet thereof.
Situate in the County of Snohomish, State of Washington.

Tax Parcel No.: 270421-004-022-00
SUBJECT TO EASEMENTS, COVENANTS, CONDITIONS, AND RESTRICTIONS OF RECORD including those on Exhibit A attached hereto.

DATED this _29_ day of _August_ , 2001.

GRANTORS:

_John W. Webb_                          _Deanna L. Webb_
JOHN W. WEBB                                      DEANNA L. WEBB

                    Nevada
STATE OF ~~WASHINGTON~~ )
                    Clark   ) ss
COUNTY OF ~~SNOHOMISH~~ )

On this _29th_ day of _August_ , 2001, before me the undersigned, a Notary Public in and for the State of ~~Washington~~ Nevada duly commissioned and sworn, personally appeared ~~JOHN W. WEBB~~ and

- 1 -

DEANNA L. WEBB, ~~husband and~~ wife, to me known to be the individuals described in and who executed the within and foregoing instrument, and acknowledged that they signed the same as their free and voluntary act and deed, for the uses and purposes therein mentioned.

WITNESS my hand and official seal hereto affixed the day and year first above written.



NOTARY PUBLIC in and for the State of ~~Washington~~ Nevada, residing Las Vegas
My Appointment Expires: 2-7-2004

[do not put seal beyond 1-1/2" borders of this page]

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
ROX ANNE WARK
No. 06-59705-1
My Appointment Expires Feb. 7, 2004

- 2 -

200109110176

State of Washington

County of Snohomish

On this day personally appeared before me JOHN W WEBB, to me known to be the individual or individuals described in and who executed the within and foregoing instrument, and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the uses and purposes therein mentioned

Given under my hand and official seal this 31    day of august, 2001

STACEY BROWN-WILSON , a Notary Public
in and for the State of Washington, residing in
Monroe
My Commission Expires 04/08/03

200109110176

## EXHIBIT A

1.  Right to make necessary slopes for cuts or fills upon property herein described as granted in Deed:

    Grantee:            Snohomish County
    Recorded:           June 17, 1966
    Recording Number:   1874846

2.  Easement and the terms and conditions thereof:

    Grantee:            Public Utility District No. 1 of
                        Snohomish County
    Purpose:            Underground and/or overhead electric
                        transmission and/or distribution line.
    Area Affected:      Portion of the easterly 25 feet
    Recorded:           January 26, 1981
    Recording Number:   8101260159

3.  Easement and the terms and conditions thereof:

    Grantee:            <CL2
    Purpose:            Sanitary Sewer Lines
    Area Affected:      as shown on map attached thereto
    Recorded:           June 17, 1994
    Recording Number:   9406170479

4.  CLW Utility Connection Agreement and the terms, conditions and provisions contained therein:

    Recorded:           January 28, 1994
    Recording Number:   9401280148

5.  City of Lynnwood Utility Connection Agreement and the terms, conditions and provisions contained therein:

    Recorded:           June 17, 1994
    Recording Number:   9406170480

- 3 -

200109110176

# Exhibit Q

# PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

### AMONG

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA**

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**and**

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

**DATED AS OF**

**SEPTEMBER 25, 2008**

## TABLE OF CONTENTS

**ARTICLE I**        **DEFINITIONS** ................................................................................2

**ARTICLE II**       **ASSUMPTION OF LIABILITIES**.............................................8

| | | |
|---|---|---|
| 2.1 | Liabilities Assumed by Assuming Bank ....................................8 |
| 2.2 | Interest on Deposit Liabilities .................................................8 |
| 2.3 | Unclaimed Deposits .................................................................8 |
| 2.4 | Omitted ....................................................................................9 |
| 2.5 | Borrower Claims .....................................................................9 |

**ARTICLE III**      **PURCHASE OF ASSETS** ..........................................................9

| | | |
|---|---|---|
| 3.1 | Assets Purchased by Assuming Bank ........................................9 |
| 3.2 | Asset Purchase Price ...............................................................9 |
| 3.3 | Manner of Conveyance; Limited Warranty; Nonrecourse; Etc....................................................................10 |
| 3.4 | Puts of Assets to the Receiver................................................10 |
| 3.5 | Assets Not Purchased by Assuming Bank ...............................11 |
| 3.6 | Assets Essential to Receiver ...................................................11 |

**ARTICLE IV**      **ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS**.........13

| | | |
|---|---|---|
| 4.1 | Continuation of Banking Business...........................................13 |
| 4.2 | Agreement with Respect to Credit Card Business ....................13 |
| 4.3 | Agreement with Respect to Safe Deposit Business ..................13 |
| 4.4 | Agreement with Respect to Safekeeping Business ...................13 |
| 4.5 | Agreement with Respect to Trust Business ..............................13 |
| 4.6 | Agreement with Respect to Bank Premises ..............................14 |
| 4.7 | Agreement with Respect to Leased Data Processing Equipment.........................................................16 |
| 4.8 | Agreement with Respect to Certain Existing Agreements.................................................................16 |
| 4.9 | Informational Tax Reporting ..................................................17 |
| 4.10 | Insurance .................................................................................17 |
| 4.11 | Office Space for Receiver and Corporation.............................17 |
| 4.12 | Omitted ...................................................................................18 |
| 4.13 | Omitted ...................................................................................18 |

**ARTICLE V**       **DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK** ....................................................18

     5.1       Payment of Checks, Drafts and Orders ...................................18
     5.2       Certain Agreements Related to Deposits ................................18
     5.3       Notice to Depositors .............................................................18

**ARTICLE VI**       **RECORDS** ...........................................................................19

     6.1       Transfer of Records................................................................19
     6.2       Delivery of Assigned Records ...............................................20
     6.3       Preservation of Records ........................................................20
     6.4       Access to Records; Copies.....................................................20

**ARTICLE VII**       **BID; INITIAL PAYMENT** .................................................20

**ARTICLE VIII**       **PROFORMA** ......................................................................20

**ARTICLE IX**       **CONTINUING COOPERATION** .........................................21

     9.1       General Matters......................................................................21
     9.2       Additional Title Documents...................................................21
     9.3       Claims and Suits ...................................................................21
     9.4       Payment of Deposits .............................................................22
     9.5       Withheld Payments ................................................................22
     9.6       Proceedings with Respect to Certain Assets and Liabilities....................................................................22
     9.7       Information.............................................................................23

**ARTICLE X**       **CONDITION PRECEDENT** ...............................................23

**ARTICLE XI**       **REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK** .............................................................23

**ARTICLE XII**       **INDEMNIFICATION** .........................................................24

    12.1       Indemnification of Indemnitees .............................................25
    12.2       Conditions Precedent to Indemnification................................27
    12.3       No Additional Warranty.........................................................28
    12.4       Indemnification of Corporation and Receiver..........................29
    12.5       Obligations Supplemental .....................................................29
    12.6       Criminal Claims....................................................................29
    12.7       Limited Guaranty of the Corporation.....................................29
    12.8       Subrogation ...........................................................................30

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

**ARTICLE XIII**     **MISCELLANEOUS** ...................................................................**30**

  13.1    Entire Agreement ...................................................................30
  13.2    Headings ...................................................................30
  13.3    Counterparts ...................................................................30
  13.4    Governing Law ...................................................................30
  13.5    Successors ...................................................................30
  13.6    Modification; Assignment ...................................................................31
  13.7    Notice ...................................................................31
  13.8    Manner of Payment ...................................................................31
  13.9    Costs, Fees and Expenses ...................................................................32
  13.10    Waiver ...................................................................32
  13.11    Severability ...................................................................32
  13.12    Term of Agreement ...................................................................32
  13.13    Survival of Covenants, Etc. ...................................................................32

**SCHEDULES**

  2.1    Certain Liabilities Not Assumed ...................................................................34
  3.2    Purchase Price of Assets or Assets ...................................................................35
  3.5    Certain Assets Not Purchased ...................................................................37

**EXHIBIT**

  3.2(c)    Valuation of Certain Qualified Financial Contracts ...................................................................38

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

## PURCHASE AND ASSUMPTION AGREEMENT

## WHOLE BANK

**THIS AGREEMENT**, made and entered into as of the 25th day of September, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of WASHINGTON MUTUAL BANK, HENDERSON, NEVADA** (the "Receiver"), **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**, organized under the laws of the United States of America, and having its principal place of business in Seattle, Washington (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION**, organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

## WITNESSETH:

**WHEREAS**, on Bank Closing, the Chartering Authority closed Washington Mutual Bank (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS**, the Assuming Bank desires to purchase substantially all of the assets and assume all deposit and substantially all other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

> What is "Substantially"

**WHEREAS**, pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS**, the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS**, the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this [Article] I, or elsewhere in this Agreement. As used herein, words imparting the singular include the [plural] and vice versa.

> Discovery Item: "Recent Report of Examination" List of all "Loans or Securites" that are listed as "Sub-Standard, Doubtful or Loss"

"**Accounting Records**" means the general ledger and subsidiary ledgers [and] supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" means Subsidiaries of the Failed Bank acquire[d] pursuant to Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Perso[n] and any other Person (i) who is directly or indirectly controlling, or controlled by, or under dire[ct] or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

> the FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of WASHINGTON MUTUAL BANK, HENDERSON, NEVADA (the "Receiver"),

"**Agreement**" means this Purchase and Assumption Agreement by and among t[he] Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from tim[e] to time.

> Define Failed Bank

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

> What was this Date

"**Assumed Deposits**" means Deposits.

"**Bank Closing**" means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

"**Bank Premises**" means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

"**Bid Amount**" has the meaning provided in Article VII.

2

"**Book Value**" means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Assuming Bank for normal operational and timing differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary. The Book Value of a Subsidiary of the Failed Bank acquired by the Assuming Bank shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

> Discovery Request. What is this amount, What Adjustments were made,

"**Business Day**" means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

"**Chartering Authority**" means (i) with respect to a national bank, the Office of the Comptroller of the Currency, (ii) with respect to a Federal savings association or savings bank, the Office of Thrift Supervision, (iii) with respect to a bank or savings institution chartered by a State, the agency of such State charged with primary responsibility for regulating and/or closing banks or savings institutions, as the case may be, (iv) the Corporation in accordance with 12 U.S.C. Section 1821(c), with regard to self appointment, or (v) the appropriate Federal banking agency in accordance with 12 U.S.C. 1821(c)(9).

"**Commitment**" means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

3

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), including without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment (other than leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, and artwork.

"**Indemnitees**" means, except as provided in paragraph (11) of Section 12.1(b), (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

4

"**Initial Payment**" means the payment made pursuant to Article VII, the amount of which shall be either (i) if the Bid Amount is positive, the Bid Amount plus the Required Payment or (ii) if the Bid Amount is negative, the Required Payment minus the Bid Amount. The Initial Payment shall be payable by the Corporation to the Assuming Bank if the Initial Payment is a negative amount. The Initial Payment shall be payable by the Assuming Bank to the Corporation if the Initial Payment is positive.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

"**Liabilities Assumed**" has the meaning provided in Section 2.1.

"**Lien**" means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

"**Loans**" means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i)    loans (including loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to Bank Closing), participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, Commitments, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii)    all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii)    all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of "Loans" amounts owing under Qualified Financial Contracts.

"**Obligor**" means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

5

**"Other Real Estate"** means all interests in real estate (other than Bank Premises and Fixtures), including but not limited to mineral rights, leasehold rights, condominium and cooperative interests, air rights and development rights that are owned by the Failed Bank.

**"Payment Date"** means the first Business Day after Bank Closing.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

**"Primary Indemnitor"** means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

**"Proforma"** means producing a balance sheet that reflects a reasonably accurate financial statement of the Failed Bank through the date of closing. The Proforma financial statements serve as a basis for the opening entries of both the Assuming Bank and the Receiver.

**"Put Date"** has the meaning provided in Section 3.4.

**"Put Notice"** has the meaning provided in Section 3.4.

**"Qualified Financial Contract"** means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

**"Record"** means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

**"Related Liability"** with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

**"Related Liability Amount"** with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with

6

respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Required Payment**" means $50,000,000.00.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a)      (i) in the event of a negative Bid Amount, the amount paid by the Assuming Bank, discounted by a percentage equal to the quotient produced by dividing the Assuming Bank's Bid Amount by the aggregate Book Value of the Risk Assets of the Failed Bank;

(ii) in the event of a negative Bid Amount, the amount resulting from (a)(i), above, or in the event of a positive Bid Amount, the amount paid by the Assuming Bank, (x) for a Loan, shall be decreased by any portion of the Loan classified "loss" and by one-half of any portion of the Loan classified "doubtful" as of the date of Bank Closing, and (y) for any Asset or asset, including a Loan, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b)      the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable and the Bid Amount shall be considered to have been positive for Loans repurchased pursuant to Section 3.4(a).

"**Risk Assets**" means (i) all Loans purchased hereunder, excluding (a) New Loans and (b) Loans to the extent secured by Assumed Deposits (and not included in (i)(a)), plus (ii) the Accrued Interest Receivable, Prepaid Expense, and Other Assets.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

"**Settlement Date**" means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as

7

may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Settlement Interest Rate**" means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

"**Subsidiary**" has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

**2.1** **Liabilities Assumed by Assuming Bank.** Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

**2.2** **Interest on Deposit Liabilities.** The Assuming Bank agrees that it will assume all deposit contracts as of Bank Closing, and it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at the same rate(s) and on the same terms as agreed to by the Failed Bank as existed as of Bank Closing. If such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.

**2.3** **Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation an electronic schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the

8

Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

**2.4    Omitted.**

**2.5    Borrower Claims.** Notwithstanding anything to the contrary in this Agreement, any liability associated with borrower claims for payment of or liability to any borrower for monetary relief, or that provide for any other form of relief to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, legal or equitable, judicial or extra-judicial, secured or unsecured, whether asserted affirmatively or defensively, related in any way to any loan or commitment to lend made by the Failed Bank prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank.

## ARTICLE III
## PURCHASE OF ASSETS

**3.1    Assets Purchased by Assuming Bank.** Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing.  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.  The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a.  Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

**3.2    Asset Purchase Price.**

(a)    All Assets and assets of the Failed Bank subject to an option to purchase by the Assuming Bank shall be purchased for the amount, or the amount resulting from the method specified for determining the amount, as specified on Schedule 3.2, except as otherwise may be provided herein. Any Asset, asset of the Failed Bank subject to an option to purchase or other asset purchased for which no purchase price is specified on Schedule 3.2 or otherwise herein shall be purchased at its Book Value. Loans or other assets charged off the Accounting Records of the Failed Bank prior to the date of Bank Closing shall be purchased at a price of zero.

9

(b)     The purchase price for securities (other than the capital stock of any Acquired Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable), market price for each such security quoted at the close of the trading day effective on Bank Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is not available for any such security, the Assuming Bank will submit a bid  for each such security within three days of notification/bid request by the Receiver (unless a different time period is agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed to be an excluded asset hereunder.

(c)     Qualified Financial Contracts shall be purchased at market value determined in accordance with the terms of Exhibit 3.2(c). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank.

**3.3     Manner of Conveyance; Limited Warranty; Nonrecourse; Etc**. THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

**3.4     Puts of Assets to the Receiver**.

(a)     **Omitted**.

(b)     **Puts Prior to the Settlement Date**. During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset which the Assuming Bank can establish is evidenced by forged or stolen instruments as of Bank Closing. The Assuming Bank shall transfer all such Assets to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset, as provided in Section 12.4.

(c)     **Notices to the Receiver**. In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

(i)     a list of all Assets that the Assuming Bank requires the Receiver to purchase;

10

(ii)     a list of all Related Liabilities with respect to the Assets identified pursuant to (i) above; and

(iii)    a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

(d)    **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

(e)    **Purchase Price and Payment Date**. Each Loan purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

(f)    **Servicing**. The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

(g)    **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

**3.5**    **Assets Not Purchased by Assuming Bank**. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement the assets or Assets listed on the attached Schedule 3.5.

**3.6**    **Assets Essential to Receiver**.

11

(a)     The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:

> (i)    made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

> (ii)   the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

> (iii)  made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

> (iv)   secured by collateral which also secures any asset owned by the Receiver; or

> (v)    related to any asset of the Failed Bank not purchased by the Assuming Bank under this Article III or any liability of the Failed Bank not assumed by the Assuming Bank under Article II.

(b)     Each such Asset or asset purchased by the Receiver shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming Bank not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. The Assuming Bank agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Asset or asset is purchased by the Receiver. All transfers with respect to Asset or assets under this Section 3.6 shall be made as provided in Section 9.6. The Assuming Bank shall transfer all such Asset or assets and Related Liabilities to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset or asset, as provided in Section 12.4.

## ARTICLE IV

12

## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

**4.1**     **Continuation of Banking Business**. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

**4.2**     **Agreement with Respect to Debit and Credit Card Business**. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's debit and credit card business, and/or processing related to debit and credit cards, if any, and assumes all outstanding extensions of credit with respect thereto.

**4.3**     **Agreement with Respect to Safe Deposit Business**. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.4**     **Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

**4.5**     **Agreement with Respect to Trust Business**.

(a)     The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank

13

Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder.

(b)     The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)     In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

(d)     The Assuming Bank shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

### 4.6     Agreement with Respect to Bank Premises.

(a)     **Option to Lease.** The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, if any, which have been continuously occupied by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Bank agrees to assume all leases assigned (or enter into subleases in lieu thereof) pursuant to this Section 4.6.

(b)     **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(c)     **Occupancy.** The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided in Section 4.6(a). Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

14

(d)   **Occupancy Costs.**

(i)   The Assuming Bank agrees, during the period of any occupancy by it of leased Bank Premises, to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(ii)   The Assuming Bank agrees during the period of occupancy by it of leased Bank Premises to pay to the Receiver rent for the use of all leased Furniture and Equipment and all owned or leased Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property. If the Assuming Bank purchases any owned Fixtures in accordance with Section 4.6(f), the amount of any rents paid by the Assuming Bank with respect thereto shall be applied as an offset against the purchase price thereof.

(e)   **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises, or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (i) or (ii).

(f)   **Vacating Premises.** If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(a) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(a), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph, the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the

15

Receiver previously repudiated any such lease), and (y) be required to purchase all Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

    (g)    **Omitted.**

**4.7**    **Agreement with Respect to Leased Data Processing Equipment**

    (a)    The Receiver hereby grants to the Assuming Bank an exclusive option for the period of ninety (90) days commencing the day after Bank Closing to accept an assignment from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

    (b)    The Assuming Bank shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

    (c)    The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Bank; <u>provided</u>, <u>that</u> neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

    (d)    The Assuming Bank agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

    (e)    The Assuming Bank shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8**    **Agreement with Respect to Certain Existing Agreements**.

    With respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within one hundred twenty (120) days after Bank Closing, the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Bank agrees to comply with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to

16

the Failed Bank, the date which is thirty (30) days after the Assuming Bank has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Bank. The Assuming Bank shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Bank all right, title and interest of the Receiver, if any, in and to agreements the Assuming Bank assumes hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8 shall not apply to service agreements related to such premises. The Assuming Bank agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement.  This paragraph shall not apply with respect to deposit contracts which are expressly assumed by the Assuming Bank under Section 2.2 of this Agreement.

    **4.9**     **Informational Tax Reporting**. The Assuming Bank agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Bank, as may be required by the Receiver.

Under a private letter ruling (PLR) issued to the FDIC in January of 1988, the Internal Revenue Service will allow the Assuming Bank to report for the Failed Bank transactions under its own TIN for the entire year 2008; there is no need to dual-report for different payors in pre- v. post-closing date periods.

The Assuming Bank agrees to prepare on behalf of the Receiver all required Federal and State compliance and income/franchise tax returns for the Failed Bank and acquired subsidiary entities as of Bank Closing. The returns will be provided to the Receiver within the statutorily required filing timeframe.

    **4.10**     **Insurance**. The Assuming Bank agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to leased Bank Premises that it occupies, and all leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Bank as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

    **4.11**     **Office Space for Receiver and Corporation**. For the period commencing on the day following Bank Closing and ending on the one hundred eightieth (180th) day thereafter, the Assuming Bank agrees to provide to the Receiver and the Corporation, without charge, adequate

17

and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines) and utilities (including local telephone service and a dedicated broadband or T-1 internet service) at the Bank Premises occupied by the Assuming Bank for their use in the discharge of their respective functions with respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Bank.

     **4.12**   **Omitted.**

     **4.13**   **Omitted.**

**ARTICLE V**
**DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK**

     **5.1**   **Payment of Checks, Drafts and Orders.** Subject to Section 9.5, the Assuming Bank agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Assuming Bank, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Bank under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Bank under this Agreement.

     **5.2**   **Certain Agreements Related to Deposits.** Subject to Section 2.2, the Assuming Bank agrees to honor the terms and conditions of any written escrow or mortgage servicing agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Bank pursuant to this Agreement.

     **5.3**   **Notice to Depositors.**

     (a)   Within thirty (30) days after Bank Closing, the Assuming Bank shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Bank agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

     (b)   The Assuming Bank shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the

18

Assuming Bank by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

(c)     If the Assuming Bank proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Bank shall give notice by mail of such changed fees to such depositors.

**ARTICLE VI**
**RECORDS**

**6.1     Transfer of Records**.

(a)     In accordance with Section 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Bank under this Agreement, except as provided in Section 6.4:

(i)     signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

(ii)     passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

(iii)     records of deposit balances carried with other banks, bankers or trust companies;

(iv)     Loan and collateral records and Credit Files and other documents;

(v)     deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi)     signature cards, agreements and records pertaining to Safe Deposit Boxes, if any; and

(vii)     records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)     The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

19

     6.2    **Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

     6.3    **Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

     6.4    **Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Receiver or the Corporation, any Record in the form of microfilm or microfiche pertaining to Deposit account relationships; provided, that in the event that the Failed Bank maintained one or more duplicate copies of such microfilm or microfiche Records, the Assuming Bank hereby assigns, transfers, and conveys to the Corporation one such duplicate copy of each such Record without cost to the Corporation, and agrees to deliver to the Corporation all Records assigned and transferred to the Corporation under this Article VI as soon as practicable on or after the date of this Agreement. The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

## ARTICLE VII
## BID; INITIAL PAYMENT

The Assuming Bank has submitted to the Receiver a positive bid of $1,888,000,000.00 for the Assets purchased and Liabilities Assumed hereunder (the "Bid Amount"). On the Payment Date, the Assuming Bank will pay to the Corporation, or the Corporation will pay to the Assuming Bank, as the case may be, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at the Settlement Interest Rate.

## ARTICLE VIII
## PROFORMA

20

The Assuming Bank, as soon as practical after Bank Closing, in accordance with the best information then available, shall provide to the Receiver a Proforma Statement of Condition indicating all assets and liabilities of the Failed Bank as shown on the Failed Bank's books and records as of Bank Closing and reflecting which assets and liabilities are passing to the Assuming Bank and which assets and liabilities are to be retained by the Receiver. In addition, the Assuming Bank is to provide to the Receiver, in a standard data request as defined by the Receiver, an electronic database of all loans, deposits, and subsidiaries and other business combinations owned by the Failed Bank as of Bank Closing. See Schedule 3.1a.

## ARTICLE IX
## CONTINUING COOPERATION

**9.1**     **General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

**9.2**     **Additional Title Documents**. The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

**9.3**     **Claims and Suits**.

(a)     The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Receiver has indemnified the Assuming Bank in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

(b)     In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

**9.4**     **Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made. Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5**     **Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6**     **Proceedings with Respect to Certain Assets and Liabilities**.

(a)     In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)     In addition to its obligations under Section 6.4, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Subsidiaries acquired by the Assuming Bank, and (ii) its books and records, the books and records of such Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files

22

shall be provided by the Assuming Bank as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

(c)     Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section 3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) maintained by, owned by, or in the possession of the Assuming Bank or any Affiliate of the Assuming Bank relating to the transferred Loan.

**9.7**     **Information**. The Assuming Bank promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Bank to assist in preparation of the pro forma statement pursuant to Section 8.1.

## ARTICLE X
## CONDITION PRECEDENT

The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Bank, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Bank, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

## ARTICLE XI
## REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK

The Assuming Bank represents and warrants to the Corporation and the Receiver as follows:

(a)     **Corporate Existence and Authority**. The Assuming Bank (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate

action to authorize the execution, delivery and performance of this Agreement and the performance of the transactions contemplated hereby.

(b)     **Third Party Consents**. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with the execution, delivery or performance by the Assuming Bank of this Agreement, other than such consents as have been duly obtained and are in full force and effect.

(c)     **Execution and Enforceability**. This Agreement has been duly executed and delivered by the Assuming Bank and when this Agreement has been duly authorized, executed and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid and binding obligation of the Assuming Bank, enforceable in accordance with its terms.

(d)     **Compliance with Law**.

(i)     Neither the Assuming Bank nor any of its Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Assuming Bank or of any of its Subsidiaries, or the ownership of the properties of the Assuming Bank or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the ability of the Assuming Bank to perform, satisfy or observe any obligation or condition under this Agreement.

(ii)     Neither the execution and delivery nor the performance by the Assuming Bank of this Agreement will result in any violation by the Assuming Bank of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

e)     **Representations Remain True**.  The Assuming Bank represents and warrants that it has executed and delivered to the Corporation a Purchaser Eligibility Certification and Confidentiality Agreement and that all information provided and representations made by or on behalf of the Assuming Bank in connection with this Agreement and the transactions contemplated hereby, including, but not limited to, the Purchaser Eligibility Certification and Confidentiality Agreement (which are affirmed and ratified hereby) are and remain true and correct in all material respects and do not fail to state any fact required to make the information contained therein not misleading.

**ARTICLE XII**
**INDEMNIFICATION**

24

**12.1    Indemnification of Indemnitees**. From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee (1) based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank for which indemnification is provided hereunder in (a) of this Section 12.1 or (2) described in Section 12.1(a) below subject in each case to certain exclusions as provided in (b) of this Section 12.1:

(a)

(1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

(2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank or any Affiliate of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank or any Affiliate of the Failed Bank arising prior to Bank Closing;

(3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

(4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Bank to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Bank is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Bank elected not to assume in accordance with this Agreement and which neither the Assuming Bank nor any Subsidiary or Affiliate of the Assuming Bank has assumed subsequent to the execution hereof;

(7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

25

(8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

(9) claims asserted by, or derivatively by any shareholder on behalf of, the Failed Bank's parent company based on the process of bidding, negotiation, execution and consummation of the transactions contemplated by this Agreement, provided that (x) the amount of the indemnification paid or payable pursuant to this clause (9) shall not exceed $500,000,000, and (y) the indemnification provided by this clause (9) shall cover only those claims specifically enumerated in the FDIC's approval of the transactions contemplated by this Agreement.

(b)     provided, that, with respect to this Agreement, except for paragraphs (7), (8) and (9) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

(1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Bank in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which liability is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

26

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Bank;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection;

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Bank, other than pursuant to this Agreement; and

(15) claims based on, related to or arising from any liability specifically not assumed by the Assuming Bank pursuant to Section 2.5 of this Agreement.

**12.2    Conditions Precedent to Indemnification**. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such

27

Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

    (a)    give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

    (b)    provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

    (c)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

    (d)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

    (e)    not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

    (f)    not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

    (g)    take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

    **12.3**    **No Additional Warranty**. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Bank subsequent to the execution of this Agreement by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

28

**12.4   Indemnification of Receiver and Corporation**. From and after Bank Closing, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)   claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)   claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Bank with respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5   Obligations Supplemental**. The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6   Criminal Claims**. Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7   Limited Guaranty of the Corporation.** The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Bank as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Bank shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or

29

agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

   **12.8   Subrogation.** Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

**ARTICLE XIII**
**MISCELLANEOUS**

   **13.1   Entire Agreement.** This Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

   **13.2   Headings.** The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

   **13.3   Counterparts.** This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

   **13.4   GOVERNING LAW.** THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

   **13.5   Successors.** All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Bank. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

30

13.6   **Modification; Assignment**. No amendment or other modification, rescission, release, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

13.7   **Notice**. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given in writing, and delivered in person against receipt therefore, or sent by certified mail, postage prepaid, courier service, telex or facsimile transmission to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee.

**Assuming Bank**

JPMorgan Chase Bank, National Association
270 Park Avenue
New York, New York 10017

Attention: Brian A. Bessey

with a copy to: Stephen M. Cutler

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201

Attention: Deputy Director (DRR-Field Operations Branch)

with copy to: Regional Counsel (Litigation Branch)

**and with respect to notice under Article XII:**

Federal Deposit Insurance Corporation
Receiver of Washington Mutual Bank, Henderson, Nevada
1601 Bryan St., Suite 1700
Dallas, Texas 75201
Attention: Regional Counsel (Litigation Branch)

13.8   **Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; provided, that in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

31

**13.9   Costs, Fees and Expenses**. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; provided, that the Assuming Bank shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

**13.10   Waiver**. Each of the Receiver, the Corporation and the Assuming Bank may waive its respective rights, powers or privileges under this Agreement; provided, that such waiver shall be in writing; and further provided, that no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

**13.11   Severability**. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

**13.12   Term of Agreement**. This Agreement shall continue in full force and effect until the sixth (6th) anniversary of Bank Closing; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement. Provided, however, the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement; in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

**13.13   Survival of Covenants, Etc**. The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

32

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF: WASHINGTON MUTUAL BANK,
HENDERSON, NEVADA

BY:_____

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

_____

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: _____

NAME: Mitchell L. Glassman
TITLE: Director

Attest:

_____

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

BY:_____

NAME: Brian A. Bessey
TITLE: Senior Vice President

Attest:

33

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF:  WASHINGTON MUTUAL BANK, HENDERSON, NEVADA**

BY: *Mitchell L. Glassman*

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

*David Gearn*

**FEDERAL DEPOSIT INSURANCE CORPORATION**

BY: *Mitchell L. Glassman*

NAME:  Mitchell L. Glassman
TITLE:  Director

Attest:

*David Gearn*

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**

BY:_____

NAME:  Brian A. Bessey
TITLE:  Senior Vice President

Attest:

_____

33

**SCHEDULE 2.1 - Certain Liabilities Not Assumed**

1.  Preferred stock and litigation pending against the Failed Bank related to liabilities retained by the receiver.

2.  Subordinated debt.

3.  Senior debt.

4.  All employee benefit plans sponsored by the holding company of the Failed Bank except the tax-qualified pension and 401(k) plans and employee medical plan.

5.  All management, employment, change-in-control, severance, unfunded deferred compensation and individual consulting agreements or plans (i) between the Failed Bank and its employees or (ii) maintained by the Failed Bank on behalf of its employees.

34

## SCHEDULE 3.2 - Purchase Price of Assets

| | | | |
|---|---|---|---|
| (a) | cash and receivables from depository institutions, including cash items in the process of collection, plus interest thereon: | | Book Value |
| (b) | securities (exclusive of the capital stock of Acquired Subsidiaries), plus interest thereon: | | Market Value |
| (c) | federal funds sold and repurchase agreements, if any, including interest thereon: | | Book Value |
| (d) | Loans: | | Book Value |
| (e) | Other Real Estate: | | Book Value |
| (f) | credit card business, if any, including all outstanding extensions of credit: | | Book Value |
| (g) | Safe Deposit Boxes and related business, safekeeping business and trust business, if any: | | Book Value |
| (h) | Records and other documents: | | Book Value |
| (i) | capital stock of any Acquired Subsidiaries: | | Book Value |
| (j) | amounts owed to the Failed Bank by any Acquired Subsidiary: | | Book Value |
| (k) | assets securing Deposits of public money, to the extent not otherwise purchased hereunder: | | Book Value |
| (l) | Overdrafts of customers: | | Book Value |

35

| | | | |
|---|---|---|---|
| (m) | rights, if any, with respect to Qualified Financial Contracts. | | Market Value |
| (n) | rights of the Failed Bank to provide mortgage servicing for others and to have mortgage servicing provided to the Failed Bank by others and related contracts. | | Book Value |
| (o) | Bank Premises: | | Book Value |
| (p) | Furniture and Equipment: | | Book Value |
| (q) | Fixtures: | | Book Value |

36

## SCHEDULE 3.5 - Certain Assets Not Purchased

(1)     Any Financial Institution Bonds, Banker's Blanket Bonds, surety bonds (except Court bonds required for retained litigation risk), Directors and Officers insurance, Professional Liability insurance, or related premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing. This shall exclude Commercial General Liability, International Liability, Commercial Automobile, Worker's Compensation, Employer's Liability, Umbrella and Excess Liability, Property, Mortgage Impairment and Mortgage Errors & Omissions, Lender-placed coverage, Private Mortgage Insurance, Boiler & Machinery, Terrorism, Mail, Storage Tank Liability, Marine Liability, Vessel Hull and Vessel Pollution (if marine assets are acquired), Aircraft Liability (if aircraft assets are acquired) insurance policies, proceeds and collateral related to, held or issued with respect to or in connection with any Asset (including Bank staff) acquired by the Assuming Bank under this Agreement, which such policies, proceeds and collateral are acquired Assets.

(2)     any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(3)     leased Bank Premises and leased Furniture and Equipment and Fixtures and data processing equipment (including hardware and software) located on leased or owned Bank Premises, if any; provided, that the Assuming Bank does obtain an option under Section 4.6, Section 4.7 or Section 4.8, as the case may be, with respect thereto; and

(4)     any criminal/restitution orders issued in favor of the Failed Bank;

37

## EXHIBIT 3.2(c) – VALUATION OF CERTAIN
## QUALIFIED FINANCIAL CONTRACTS

**A.**   **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

**B.**   **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

**C.**   **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

**D.**   **Methodology**

1.     The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.     In valuing all other Qualified Financial Contracts, the following principles will apply:

(i)     All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

(ii)    All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

(iii)   Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

38

(iv)    For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

(v)    For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

Execution Copy
Whole Bank P&A

Washington Mutual Bank
Henderson, Nevada

# Exhibit

# R

10-K 1 a2153144z10-k.htm 10-K

QuickLinks -- Click here to rapidly navigate through this document

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004**

### Commission File Number 1-14667

# WASHINGTON MUTUAL, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Washington** | **91-1653725** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1201 Third Avenue, Seattle, Washington** | **98101** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(206) 461-2000**

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Common Stock | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

| **Title of each class** | **Name of each exchange on which registered** |
|---|---|
| Litigation Tracking Warrants™ | NASDAQ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ý No o.

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o.

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ý No o..

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2004:

### Common Stock – $33,368,030,966[(1)]

[(1)] Does not include any value attributable to 6,000,000 shares held in escrow.

The number of shares outstanding of the issuer's classes of common stock as of February 28, 2005:

**Common Stock – 879,248,564**[2]

[2] Includes 6,000,000 shares held in escrow.

**Documents Incorporated by Reference**

Portions of the definitive proxy statement for the Annual Meeting of Shareholders to be held April 19, 2005, are incorporated by reference into Part III.

# WASHINGTON MUTUAL, INC.
## 2004 ANNUAL REPORT ON FORM 10-K
### TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| **PART I** |  |  | 1 |
| Item 1. | Business |  | 1 |
|  |  | Overview | 1 |
|  |  | Available Information | 2 |
|  |  | Employees | 2 |
|  |  | Factors That May Affect Future Results | 2 |
|  |  | Environmental Regulation | 5 |
|  |  | Regulation and Supervision | 6 |
|  |  | Executive Officers | 10 |
| Item 2. | Properties |  | 12 |
| Item 3. | Legal Proceedings |  | 12 |
| Item 4. | Submission of Matters to a Vote of Security Holders |  | 13 |
| **PART II** |  |  | 13 |
| Item 5. | Market for our Common Stock, Related Stockholder Matters and Issuer Purchases of Equity Securities |  | 13 |
| Item 6. | Selected Financial Data |  | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 14 |
|  |  | Controls and Procedures | 14 |
|  |  | Overview | 14 |
|  |  | Critical Accounting Policies | 17 |
|  |  | Recently Issued Accounting Standards | 18 |
|  |  | Five-Year Summary of Selected Financial Data | 20 |
|  |  | Ratios and Other Supplemental Data | 21 |
|  |  | Earnings Performance from Continuing Operations | 22 |
|  |  | Review of Financial Condition | 32 |
|  |  | Operating Segments | 35 |
|  |  | Risk Management | 42 |
|  |  | Credit Risk Management | 42 |
|  |  | Liquidity Risk Management | 50 |
|  |  | Off-Balance Sheet Activities and Contractual Obligations | 52 |
|  |  | Capital Adequacy | 54 |
|  |  | Market Risk Management | 54 |
|  |  | Maturity and Repricing Information | 59 |
|  |  | Operational Risk Management | 65 |
|  |  | Tax Contingency | 65 |
|  |  | Goodwill Litigation | 65 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk |  | 54 |
| Item 8. | Financial Statements and Supplementary Data |  | 68 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure |  | 68 |
| Item 9A. | Controls and Procedures |  | 14 |
| Item 9B. | Other Information |  | 68 |
| **PART III** |  |  | 69 |
| Item 10. | Directors and Executive Officers of the Registrant |  | 69 |
| Item 11. | Executive Compensation |  | 69 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management |  | 69 |
| Item 13. | Certain Relationships and Related Transactions |  | 69 |
| Item 14. | Principal Accounting Fees and Services |  | 69 |
| **PART IV** |  |  | 70 |
| Item 15. | Exhibits, Financial Statement Schedules |  | 70 |

i

## PART I

### BUSINESS

### Overview

With a history dating back to 1889, Washington Mutual, Inc. (together with its subsidiaries, "Washington Mutual," or the "Company") is a retailer of financial services to consumers and small businesses. Based on our consolidated assets at December 31, 2004 we were the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies.

Our earnings are primarily driven by real estate secured lending and deposit taking activities which generate net interest income and by activities that generate noninterest income, including the sale and servicing of loans and providing fee-based services to our customers. Real estate secured loans and mortgage-backed securities generate more than 90% of interest income and this concentration is likely to continue as a result of our decision to exit certain non-core businesses, such as lending to mid- and large-sized companies.

We strive to be the nation's leading retailer of financial services for consumers and small businesses. We plan to achieve this by building strong, profitable relationships with a broad spectrum of consumers and businesses. Expanding our retail banking franchise and achieving efficiencies in our operations will be critical to future success.

Following the acquisition of the three largest California-based thrift institutions in the latter part of the 1990s, we continued to expand nationally by acquiring companies with strong retail banking franchises in Texas and the greater New York metropolitan area. During this period, we developed and launched our award-winning and innovative retail banking stores that serve customers in an open, free-flowing retail environment. With the goal of combining our strengths as a deposit taker and portfolio lender with those of a mortgage banker, we also expanded our presence in the home loan origination and servicing businesses through acquisition. These mortgage banking acquisitions also served to further broaden our national footprint.

Having created a viable branch presence in many of the largest metropolitan areas over the past decade, our current retail banking store expansion strategy is focused primarily on middle market consumers in those states where we have both a home loan and retail banking presence. As compared to our branching strategy over the last decade, this focus on our existing markets carries lower execution risk because it enables us to leverage both existing infrastructure and brand awareness and is concentrated in markets with characteristics of both above average household growth and below average branch density. For more detail on the products and services offered by our Retail Banking and Financial Services Group, refer to Management's Discussion and Analysis – "Operating Segments."

In the mortgage banking business, we are building scalable and repeatable processes that will enable us to enhance customer service and offer products at prices that are both competitive and profitable. The ending of the refinance boom in the latter part of 2003 and the ensuing decline in home loan volume resulted in an unacceptably high mortgage banking fixed cost structure. This was largely the result of not having integrated the loan fulfillment operations and the technologies of acquired companies. Our goal is to make this business more competitive by improving productivity and enhancing customer service. For more detail on the products and services offered by our Mortgage Banking Group, refer to Management's Discussion and Analysis – "Operating Segments."

Multi-family lending complements the Company's expertise in residential real estate secured lending. As a result of productivity improvements completed in this business in 2004, we are well-positioned to execute on our strategy of increasing market share in our top 15 targeted metropolitan markets. These markets have stable demand, a large disparity between the cost of renting and the cost of home ownership, and households that typically rent for an extended period of time. Our target markets also have supply

1

constraints such as geographic barriers, rent control and zoning restrictions. For more detail on the products and services offered by our Commercial Group, of which multi-family lending is the most significant part, refer to Management's Discussion and Analysis – "Operating Segments."

### Available Information

We make our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and all amendments to such reports filed pursuant to Section 13(a) or 15(d) of the Exchange Act, available free of charge on or through our website located at www.wamu.com/ir as soon as reasonably practicable after filing with the United States Securities and Exchange Commission.

The Company's Code of Conduct, which applies to all officers, directors and employees of the Company, and the Code of Ethics for Senior Financial Officers, which applies to the Company's Chief Executive Officer, Chief Financial Officer, Controller, and each business segment or business line chief financial officer and controller, as well as any waiver of our Code of Conduct or Code of Ethics for Senior Financial Officers, are disclosed on our website located at www.wamu.com/ir.

### Employees

At December 31, 2004, we had 52,579 employees, compared with 63,720 at December 31, 2003 and 55,200 at December 31, 2002, which included zero, 2,346 and 2,330 employees related to the Company's discontinued operations. During 2004, our number of employees decreased primarily due to the Company's cost containment initiative directed at reducing the fixed cost structure of the mortgage banking business through reduced employee headcount. During 2003, our number of employees increased substantially to accommodate the high refinancing activity in the earlier part of the year and the opening of new retail banking stores. We believe that we have been successful in attracting quality employees and that our employee relations are good.

### Factors That May Affect Future Results

Our Form 10-K and other documents that we file with the Securities and Exchange Commission have forward-looking statements. In addition, our senior management may make forward-looking statements orally to analysts, investors, the media and others. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words such as "expects," "anticipates," "intends," "plans," "believes," "seeks," "estimates," or words of similar meaning, or future or conditional verbs such as "will," "would," "should," "could" or "may."

Forward-looking statements provide our expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. We do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond our control, which could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements.

Some of these factors are described below.

*Volatile interest rates impact our mortgage banking business and could adversely affect our earnings.*

Changes in interest rates affect the mortgage banking business in complex and significant ways. Changes in interest rates can affect loan origination fees, gain from mortgage loans and loan servicing fees, which are the principal components of home loan mortgage banking income. When mortgage rates decline, we would generally expect loan volumes to increase as borrowers refinance, which leads to accelerated payoffs of mortgage loans in our servicing portfolio, which reduces the fair value of our mortgage servicing rights ("MSR"), and to increased loan origination fees and gain from mortgage loans, as our mix of originated mortgage loans generally shifts to saleable fixed-rate products. When mortgage rates rise, we

2

_____

would generally expect loan volumes to decrease, which generally leads to reduced payoffs in our servicing portfolio, which increases the fair value of our MSR, and to reduced loan origination fees and gain from mortgage loans, as our mix or originated mortgage loans generally shifts to adjustable-rate products we hold in portfolio.

To mitigate changes in fair value of our MSR, we purchase and sell financial instruments, such as mortgage-backed securities and fixed-rate investment securities; enter into interest rate contracts and forward commitments to purchase or sell mortgage-backed securities, which tend to increase in value when mortgage rates decline and decrease in value when mortgage rates rise; and we adjust the mix and amount of such financial instruments or contracts to take into account the effects of different interest rate environments. Our management must exercise judgment in selecting the amount, type and mix of financial instruments and contracts to mitigate changes in fair value of our MSR. We cannot assure that the amount, type and mix of financial instruments and contracts we select will offset significant decreases in the value of the MSR and the Company's earnings could be adversely affected. Moreover, some of the risk management instruments we use may experience periods of illiquidity in the secondary markets, in which case our ability to effectively mitigate changes in the fair value of the MSR could be adversely affected.

Historically, the Company has held adjustable-rate mortgage ("ARM") loans in its portfolio; however, the industry-wide increase in the origination volume of adjustable-rate mortgages has facilitated the development of a secondary market for these products and has allowed us to sell a significant portion of our signature adjustable-rate mortgage, the Option ARM, into this market. The Company believes that secondary market prices offered for its Option ARM product may result in stronger *gain from mortgage* loans than its conforming fixed and hybrid products; therefore, a downturn in customer demand for this product or a prolonged period of secondary market illiquidity could have an adverse effect on the Company's earnings.

For further discussion of how interest rate risk, basis risk and prepayment risk are managed, refer to Management's Discussion and Analysis – "Market Risk Management."

*Rising unemployment or a decrease in housing prices could adversely affect our credit performance.*

The Company's credit performance has been strong, reflecting a generally favorable economic environment for real estate lending. The Company continually monitors changes in the economy, particularly unemployment rates and housing prices. If unemployment were to rise and either a slowdown in housing price appreciation or outright declines in housing prices were to occur, borrowers may be unable to repay their loans. As a result, the Company could experience higher credit losses in its mortgage loan portfolios, which could adversely affect our earnings.

*A continuing emphasis on subprime lending could negatively impact our business.*

The Company began accelerating purchases of subprime loans in 2003, increased its specialty mortgage finance portfolio significantly in 2004 and intends to continue to grow this portfolio in the future. The specialty mortgage finance portfolio has generally performed well as a result of a strong mortgage market, housing price appreciation and the Company's disciplined approach in re-underwriting these assets. However, if there were a downturn in the national economy or local economies where we do business, the credit performance of this portfolio could suffer, with a potential adverse effect on our earnings.

*The potential for negative amortization in the Option ARM product could have an adverse effect on the Company's credit.*

The Option ARM loan is a unique adjustable-rate mortgage that can provide the borrower with up to four payment options each month and an introductory rate of interest ("start rate") that is usually much lower than the loan's fully-indexed interest rate and will last from one month to five years, depending on the type of Option ARM selected by the borrower. The minimum monthly payment is a fully amortizing

3